IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE AT MEMPHIS

JANE DOE,

    Plaintiff,

v.                                                                        Docket No. _____

RHODES COLLEGE, and                                JURY DEMAND
ROBERTO DE LA SALUD BEA

    Defendants.

**COMPLAINT FOR VIOLATION OF TITLE VII and TITLE IX OF THE CIVIL RIGHTS ACT OF 1964, BREACH OF CONTRACT, DEFAMATION OF CHARACTER, TEMPORARY RESTRAINING ORDER, PERMANENT INJUNCTIVE RELIEF AND MONEY DAMAGES**

TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSE AT MEMPHIS:

    COMES NOW Jane Doe (hereinafter "Plaintiff") and for her causes of action against Rhodes College (hereinafter "Rhodes") and Roberto De La Salud Bea (hereinafter "Dr. Bea") (collectively "Defendants") respectfully states as follows:

    1.    Plaintiff is an adult, presently residing in DeKalb County, Georgia.

    2.    Plaintiff seeks leave to proceed under a pseudonym due to fear of personal embarrassment, her youth, and harm arising from prejudice in obtaining admission to graduate programs arising from bringing suit against her former academic institution.

    3.    Rhodes is a Tennessee Public Benefit Corporation with its principal office at 2000 North Parkway, Memphis, Tennessee 38112.

    4.    Roberto de la Salud Bea is an adult resident of Shelby County, Tennessee presently residing at 57 North Somerville Street, Apartment 508, Memphis, Tennessee 38104.

    5.    This Court has subject matter jurisdiction over the necessary particulars of this case. The diversity of citizenship requirement is met because the Plaintiff is not a resident of the

same state as any Defendant.  The amount in controversy exceeds $75,000 as required under 28 U.S.C. § 1332(b).  This is a civil action, in which it is facially apparent that the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs as Plaintiff facially alleged facts that would support a contention for damages exceeding $75,000.00. Therefore, the United States District Court would have had original subject matter jurisdiction under 28 U.S.C. § 1332.  Additionally, this Complaint meets the subject matter jurisdiction requirements under federal question jurisdiction, 28 U.S.C. § 1331, as it arises from Title IX of the Civil Rights Act of 1964, 20 U.S.C. §§ 1681–1688.

6. This Court has subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, supplemental jurisdiction.

7. Venue is proper in the Federal Court for the Western District of Tennessee at Memphis, as all or a substantial part of the actions giving rise to this suit occurred in Shelby County, Tennessee.

## I. Factual Allegations

8. Plaintiff re-alleges and incorporates herein, as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges as follows.

9. Plaintiff was a junior neuroscience and history major at Rhodes in the fall of 2015.  She excelled academically, being accepted for early admission to George Washington School of Medicine and Health Sciences, and having qualified for a third round interview for the Truman Foundation scholarship.  Plaintiff balanced academics with athletics, by playing on the varsity tennis team.

10. In the fall 2015, Plaintiff was enrolled in Dr. Bea's Chemistry 212 "Organic Chemistry II" course.  Plaintiff was previously a student in Dr. Bea's Chemistry 211 "Organic Chemistry I" course in Spring 2015.

In summer 2015, Plaintiff was completing an internship in Memphis and living on Rhodes campus.  One afternoon in July 2015, Dr. Bea encountered Plaintiff in a parking lot on campus. They chatted about her summer internship, and he began to ask her numerous personal questions including where she was staying on campus, how she was spending her evenings, whether she had friends staying with her during the summer, and how her relationship was with her boyfriend was.

Throughout the conversation, he maintained a tone of excitement towards seeing Plaintiff and emphasized that he missed her. With each question, Dr. Bea took a few steps closer to Plaintiff, and when he got really close, she had to take a few steps back to create space between them.

11. Dr. Bea then invited Plaintiff to dinner with him. Plaintiff declined his invitation, and the conversation ended.

12. When Plaintiff tried to leave and enter her car, Dr. Bea extended his arm towards Plaintiff to stop her, but she moved back to stop him from touching her. Dr. Bea's personal questions, and close proximity made Plaintiff very uncomfortable.

She and Dr. Bea had a professional relationship and they never discussed her personal life. It appeared to Plaintiff that the motivation behind Dr. Bea's questions was to ascertain whether or not she was available in a personal context, which was confirmed when his questions concluded with his dinner invitation.

13. Plaintiff had never discussed her personal life with Dr. Bea, and she was surprised that he knew that she had a boyfriend. Plaintiff was so uncomfortable after this encounter that she called her mother to tell her about the conversation. Plaintiff expressed to her mother Plaintiff's discomfort arising from the stream of personal questions. Plaintiff's mother advised Plaintiff to let the encounter go and keep all meetings with Bea at a professional level because Plaintiff had another class with Bea scheduled for the next semester.

14. Plaintiff took a lab course in conjunction with her Organic Chemistry II course. Professor Kimberly Brien taught the lab course. Bea was not the instructor of the course nor had any reason to be physically present in the laboratory.

15. As corroborated by Professor Brien and Plaintiff's lab partner, Dr. Bea showed up in Plaintiff's lab course every week. Dr. Bea paid attention exclusively to Plaintiff. He corrected the lab mistakes she made and spoke with her, distracting her from her work. Dr. Bea showed up and behaved in this manner each week in Plaintiff's lab course though he had no professional reason to be present there.

16. Around the third week of November 2015, Dr. Bea again engaged in inappropriate conduct towards Plaintiff. Plaintiff was sitting with a classmate in the Catherine Burrow Refectory texting on her cell phone. Dr. Bea approached Plaintiff from behind, leaned over her shoulder, and abruptly asked her, "Is that your boyfriend?" before leaving the

Refectory. Dr. Bea's odd behavior shocked Plaintiff and the student with whom she was sitting who witnessed the entire encounter.

17. Feeling uncomfortable with Dr. Bea's invasive behavior, and upon encouragement by her roommate and her friend who witnessed the encounter, Plaintiff resolved to confront Dr. Bea. While Rhodes College's sexual misconduct policy advises students of their right to make formal complaints, Plaintiff considered her professional relationship with Dr. Bea to be worth preserving and believed that taking "individual action" was appropriate under these circumstances. "Individual action," or, in essence, politely and directly confronting a harasser is outlined in Rhodes' sexual misconduct policy as an appropriate course of action in situations of this sort.

18. In taking "individual action" Plaintiff's friend who witnessed the encounter accompanied Plaintiff to confront Dr. Bea. On November 19, 2015, Plaintiff encountered him in front of Kennedy, the chemistry building. Plaintiff told Dr. Bea that his questions about her personal life and continual inquiries about her boyfriend made her very uncomfortable. Plaintiff asked Dr. Bea to maintain a strictly professional relationship with her. Dr. Bea then stormed away angrily, as witnessed by another student.

19. Immediately after Plaintiff confronted Dr. Bea, Dr. Bea stopped communicating with Plaintiff, even during class or when Plaintiff asked direct, class-related questions. Dr. Bea became hostile towards her. On November 23, 2015, Plaintiff attempted one final time to communicate with Dr. Bea about the subject in an attempt to maintain their professional and academic relationship. Dr. Bea refused to even acknowledge her.

20. On information and belief, Dr. Bea then initiated a written complaint of academic misconduct, falsely accusing Plaintiff of having cheated on numerous exams and quizzes and of having altered her grades in his grade roster. *It is critical to note that Dr. Bea's allegations of cheating occurred a mere eight days after Plaintiff's last confrontation with Dr. Bea.*

21. As a result of Dr. Bea's allegations, Rhodes convened an Honor Council hearing. This Honor Council hearing was conducted exclusively by students. A panel of twelve students, led by the Honor Council President, a senior at Rhodes, conducted the entirety of the hearing with little to no faculty or administrative oversight.

22. Plaintiff was not advised of the specific nature of the allegations against her nor given any information from which she would have been able to deduce that the conduct in

question was retaliatory in nature. In fact, it was not until the hearing itself, at which Plaintiff was not permitted counsel, that she realized that Dr. Bea was engaging in retaliatory conduct. Specifically, Plaintiff realized that Dr. Bea's statements were not merely erroneous, but patently false, that Dr. Bea had fabricated evidence against her, and that Dr. Bea misrepresented the facts surrounding the conduct of her quizzes and examinations.

23. Dr. Bea claimed that Plaintiff had been to all appearances an outstanding pupil but that he had become suspicious that Plaintiff was cheating when she scored a grade of forty-seven (47) on an exam. Dr. Bea contended that he would not have forgotten such a low grade, which was the second-lowest in his class. Plaintiff has obtained the actual exam in question, on which she actually scored a grade of seventy-four (74), Dr. Bea having evidently modified the grade sheet to reflect the far lower grade that he claims aroused his suspicions. Dr. Bea then described how he became suspicious that Plaintiff was accessing his computer to locate answer keys before taking quizzes and exams. He never confronted or claimed to have confronted Plaintiff about this, and, even more bizarrely, apparently did not take steps to secure his computer. Instead, Dr. Bea claimed that he contrived a clever trap for Plaintiff by crafting a "fake" answer key for a quiz and leaving it on his computer desktop where she could find it if she accessed his computer. Dr. Bea never explained why he would leave his computer unsecure in this fashion or why he did not confront Plaintiff directly about his concerns.

24. Dr. Bea provided forged documents to the Honor Council, including a copy of the "fake" answer key. Plaintiff contends that this document was manufactured after the fact to reflect the mistakes on her actual answer key. Dr. Bea further introduced a two forged grade rosters, which he accused Plaintiff of modifying. The alleged modifications would have made no sense in light of the fact that Plaintiff's actual exams and quizzes reflect far superior grades to those that Bea included on his forged grade roster.

25. Dr. Bea went on to describe to the Honor Council how he was able to compare the "fake" answer key to Plaintiff's actual answer key and determine that Plaintiff had copied it. In essence, all of Dr. Bea's allegations of academic misconduct against Plaintiff rest on the credibility of his statements about this preposterous and deceptive course of conduct.

26. Plaintiff was not apprised of the nature of these allegations until the Honor Council hearing. Instead, Plaintiff was only advised that she was accused of cheating during the fall 2015 semester.

27.     Accordingly, Plaintiff was not in a position to formulate a defense that Dr. Bea's conduct was retaliatory or initiate a Title IX complaint process until after the hearing. Plaintiff was not able to present witnesses to this effect. Additionally, Plaintiff contends that an academic misconduct hearing before a panel of students is inherently ill-equipped to address the types of retaliatory conduct addressed here.

28.     During said hearing, Plaintiff was forced to sit one seat away from Dr. Bea. When, in desperation, she attempted to elicit testimony from Dr. Bea related to Dr. Bea's above-described conduct, Dr. Bea, in a threatening and raised voice, said, "Be careful what you say!" Dr. Bea went on to ask badgering and berating questions blatantly crafted to silence Plaintiff, who was never given the opportunity to adequately allege that Dr. Bea had made advances towards her, that she had rejected those advances and that Dr. Bea's reports of academic misconduct occurred in the immediate aftermath of that rejection.

29.     Following this hearing, Plaintiff received a letter that stated that the allegations of academic misconduct had been sustained and that she had been expelled. No rationale or explanation was provided.

30.     Plaintiff appealed the outcome of the proceeding to the Faculty Appeals Council.

31.     The Faculty Appeals Council ("FAC") consisted entirely of faculty members, but the power of the FAC is limited to identifying errors in the proceedings or identifying newly obtained evidence and making recommendations to the Honor Council regarding a modification of the original outcome and sanction. The FAC identified that certain evidence was previously unavailable but refused to consider the allegations against Dr. Bea, apparently finding that said conduct was not "new evidence" and that it could have been presented in the initial hearing, notwithstanding the fact that Plaintiff was never placed on reasonable notice of the specific allegations against her.

32.     The Honor Council convened for a closed-door session and reaffirmed their previous finding and sanction, again without explanation of their rationale.

33.     Plaintiff contemporaneously initiated a Title IX complaint through Rhodes' Title IX coordinator. Rhodes considered the Title IX investigation and academic misconduct matter to be entirely separate issues and allowed the academic misconduct matter to proceed to conclusion before even initiating any meaningful investigation of the allegations of retaliatory conduct.

34. The investigation was conducted by Whitney Harmon, an attorney hired for the purpose of conducting such investigations.

35. During this investigation, conducted in February of 2016, Dr. Bea again, on information and belief, falsely accused Plaintiff of academic misconduct.

36. After interviewing Dr. Bea, Whitney Harmon interviewed Plaintiff. Prior to consenting to the interview, Plaintiff, through her counsel, reached an understanding with Whitney Harmon that she was not acting as counsel to Rhodes but as an independent investigator, that her report would not be subject to the attorney-client privilege or work-product doctrines and that Plaintiff would receive a copy of said report. After assuring Plaintiff, though her counsel, of these conditions, Plaintiff agreed to be interviewed in Rhodes internal Title IX investigation in hopes that Rhodes would rectify the issue without need for the bringing of this suit.

37. Ms. Harmon, in conducting the internal Title IX investigation, stated in correspondence to Counsel for Plaintiff on February 23, 2016 that: "My role is exclusively related to the sexual harassment allegations, and not the Honor Council proceeding or the allegations that led to the proceeding," apparently having never been apprised by Rhodes that the allegation that Dr. Bea's conduct violated Title IX related directly to these retaliatory statements by Dr. Bea that led to Plaintiff's expulsion.

38. Instead of being provided with a copy of Ms. Harmon's report, on April 6, 2016, Rhodes sent Plaintiff a letter summarily advising her that her allegations of Title IX violations were not sustained and that the investigation was closed. Plaintiff was not provided a report or any rationale for this decision.

39. Plaintiff, having exhausted all of her internal remedies, now brings suit against Rhodes College and Roberto de la Salud Bea for the following causes of action:

**Causes of Action Against Defendant Rhodes College**

**II. Count 1: Sexual Harassment and Retaliatory Expulsion on the Basis of Gender in Violation of 20 U.S.C. § 1681 (Title IX)**

40. Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges.

41. The acts, and failures to act, perpetrated against Plaintiff amounted to unlawful sexual harassment and discrimination on the basis of gender. One or more administrators or officials of Rhodes, with authority to take corrective action on Plaintiff's behalf, had actual notice of said discrimination and failed to adequately respond, in violation of their own policies. Those failures amounted to deliberate indifference toward the unlawful conduct that occurred, was occurring, or was likely to occur.

42. Additionally, and/or in the alternative, Rhodes failed to enact and/or disseminate and/or implement proper or adequate policies to discover, prohibit or remedy the kind of discrimination that Plaintiff suffered. This failure included, without limitation, non-existent or inadequate customs, policies, or procedures for the recognition, reporting, investigation, and correction of unlawful discrimination. Those failures amounted to deliberate indifference toward the unlawful conduct that had occurred, was occurring, or was likely to occur.

43. Rhodes acted with deliberate indifference in deviating significantly from the standards outlined in the Rhodes College Student Handbook, the Constitution and policies of the Rhodes College Honor Council, its own Title IX policies and procedures and its own employment policies and procedures.

44. As a result of Rhodes' deliberate indifference, Plaintiff suffered loss of educational opportunities at Rhodes, loss of educational opportunities at medical school, retaliatory expulsion for confronting Dr. Bea for sexual harassment, and/or benefits and has and will continue to incur attorney fees and costs of litigation.

### III. Count 2: Retaliatory Discharge from Employment in Violation of Title VII of the Civil Rights Act of 1964

45. Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges as follows.

46. Rhodes employed Plaintiff as a teacher's assistant in the chemistry lab.

47. On information and belief, Plaintiff was terminated from her job at Rhodes in retaliation for bringing a claim of sexual harassment against Dr. Bea, which is highly discriminatory and a gross violation of Title VII.

48. Dr. Bea threatened Plaintiff when she tried to address his sexual harassment during the Honor Council hearing and told Plaintiff that he did not want to jeopardize his tenure, so she never had a real opportunity to present the sexual harassment charge.

49. Due to Plaintiff's expulsion from Rhodes, Plaintiff was also terminated from her employment position, resulting in loss of income and opportunity.

## IV. Count 3: Breach of Contract as to the Honor Council Hearing Procedures

50. Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges as follows.

51. Rhodes' Acceptance Letter, Honor Code and Student Handbook form a contract between Rhodes and Plaintiff, setting forth reciprocal responsibilities of both Rhodes and the students to each other.

52. Rhodes is the drafter of the terms of the contract, and the contract, where ambiguous, must therefore be construed against Rhodes.

53. Rhodes Students are required to sign the Rhodes Honor Code and pledge to abide by its terms during their tenure at Rhodes. The Rhodes Honor Council adjudicated alleged Honor Code infractions operating under the Constitution of the Honor Council of Rhodes College (hereinafter "Honor Council Constitution"). While Plaintiff was expelled from Rhodes for an alleged infraction of the Honor Code, Rhodes failed to adhere to the very Honor Council Constitution upon which it relied to justify Plaintiff's expulsion. Rhodes breached its own Honor Council Constitution and contract in the following ways:

    A. **Article IV, Section (3)(A)(2):** "The Council must act with complete impartiality. Any Council member who believes that his or her participation in any aspect of the investigation or hearing process constitutes a conflict of interest must report the potential conflict of interest to the Honor Council President, who shall decide whether that member should recuse himself or herself."

    Rhodes breached this provision because one of the Honor Council members, Mr. Zain Virk, should have recused himself from the hearing because he was Dr. Bea's research assistant. He presented a conflict of interest and biased the Honor Council against Plaintiff.

B. **Article IV, Section (2)(F):** "All participants in the hearing process should keep the matter under consideration confidential."

   Rhodes breached this provision because Dr. Bea admitted that he spoke to other Chemistry professors about his allegations that Plaintiff was cheating and stealing.

C. **Article IV, Section (3)(A)(4):** "Disruptive behavior on the part of anyone present shall result in immediate and permanent removal from the hearing."

   Rhodes breached this provision because when Plaintiff's witnesses testified, Dr. Bea was very aggressive while asking questions. His aggressiveness inhibited Plaintiff's witnesses from providing complete responses to questions due to Dr. Bea's constant interruptions and multiple outbursts. This intimidation tactic was seen and heard by the Honor Council members and his outbursts could be heard by Plaintiff's parents and witnesses who were sitting outside the hearing room.

   After one witness, "M," finished testifying, the Honor Council president, "RA," actually apologized to the witness in front of Plaintiff's parents for Dr. Bea's aggressive behavior. As a result of Dr. Bea's outbursts, the witnesses were not able to fully testify on behalf of Plaintiff.

D. **Article II, Section 4:** "The President shall decide questions of procedure and interpretations arising under the Constitution [. . .] the President's role in the hearing and in deliberations shall be one of impartial participation, and the President shall not vote."

   Rhodes breached this provision because throughout the hearing process, President "RA" failed to adhere to the proper role of an Honor Council president. While she was supposed to serve as a facilitator of the hearing, she asked questions and made comments. Ms. Adolf also demonstrated a lack of knowledge with the provisions of the Honor Council Constitution.

   Significantly, Ms. Adolf pressed Plaintiff to answer the question of whether Jane Doe believed that Dr. Bea was telling the truth throughout the hearing process. Plaintiff expressed that she did not wish to make any accusations of lying and had refrained from using any such language throughout any of her testimony. Ms. Adolf repeated her question several times, and Plaintiff stated she

was uncomfortable answering the question. Ms. Adolf exceeded the bounds of her role as one of "impartial participation" by her barrage of questions to Plaintiff.

    E.    **Article IV, Section (2)(G)-** "The Council may find the Accused 'In Violation' of the Honor Code only upon clear and convincing evidence. 'Clear and convincing evidence' is an intermediate standard of proof, greater than 'by a preponderance of evidence,' but less than 'beyond a reasonable doubt.'"

Based on this definition, as well as the legal definition of "clear and convincing evidence," an accusation must be highly and substantially more probable to be true than not and the trier of fact must have a firm belief or conviction in its factuality. Rhodes breached this provision as this standard cannot be met by the evidence presented. The only evidence presented at the Honor Council hearing was a "fake" answer key that Dr. Bea created. Other than the fake answer key, the only evidence of cheating presented was Dr. Bea's testimony, much of which was mere supposition.

Plaintiff attempted to present witnesses on her behalf, advising Ms. Adolf that she had witnesses who would testify with regard to Dr. Bea's sexual harassment. Ms. Adolf refused to allow Plaintiff to present this key evidence by telling Plaintiff that the time for witnesses had passed. Ms. Adolf thereby precluded Plaintiff from presenting a vital component of her evidence. Without the ability to demonstrate that Dr. Bea's allegations were retaliatory, the entire proceeding was reduced to a professor demanding that twelve students, including his research assistant, take his word over that of a student. This procedural decision deprived Plaintiff of any semblance of a fair hearing.

54.    As a result of Rhodes's breach of contract, Plaintiff has suffered damages both actual and consequential and will continue to suffer immediate and irreparable harm for which there is no adequate remedy at law.

55.    Plaintiff has a strong likelihood of success on the merits of her breach of contract claims for two primary reasons.

First, her expulsion was predicated on a standard of "clear and convincing evidence" set forth in Rhodes' policies and procedures, which could not have been met by the evidence presented at the Honor Council hearing. Second, Plaintiff was not afforded appropriate Title IX

process as outlined in Rhodes' *Title IX and Nondiscrimination Handbook*(hereinafter "Title IX Handbook"), which states, in pertinent part, as follows:

> Rhodes Title IX and Nondiscrimination Handbook, Section III: "Rhodes College will address allegations of sexual misconduct or harassment in a timely and effective way, provide resources as needed for affected persons…and not tolerate retaliation against any person who reports sex/gender discrimination or sexual misconduct."

Regarding its methodology for addressing allegations of sexual misconduct, the Title IX Handbook goes on to state:

> A Claim investigation will be conducted by an Investigator and may include conducting substantive interviews of the Claimant, the Respondent, and any witnesses; reviewing law enforcement investigation documents, if applicable; reviewing relevant student and personnel files; and gathering and examining other relevant documents or evidence. The results of an investigation of a Claim will be presented at a Formal Resolution Hearing and/or may be presented at an Informal Resolution Conference.

Finally, the Title IX Handbook goes on to outline in detail the procedures for a Formal Resolution Hearing:

> 1. A Formal Resolution Hearing is the College's formal disciplinary proceeding through which the Sexual Misconduct Hearing Board evaluates evidence related to a Claim to determine whether a Respondent is responsible or not responsible for a violation of this policy, based on the criteria of "a preponderance of evidence". If the Respondent is found to have been responsible for a violation of this policy, the Respondent may be subjected to disciplinary action.
>
> 2. All hearings under this section will be recorded and closed to the public. The admission of any person to the hearing will be at the discretion of the Sexual Misconduct Hearing Board's chairperson; however, the Claimant and the Respondent will have the same opportunities to have others present. Rhodes may limit the number of people in attendance at hearings, conferences and related disciplinary proceedings but will not interfere with parties' choices of specific attendees.
>
> 3. Legal rules of evidence or criminal or civil procedure will not apply.
>
> 4. A Claimant does not need to be present at the hearing as a prerequisite to proceed with the hearing. If the Claimant chooses to be present at such hearing, s/he will not be required to be present for the entire hearing. In such cases, the Respondent may also choose not to be present for the entire hearing. When

> requested, the Board's chairperson will make arrangements so that the Claimant and the Respondent do not have to be present in the same room at the same time.
>
> That said, the hearing is the opportunity for the Claimant and the Respondent to provide their facts and evidence to the Sexual Misconduct Hearing Board, and a Claimant or Respondent who fails to appear after having received proper notice of a hearing will be deemed to have waived any right to personally present any evidence during the hearing and any subsequent appeal. Others may present evidence related to their case, such as the Investigator or fact witnesses, only during the Formal Resolution Hearing.
>
> 5. In all cases, the Sexual Misconduct Hearing Board must consider evidence presented by the Claimant, the Respondent, the Investigator and/or others and determine by a preponderance of the evidence whether a violation of this policy occurred, i.e., whether it is more likely than not that a Respondent is responsible for having violated this policy.
>
> 6. Decisions made in a Formal Resolution Hearing may be appealed as described in the Appeal Section of this policy.

Plaintiff was not permitted to present her claims within the context of a hearing as outlined above. Whitney Harmon, an independent investigator retained by Rhodes, did conduct an investigation. Despite her agreement prior to interviewing Plaintiff that Plaintiff would have access to her report, Ms. Harmon did not produce a copy of the report to Plaintiff or her counsel.

Instead, Rhodes simply sent Plaintiff a letter stating that it "could not substantiate" her claims. This failure to substantiate occurred in the face of eyewitness testimony confirming that Plaintiff confronted Dr. Bea just days prior to his allegation of cheating, eyewitness testimony substantiating Bea's inappropriate contact with Plaintiff during her lab, eyewitness testimony regarding Bea's inappropriate behavior in the Refectory, and testimony substantiating that Plaintiff had previously expressed concerns about Bea's behavior towards her on numerous occasions from the summer of 2015 through the date of the confrontation.

56.    Instead of affording Plaintiff a hearing pursuant to Rhodes own Title IX Handbook and contractual obligations, Rhodes simply dismissed Plaintiff's claims in an act of gross deliberate indifference to her contractual and statutory rights. Rhodes failure to afford her

the process assured her under the Title IX Handbook is a breach of contract, and Plaintiff's claims therefore have a strong probability of success.

## V. Count 4: Temporary Restraining Order

57. Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges.

58. As a result of Rhodes' failure to adhere to its own internal policies and its contractual obligations, Plaintiff has suffered and will continue to suffer immediate and irreparable harm to her reputation.

59. Plaintiff's reputational damage is without a remedy at law as it impairs and continues to impair her ability to obtain admission to other academic institutions and is likely to further impair her ability to obtain admission to any medical school, including George Washington School of Medicine and Health Sciences, to which Plaintiff had been early admitted. Plaintiff is at risk of George Washington School of Medicine and Health Sciences reneging on her offer of admission due to her Rhodes academic and disciplinary record.

60. Plaintiff is entitled to a temporary restraining order compelling Rhodes to refrain from releasing to any party any portion(s) of Plaintiff's academic record from Rhodes indicating that she was involuntarily withdrawn from classes at Rhodes and/or indicating that she has been expelled for violating Rhodes' Honor Code during the pendency of this litigation and pending further orders of this Court.

## VI Count 5: Mandatory Injunction

61. Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges.

62. As a result of Rhodes' failure to adhere to its own internal policies and its contractual obligations, Plaintiff has suffered and will continue to suffer immediate and irreparable harm to her reputation.

63. Plaintiff's reputational damage is without a remedy at law as it impairs and continues to impair her ability to obtain admission to other academic institutions and is likely to further impair her ability to obtain admission to any medical school, including George Washington School of Medicine and Health Sciences, to which Plaintiff had been early admitted.

Plaintiff is at risk of George Washington School of Medicine and Health Sciences reneging on her offer of admission due to her Rhodes academic record.

64. Plaintiff is entitled to a mandatory injunction compelling Rhodes to expunge those portions of Plaintiff's academic record indicating that she was involuntarily withdrawn from classes and that indicate that she expelled for violating Rhodes' Honor Cod and to a restraining order compelling Rhodes to refrain from releasing to any party any portion(s) of Plaintiff's academic record from Rhodes indicating that she was involuntarily withdrawn from classes at Rhodes and/or indicating that she has been expelled for violating Rhodes' Honor Code.

### VII. Count 6: Tortious Interference with Business Relations

65. Plaintiff re-alleges and incorporates herein, as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges as follows.

66. At the time of the events in question, Plaintiff was accepted on an early admission basis to George Washington University's School of Medicine and Health Sciences and had an ongoing contractual relationship with George Washington University School of Medicine and Health Sciences.

67. Rhodes publicized that Plaintiff was involuntarily withdrawn from Rhodes to George Washington School of Medicine and Health Sciences, interfering with Plaintiffs early acceptance status at George Washington School of Medicine and Health Sciences.

68. At the time Rhodes publicized this statement, it was aware of Plaintiff's allegations against Dr. Bea. This action on the part of Rhodes has jeopardized Plaintiff's prior early admission and subsequent acceptance to George Washington University's School of Medicine and Health Sciences.

69. Rhodes was aware of the relationship between George Washington University's School of Medicine and Health Sciences and Plaintiff.

70. Rhodes intentionally interfered with or caused a breach of George Washington University's contractual relationship with Plaintiff through its conduct.

71. As a direct and proximate result of Rhodes' conduct, Plaintiff has sustained damages in an amount to be shown to the Court.

## VIII. Count 7: Negligent Failure to Train or Supervise

72. Plaintiff re-alleges and incorporates herein, as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges as follows.

73. Rhodes owed Plaintiff a duty of care to adequately train and supervise its agents and employees in accordance with its own internal policies and procedures and applicable state and federal law.

74. Rhodes' policies and practices, including failure to properly warn, train, and/or educate its students regarding the prevention of sexual harassment and/or assault, and the failure to properly investigate reports of sexual harassment and assault have a disparate impact on Plaintiff as a female by subjecting her to increased levels of sexual abuse, assault, and other violence on campus in comparison to male students and by subjecting her to increased levels of emotional distress and other harm by virtue of Rhodes' failures to promptly and appropriately address complaints of sexual assault.

75. Rhodes breached its duty of care when it failed to adequately train and/or supervise its employees and agents with regard to and in accordance with its own internal policies and procedures and applicable state and federal law.

76. As a direct and proximate result of Rhodes's breach of its duty of care that it owed to the Plaintiff, Plaintiff has suffered damages, both actual and consequential in an amount to be established to the Court.

## IX. Count 8: Violation of the Tennessee Consumer Protection Act of 1977

77. Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges.

78. Rhodes College advertises the following information on its website: "Rhodes College is committed to providing a working, educational, social, and residential environment for all members of our College community, including all faculty, staff, and students, that is free from any form of sexual misconduct including harassment and assault. Sexually abusive behavior is harmful to both the learning environment and the sense of community the college is trying to foster among students, faculty, staff, and administrators. This policy aims to maintain a

consistent, compassionate, campus-wide mechanism for assisting Rhodes students who have been sexually assaulted or harassed by a Rhodes student or employee regardless of where or when the incident occurred."

79. This representation is false and misleading as Rhodes does not and has not provided such an environment to Plaintiff and such representation constitutes an "unfair or deceptive act" within the meaning of Tenn. Code Ann. Section 47-18-104.

80. Rhodes use of an unfair or deceptive trade practice is willful in nature.

81. Plaintiff has sustained an ascertainable loss of money as a result of Rhodes' unfair or deceptive trade practice and is entitled to recover treble damages pursuant to Tenn. Code Ann. Section 47-18-109.

## Causes of Action Against Roberto De La Salud Bea
### X.  Count 9: Defamation of Character by Dr. Bea

82. Plaintiff re-alleges and incorporates herein, as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges as follows.

83. Dr. Bea's written and oral statements that Plaintiff violated the Rhodes College Honor Code are defamatory in nature and have caused the Plaintiff specific and cognizable reputational damage.

84. Dr. Bea's knew or should have known at the time that he represented to Rhodes that Plaintiff had violated the Honor Code that his statements were false and misleading.

85. Dr. Bea has continued to assert that Plaintiff violated the Honor Code, most recently in interviews with Whitney Harmon, an independent attorney engaged to investigate Rhodes Title IX investigation.

86. Dr. Bea's continued written and oral defamatory statements represent a tort that is continuing in nature and was complete upon the final misrepresentation to Whitney Harmon during her investigation of the Title IX complaint.

87. Plaintiff has suffered damages in an amount to be shown to the Court as a direct and proximate result of Dr. Bea's false and misleading statements.

## XI      Count 10: Intentional Infliction of Emotional Distress

88.     Plaintiff re-alleges and incorporates herein, as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges as follows.

89.     Dr. Bea's conduct towards Plaintiff has been extreme and outrageous and is beyond the standards of decency in a civilized society.

90.     Specifically, Dr. Bea's pattern of conduct towards Plaintiff has been intentionally and/or recklessly abusive. His attempts to take advantage of his position of authority and confidence for personal reasons are unconscionable and intolerable and a violation of his duty to Plaintiff as her professor. His further promulgation of false and misleading statements about Plaintiff to her peers, her academic institution, other faculty members and Rhodes' administration have caused Plaintiff severe embarrassment, psychological and emotional distress.

91.     As a direct and proximate result of Dr. Bea's conduct, Plaintiff has suffered damages in an amount to be shown to the Court.

## XII.    Count 11:    Tortious Interference With Business Relations

92.     Plaintiff re-alleges and incorporates herein, as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges as follows.

93.     At the time of the events in question, Plaintiff there existed between Plaintiff and Rhodes College an ongoing contractual, business relationship of which Dr. Bea was aware.

94.     Dr. Bea's false and misleading statements ultimately led to the termination of this ongoing contractual and business relationship.

95.     Dr. Bea's actions were intended to and did produce a breach in the contractual and business relationship between Rhodes and Rhodes.

96.     As a direct and proximate result of Dr. Bea's conduct Plaintiff has suffered damages in an amount to be shown to the Court.

### XIII. Damages

97.     As a result of Defendants' conduct Plaintiff has suffered damages for breach of contract, defamation, damage to reputation, and lost income she would have earned as a medical doctor.

98.     As a result of Defendants' conduct Plaintiff has suffered and continues to suffer damages to her reputation for which there is no adequate remedy at law and for which this Court should fashion an appropriate equitable remedy.

99.     Plaintiff has suffered consequential damages to her reputation and a potential inability to ever attend medical school and appreciate the career of a medical doctor in an amount to be established to the Court in excess of five million dollars ($5,000,000.00).

**WHEREFORE PREMISES CONSIDERED, Plaintiff prays that:**

1.   <u>This Court empanel a jury for the trial of this matter;</u>

2.   This Court enter a judgment against Defendants in an amount to be established to the Court in excess of $5,000,000.00;

3.   This Court award Plaintiff treble damages, where afforded by applicable statute(s), statutory and discretionary costs and attorneys' fees and suit expenses where afforded by applicable statute(s);

4.   This Court award Plaintiff punitive damages against both Defendants in an amount sufficient to deter similar future conduct on the part of either Defendant;

5.   This Court issue a temporary restraining order compelling Rhodes to refrain from releasing to any party any portion(s) of Plaintiff's academic record from Rhodes indicating that she was involuntarily withdrawn from classes at Rhodes and/or indicating that she has been expelled for violating Rhodes' Honor Code during the pendency of this litigation and pending further orders of this Court;

6.   This Court issue a mandatory injunction compelling Rhodes to expunge from the academic record of Plaintiff any reference to her compulsory withdrawal from the fall 2015 semester as well as any reference to her having violated Rhodes's Honor Code;

7.   This Court fashion any other appropriate equitable remedy sufficient to restore Plaintiff's reputation and standing in the community;

8.   This Court order any further relief to which Plaintiff may prove she is entitled.

Respectfully submitted,

BLACK MCLAREN JONES RYLAND & GRIFFEE
A Professional Corporation

By: /s/Brice M. Timmons_____
    BRICE M. TIMMONS        #29582
    SHEERIN MEHDIAN         #34357
    530 Oak Court Drive, Suite 360
    Memphis, Tennessee  38117
    (901) 762-0535 – telephone
    (901) 762-0539 – facsimile
    btimmons@blackmclaw.com
    *Attorneys for Plaintiff*


COHEN McNEILE & PAPPAS, P.C.
Clifford A. Cohen          KS #08681
4601 College Blvd., Ste. 200
Leawood, KS 66211
(913) 491-4050; Fax (913) 491-3059
ccohen@cmplaw.net
*Attorneys for Plaintiff*