**(UNREDACTED)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TENNESSEE

WESTERN DIVISION

-----------------------------------------------

JANE DOE,                              )
                                       )
               Plaintiff,              )
                                       )
          VS.                          )   NO. 16-2308
                                       )
RHODES COLLEGE, AND                    )
ROBERTO DE LA SALUD BEA,               )
                                       )
               Defendant.              )


-----------------------------------------------


TRO/INJUNCTION HEARING

BEFORE THE HONORABLE JOHN T. FOWLKES, JR., JUDGE

TUESDAY AFTERNOON

JUNE 7, 2016


LYNN DUDLEY
OFFICIAL REPORTER
FOURTH FLOOR FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103

2

A P P E A R A N C E S

Appearing on behalf of the Plaintiff:

        BLACK MCLAREN JONES RYLAND &
        GRIFFEE, PC
        530 OAK COURT DRIVE
        SUITE 310
        MEMPHIS, TENNESSEE 38117
        BY:  BRICE M. TIMMONS, ESQ.
            ATTORNEY AT LAW

Appearing on behalf of the Plaintiff:

        COHEN MCNEILE & PAPPAS, PC
        4601 COLLEGE BLVD
        SUITE 200
        LEAWOOD, KANSAS 66211
        BY:  CLIFFORD A. COHEN, ESQ.
            ATTORNEY AT LAW

Appearing on behalf of the Defendants:

        BURCH, PORTER & JOHNSON PLLC
        130 NORTH COURT AVENUE
        MEMPHIS, TENNESSEE 38130
        (901) 524-5000
        BY:  GARY S. PEEPLES, ESQ.
            LISA A. KRUPICKA, ESQ.
            ATTORNEYS AT LAW

3

# W I T N E S S   I N D E X

| WITNESS | PAGE | LINE |
|---|---|---|

PRIANKA BOSE

    DIRECT EXAMINATION

    BY MR. TIMMONS  ................25          6

    CROSS EXAMINATION

    BY MS. KRUPICKA  ...............107          21

    REDIRECT EXAMINATION

    BY MR. TIMMONS  ...............149          7

ILLENE CHELSEA DEZFULI

    DIRECT EXAMINATION

    BY MR. TIMMONS  ...............156          6

RATHI BOSE

    DIRECT EXAMINATION

    BY MR. TIMMONS  ...............162          6

MARCUS POHLMANN

    DIRECT EXAMINATION

    BY MS. KRUPICKA  ...............170          6

    CROSS EXAMINATION

    BY MR. COHEN  .................175          23

4

# E X H I B I T   I N D E X

| EXHIBIT NUMBER | | PAGE | LINE |
|---|---|---|---|
| Exhibit Number 1 | Letter  .........57 | | 25 |
| Exhibit Number 2 | E-mail  .........62 | | 1 |
| Exhibit Number 3 | E-mails  ........69 | | 11 |
| Exhibit Number 4 | Transcript  ......73 | | 1 |
| Exhibit Number 5 | Grading roster  ..74 | | 12 |
| Exhibit Number 6 | Grading roster  ..75 | | 7 |
| Exhibit Number 6 | Grade roster  ...105 | | 9 |
| Exhibit Number 7 | Midterm 1  .......76 | | 8 |
| Exhibit Number 8 | Quiz 2  ..........76 | | 17 |
| Exhibit Number 9 | Midterm 2A  ......76 | | 24 |
| Exhibit Number 10 | Quiz 3  .........77 | | 9 |
| Exhibit Number 11 | Midterm 3  ......77 | | 20 |
| Exhibit Number 12 | Fake Answer Key  83 | | 15 |
| Exhibit Number 13 | Transcript  .....97 | | 16 |
| Exhibit Number 13 | Transcript  .....99 | | 13 |
| Exhibit Number 14 | Packet  ........136 | | 14 |
| Exhibit Number 15 | Appeal packet  .141 | | 2 |
| Exhibit Number 16 | Transcript  ....142 | | 19 |
| Exhibit Number 17 | E-mail  ........173 | | 5 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**TUESDAY AFTERNOON**

**JUNE 7, 2016**

The TRO/Injunction Hearing in this case began on this date, Tuesday, 7 2016, 2016, at two o'clock p.m., when and where evidence was introduced and proceedings were had as follows:


------------------------


**THE COURT:**  All right.  Good afternoon, everyone.

**MS. KRUPICKA:**  Good afternoon, Your Honor.

**MR. TIMMONS:**  Good afternoon.

**THE COURT:**  For the record, this is Jane Doe versus Rhodes College, et al, set today for a hearing on motion for preliminary injunction.  Of course, we have some other motions that are on -- in the record.

And, like I normally do, after we get everyone identified for the record, I'm going to need kind of an update from both sides about where we are in the case, any progress that has been made, discussions, also brief talk about, at least from your various prospectives how we are going to proceed today, whether there will be witness

1    testimony, how many, so I can get a gauge on where

2    we will be going.

3            I've read the material that has been filed

4    by both sides.  And so I think we can make a lot of

5    progress in at least bringing the preliminary

6    matters to a head and to a close, understanding that

7    there are some other motions that have been filed,

8    most -- most particularly the motion to dismiss.

9            With that being said, let's see,

10   identifying the parties, who is here representing

11   plaintiff in the case today?

12           **MR. TIMMONS:**  Your Honor, my name is Brice

13   Timmons from Black McLaren here in Memphis.  I

14   represent Ms. Prianka Bose who is proceeding

15   presently as Jane Doe.

16           **THE COURT:**  All right.

17           **MR. TIMMONS:**  This is my cocounsel, Cliff

18   Cohen from the Kansas bar who is admitted

19   pro hac vice for the purposes of this case.

20           **THE COURT:**  Okay.  Mr. Cohen, welcome,

21   it's go to see you today.

22           **MR. COHEN:**  Please to be here, thank you,

23   Your Honor.

24           **THE COURT:**  All right.  And who is

25   representing the defendants?

1           **MS. KRUPICKA:**   Good afternoon, Your Honor.

2           Lisa Krupicka for Rhodes College.

3           My colleague Gary Peeples for Rhodes

4    College.

5           We have Mr. Kyle Webb, Vice-President of

6    Finance from Rhodes College is our representative of

7    the college.

8           And this is the defendant, Dr. Roberto de

9    la Salud Bea.

10          **THE COURT:**  Okay.  It's good to see you

11   all, thanks for coming in today.

12          Okay.  And now update as far as the case

13   is concerned, where we are, and summarizing, at

14   least from your perspective, what we will be doing

15   today.

16          Let me hear first from plaintiff.

17          **MR. TIMMONS:**  Your Honor, at this stage,

18   as clear from the docket, we have a pending motion

19   for preliminary injunction.  The defendants have

20   filed a partial motion for 12(b)(6) dismissal to

21   which we filed a response.

22          There's also the remaining issue of the

23   protective order related to Ms. Bose proceeding

24   under a pseudonym.

25          I would assume that those last two matters

1    can be taken up at a later time.  We have got a lot

2    of witnesses here today and I think that we should

3    probably just move straight into the proof and get

4    to the crux of the preliminary injunction issue.

5           Ms. Bose will testify as my first and

6    primary witness.  And then I have two supporting

7    witnesses and one potential rebuttal witness

8    depending on the testimony presented by the -- the

9    defense.  And that would be all that I have today.

10          **THE COURT:**  All right.  Any argument that

11   you will make before we get into the proof?

12          I mean, that's okay if you don't, we can

13   just go ahead and start dealing with witness

14   testimony.

15          **MR. TIMMONS:**  Your Honor, I would prefer

16   to just move straight into testimony, and except to

17   the extent that the court want -- has any questions

18   about the briefs that have already been filed.

19          **THE COURT:**  Uh-huh.

20          **MR. TIMMONS:**  If Ms. Krupicka wishes to

21   make openings, we're prepared to make an opening,

22   but in the interest of time, I understand the court

23   probably doesn't want to be here past six o'clock

24   today, so I would prefer to just move on into the

25   proof.

1           **THE COURT:**  All right.  Let me hear from

2    the defense.

3           Would it be Ms. Krupicka?

4           **MS. KRUPICKA:**  Your Honor, it's our

5    position that, although we are prepared to offer

6    witnesses today, but that it is not necessary to

7    hear a lot of testimony, that the testimony, the

8    relevant facts are all transcribed in this

9    particular case.  Virtually no dispute for purpose

10   us of this motion as to the facts.

11          We submit to Your Honor that simply on the

12   briefs Your Honor can determine there is no

13   substantially likelihood of success on the merits

14   and that there is no irreparable harm that can be

15   addressed by preliminary injunction.

16          And I would like to be heard on that if I

17   may, Your Honor.

18          **THE COURT:**  The transcripts, are they in

19   the okay.  Record here.

20          **MS. KRUPICKA:**  Yes, they are.

21          **THE COURT:**  Okay.

22          **MR. TIMMONS:**  Your Honor, I'm not entirely

23   clear what she's suggesting.

24          The only transcripts that are in this case

25   are transcripts of proceedings that took place in

1    the administrative process within Rhodes College.

2         Now certain of those I have prepared as

3    potential exhibits today, but they are not

4    deposition transcripts that can be filed with the

5    court.

6         So I don't see how we could proceed

7    without the court taking live testimony.

8         **MS. KRUPICKA:**  Your Honor, I would submit

9    to you that we can take the plaintiff's position in

10   terms of her -- her version of the facts as

11   undisputed for purposes of this motion and that

12   there is still no substantially likelihood of

13   success on the merits.

14        And I've got the tran -- the Honor Council

15   hearing was transcribed, the Facility Appeals

16   Committee hearing was transcribed, the witnesses

17   were testifying under oath.

18        We can -- I have a witness that can admit

19   those for -- if the court would like to review the,

20   but, frankly, if the Honor Council and the Faculty

21   Appeals Committee didn't hear any proof, then the

22   proof is not -- is not relevant to this proceeding

23   because Rhodes College is being sued and it's Rhodes

24   College's actions that are being challenged.  And if

25   there is proof that the Honor Council or the Faculty

1    Appeals Committee didn't hear, then that proof is

2    not admissible for purposes of proving anything in

3    this case.

4             **THE COURT:**  Thank you.

5             **MR. COHEN:**  May I be heard briefly, Your

6    Honor?

7             **THE COURT:**  Yeah, Mr. Cohen and

8    Mr. Timmons, she says that there is no need for the

9    testimony in light of the fact that it's all in the

10   record.

11            Now I'll be honest with you, I haven't

12   read that, I haven't seen it in the record.  I

13   thought there would be some, oh, augmentation of the

14   record today.

15            But how do you -- how do you respond to

16   that?

17            **MR. COHEN:**  Your Honor, the disconnect is

18   that Ms. Krupicka would tell the court that this

19   case is all about whether our client got a fair

20   hearing at the Rhodes College Honor Council with

21   regard to an allegation of cheating.

22            The truth is the case today is not about

23   that at all.  It's really about count one of the

24   complaint that alleges that the mere fact that our

25   client complained of unwelcomed sexual harassment,

1    unwelcomed romantic interest on the part of the

2    defendant Bea caused him and the college to

3    retaliate leading to her expulsion and her damages.

4            **THE COURT:**  I'm -- I'm familiar with all

5    that.

6            What I'm talking about is the state of the

7    record today and whether we need testimony or, as

8    Ms. Krupicka says, the -- the record is already

9    augmented with the testimony and the facts that I

10   need to make this decision.

11           That's -- that's the question that I have

12   right now.

13           **MR. COHEN:**  Your Honor, I don't think

14   there is any record that you could look at today,

15   without live testimony, that would inform you as to

16   the facts and circumstances of the unwelcomed

17   attention by the professor, the efforts she made

18   directly with him to have him stop that, the

19   resulting accusation of cheating made within eight

20   days of her complaint to him, and then her

21   continuing efforts through different administrative

22   channels at Rhodes to stop the retaliation except it

23   didn't stop and it resulted in her expulsion.  That

24   story is nowhere available except from the mouths of

25   these witnesses.

1          **THE COURT:**  That did not come out in any

2    of the hearings or anything like that?

3          **MR. TIMMONS:**  No, Your Honor.

4          In fact, no, I don't think it's terribly

5    relevant to the preliminary injunction today, a

6    significant portion of the plaintiff's position is

7    that she was denied a fair opportunity to present

8    this material, that the limited investigation

9    conducted at the college level went out of its way

10   to preclude her from establishing that Dr. Bea

11   harassed her --

12         **THE COURT:**  There'll be a time to argue

13   all that.

14         **MR. TIMMONS:**  Certainly.

15         **THE COURT:**  Really all I'm dealing with

16   right now is the state of the record and whether or

17   not we'll take the live testimony today.

18         **MR. TIMMONS:**  There is no live

19   testimony -- there is no testimony in the record at

20   all at this stage.

21         And the admission of transcripts of

22   proceedings that were prepared by the defendant at

23   hearings conducted by the defendant cannot serve to

24   take the place of live witness testimony so the

25   plaintiff has an opportunity to demonstrate her case

```
1   for a violation of Title IX to this court.
2               THE COURT:  All right, I understand.
3               Ms. Krupicka, when you say that --
4               MS. KRUPICKA:  Your Honor, may I be heard
5   one -- on one more, may I respond to that?
6               THE COURT:  Yes.
7               MS. KRUPICKA:  This is a case in which
8   they're seeking a preliminary injunction to expunge
9   Ms. Doe's record of any expulsion.
10              And the basis for that is that they claim
11  that Rhodes College retaliated against Ms. Doe -- I
12  hope I keep saying Ms. Doe -- for something that --
13  that she said to Dr. Bea.
14              And I would submit to you, Your Honor,
15  that there is no individual liability under Title IX
16  for -- so it will -- they will have to establish
17  that Rhodes College retaliated against Ms. Doe
18  because she complained to Dr. Bea that she didn't
19  want to discuss her personal life with him.
20              And I would submit to, Your Honor, that
21  viewing the transcript of the Honor Council hearing,
22  reviewing the submission to the Faculty Appeals
23  Committee and viewing the -- the transcript of the
24  Faculty Appeals Committee hearing there is
25  absolutely no evidence that Rhodes College
```

1   retaliated against her, even if we accept everything

2   that Ms. Doe is saying is true, no evidence.

3          THE COURT:  Again, getting back to my

4   inquiry, the state of the record that I have here,

5   do we have all that in here?

6          MS. KRUPICKA:  No, Your Honor.

7          I'm -- I'm happy to offer it now.

8          THE COURT:  Okay.  I'm happy for you -- we

9   can receive those exhibits, but I'm not going to cut

10  plaintiff off from -- from making her case -- her

11  case.

12         The allegations are that, although there

13  is an investigation that was conducted, it was

14  insufficient.

15         And so because of that, I'm going to allow

16  the plaintiff to present the case, the live

17  testimony that is necessary.  And obviously you will

18  be able to cross examine.  And if you desire to put

19  on any proof, the opportunity will be afforded.

20         MS. KRUPICKA:  Your Honor, may I make an

21  opening statement?

22         THE COURT:  Yes, go ahead.

23         MS. KRUPICKA:  I don't want to annoy you,

24  Your Honor, but I do think it might help to put this

25  dispute into context.

1        **THE COURT:**  Go ahead.

2        **MS. KRUPICKA:**  Do you want me to come to

3   the podium or should I stand here?

4        **THE COURT:**  That's fine there or the

5   podium, just your choice.

6        **MS. KRUPICKA:**  Probably hear a little

7   better from up there.

8        Your Honor, as I understand it the

9   purpose, this is a motion for a hearing on a motion

10   for preliminary injunction.

11        And as we know, the main factors to be

12   considered in determining whether injunctive relief

13   is warranted is, number one, substantially

14   likelihood of success on the merits, and, number

15   two, irreparable harm.

16        Now I would submit to Your Honor that

17   nothing any witness says today will establish either

18   one of those things.

19        First of all with regard to the Title IX

20   claim.

21        It is my understanding that the plaintiff

22   has now abandoned her claim that the violation is

23   for sexual harassment and now claims that the

24   violation of Title IX is for retaliation.

25        Assuming the sexual harassment statement

 1   is still alive, we've submitted to Your Honor

 2   multiple cases all holding on facts much more

 3   serious than this one, that there's -- that the --

 4   they do not state a claim.

 5          Here, Ms. Bose claims that Dr. Bea asked

 6   her about her boyfriend, that he asked her to dinner

 7   on one occasion, that he observed her in her lab

 8   class, that he passed her in the cafeteria and said

 9   are you texting your boyfriend, and that she

10   subsequently told him she didn't want to discuss

11   personal matters with him.  That is the extent of

12   her allegations.

13          And I would -- if Your Honor would refer

14   to the cases we've cited in our brief, I would

15   submit that they don't even -- even remotely

16   approach the level of seriousness that would state a

17   claim for sexual harassment under Title IX.

18          But let's go to retaliation claim.

19          Again, this claim must be against Rhodes

20   College, it cannot be against Dr. Bea, there's no

21   individual liability under Title IX.

22          There is absolutely no evidence, I submit

23   to Your Honor, that Rhodes suspected Dr. Bea of

24   fabricating evidence in order to retaliate against

25   the plaintiff.

1          The plaintiff never at anytime during the

2     five hours or so Honor Council hearing or during the

3     Faculty -- or -- no -- the five or so hours of Honor

4     Council hearing did she say that Dr. Bea had falsely

5     accused her of cheating in order to retaliate

6     against her until her closing argument.

7          And even then she made a very thinly

8     veiled reference to it.  Most of the hearing she

9     spent arguing either that she got to those answers

10    on her own or that Dr. Bea was so familiar with the

11    way she thought that he wrote the quiz, he created

12    the fake answer key with answers he thought she

13    would -- wrong answers she thought he would give --

14    she would give.

15         And, Your Honor, there is absolutely no

16    proof that Rhodes College ever -- there is no

17    evidence that Rhodes College was ever permitted to

18    consider this idea and reject it until the Faculty

19    Appeals Committee hearing in which an extensive

20    appeal letter was submitted listing all of the

21    things that Dr. Bea was alleged to have done.

22         The Faculty Appeals Committee considered

23    that appeal and they upheld the decision of the

24    Honor Council.

25         So to me, Your Honor, there is no dispute

1    that Ms. Bose had ample evidence to try to establish

2    that Rhodes College knew that the proof of her

3    cheating was false and expelled her anyway.  And

4    there is just no evidence of that, Your Honor.

5           In fact, there is really no evidence that

6    Dr. Bea, simply as a matter of logic, could have

7    retaliated against her.  Her theory was that he knew

8    how she thought, so he created a fake answer key

9    that he -- that he could guess the wrong answers she

10   would give.

11          Now her theory, apparently now, is that

12   Dr. Bea created the fake answer key after the fact

13   to get her.

14          And, you know, Your Honor, Rhodes College

15   has no knowledge of that, that information was never

16   presented to Rhodes College.  Her expulsion was

17   based on the record before it.  And there is no

18   evidence that Rhodes knew of any alleged retaliation

19   by Dr. Bea.

20          So I'd submit to Your Honor that that

21   claim, there is no substantially likelihood of

22   success on the merits on that claim.

23          The evidence showed that -- that Rhodes

24   received -- showed that Jane Doe had the same

25   answers on her quiz as Dr. Bea's fake answer key.

1   And the odds of that happening without cheating are

2   slim to none.

3          The other claim that they're seeking

4   relief on is a preliminary injunction matter is for

5   breach of contract.  Rhodes apparently not following

6   its procedures precisely.

7          That is not a proper subject for

8   injunctive relief, Your Honor.  It's only -- only

9   money damages are -- can compensate for a breach of

10  contract.

11         Then we come to the issue of irreparable

12  harm.

13         As we know, preliminary junction is

14  designed to preserve the status quo so the plaintiff

15  will not experience irreparable harm pending a trial

16  on the merits.

17         In this particular case the status quo is

18  that the plaintiff is expelled.  She's been expelled

19  since March.  She's enrolled in another university.

20  The court can't order Rhodes to take the expulsion

21  back without a trial on the merits.

22         And there's no evidence that order doing

23  that will give the plaintiff the relief she seeks.

24  Right now she's out of Rhodes, you can't order us to

25  take her back or order her or order her record

1   expunged until we've had an opportunity to have a

2   trial on the merits.

3           There is no reason that there needs to be

4   an injunction now.

5           The plaintiff apparently is arguing that

6   there is some window of opportunity where she can

7   still be enrolled in the GW program if her record is

8   expunged.  But that's simply not the case.  We're

9   prepared to offer proof and we have submitted into

10  the record the memorandum of understanding between

11  George Washington University School of Medicine and

12  Rhodes College.

13          This is a program that Ms. Doe can access

14  only if she is enrolled at Rhodes College and only

15  if she meets the requirements of the program.

16          She is not enrolled at Rhodes College.

17          And -- and so there is -- she is not

18  entitled to be readmitted to the GW program unless

19  Your Honor were to give her all the relief that she

20  seeks before a trial on the merits, which we would

21  submit is grossly improper.

22          So I would submit to Your Honor that not

23  only is there not a substantially likelihood of

24  success on the merits, but that there is no evidence

25  either of irreparable harm or that an injunction in

1    the case will afford the plaintiff any meaningful

2    relive.

3              Thank you.

4              **THE COURT:**  All right, thank you.

5              In light of the fact that defense made an

6    opening statement, Mr. Timmons or Mr. Cohen, if you

7    want to make an opening, that's fine or we can go

8    ahead and get on with the proof.

9              **MR. TIMMONS:**  Your Honor, I think in the

10   interest of time, we should just proceed with the

11   proof.

12             **THE COURT:**  All right.  Call your first

13   witness.

14             **MR. TIMMONS:**  Your Honor, I call Prianka

15   Bose.

16             **THE COURT:**  All right.

17             Come forward, please.

18             Come around.

19             **MR. TIMMONS:**  And, Your Honor, I assume

20   it's all right that I refer to her by her proper

21   name, she's filed as Jane Doe --

22             **THE COURT:**  I understand.

23             **MR. TIMMONS:**  -- but I assume that --

24   assuming Your Honor intends to continue the

25   pseudonym after today that we will enter a

```
 1   protective order that would address the record
 2   today, is that fair enough?
 3           THE COURT:  Ms. Krupicka.
 4           MS. KRUPICKA:  I object, Your Honor, if
 5   she is entitled to pseudonym, this is a public
 6   hearing, it's on a public record, I just don't see
 7   any reason why we would dispense with this relief
 8   that they fought so hard to get.
 9           THE COURT:  Is there really any need for
10   it at this point?
11           MR. TIMMONS:  Your Honor, there's -- I can
12   refer to her by whatever name the court prefers me
13   to refer to her by.
14           THE COURT:  All right.  Then her -- her
15   formal name will be fine.
16           MR. TIMMONS:  Thank you, Your Honor.
17           THE COURT:  Raise your right hand if you
18   would, please.
19           Do you solemnly swear or affirm, under the
20   penalties of perjury, the testimony that you are
21   about to provide the court in this matter will be
22   the truth, the whole truth and nothing but the
23   truth, so help you God?
24           THE WITNESS:  Yes.
25           THE COURT:  Have a seat right here,
```

1   please?

2          **MR. TIMMONS:**  Your Honor, I have some

3   documents, if I could approach the --

4          **THE COURT:**  That will be fine.

5          **MR. TIMMONS:**  Thank you.

6          And just as a point of procedure, when I'm

7   submitting original documents for the court

8   reporter, should I just pass those and then place a

9   copy on the monitor here?

10         **THE COURT:**  Once you get them identified

11  and admitted, the clerk will mark them and then you

12  can place them on the -- on the display.

13         **MR. TIMMONS:**  Thank you, Your Honor.

14

15

16

17

18

19

20

21

22

23

24

25

1                          **PRIANKA BOSE,**

2   was thereupon called as a witness on behalf of the

3   Plaintiff, and having been first duly sworn,

4   was examined and testified as follows:

5                        **DIRECT EXAMINATION**

6   **BY MR. TIMMONS:**

7   **Q.**     Would you please state your name for the

8   court.

9   **A.**     Prianka Bose.

10  **Q.**     Ms. Bose --

11            **THE COURT:**  Get her to spell her name,

12  please.

13  **BY MR. TIMMONS:**

14  **Q.**     Would you please spell your name.

15  **A.**     P- as in panda, r-i-a-n-k-a, last name is B-

16  as in boy, o-s-e.

17  **Q.**     And, Ms. Bose, until the end of the fall

18  semester of 2015, where were you a student?

19  **A.**     I was a student at Rhodes College.

20  **Q.**     Okay.  What was your major?

21  **A.**     I was a double major in neuroscience and

22  history, with a minor in environmental studies.

23  **Q.**     Okay.  At that time -- I'm sorry -- as -- as

24  of the beginning of the fall semester of 2015, what

25  was your GPA at Rhodes College?

                      PRIANKA BOSE - DIRECT
                                                        26

1   **A.**      My GPA at Rhodes was about a 3.7.

2   **Q.**      Okay.  And had you been admitted into any

3   graduate programs following your -- that were -- you

4   were expected to attend after Rhodes College?

5   **A.**      I was on a provisional acceptance to George

6   Washington University Medical School in Washington,

7   D.C., it was an early acceptance program that was

8   affiliated with Rhodes and many other colleges in

9   the United States.

10  **Q.**      All right.  Tell us about this program and

11  how it worked?

12  **A.**      When you become a sophomore at Rhodes, you

13  have the option to apply to the George Washington

14  Program.  The way you apply is a three-step process.

15          First, you write your essays, it's about six

16  essays, and then you submit them to the Health

17  Professional Adviser, at the time that I was a

18  student the Health Professional Adviser was Dr. Alan

19  Jaslow.

20          After you submitted to Dr. Jaslow, he reviews

21  them and makes a first cut.  And out of the people

22  who survive the first cut, they are then put through

23  an internal interview phase, so you have two

24  interviews with two different science teachers in

25  different departments.  I had social sciences with

PRIANKA BOSE - DIRECT

27

1    psychology and natural science of physics.

2          After you survive that cut, then Dr. Jaslow

3    will then send your application to GW for their

4    revisement (sic) -- revisement (sic).  And then GW

5    will make a cut.  And they will either tell you that

6    they have cut you or they will tell you that you

7    have an invitation to go and give an interview at

8    the school itself.

9          So I survived all the cuts and I -- when I

10   was accepted I signed a contract and you have to

11   maintain your GPA above a 3.6 or above, and you

12   couldn't make anything lower than a B minus in any

13   of your science classes.  And they just wanted you

14   to continue, you know, exploring your different

15   areas.

16         The whole point of the early admissions

17   program is that you get the opportunity to explore

18   diverse areas that might help you in medicine or

19   just cultivate you -- cultivate your interest before

20   you get to medical school.

21   **Q.**    How does this admissions process differ from

22   the normal medical school admissions process that

23   you would go through if you were applying to GW as a

24   normal general applications student?

25   **A.**    So the major difference is that I didn't have

PRIANKA BOSE - DIRECT

28

1    to take the MCAT, but normal people who have to

2    apply have to take the MCAT, which is the medical

3    college admissions test.

4         I would have had to have taken this test my

5    junior or maybe senior year at Rhodes in order to

6    qualify for first -- it's called first -- yeah,

7    primary application and then there's a secondary

8    application phase for med school.  And I'm sure

9    there may be a third step within your interviews and

10   they just goes on and on.  I haven't looked into it

11   because I didn't think that I had to since I was

12   already admitted to medical school.

13   **Q.**    All right.  Now what, if any, factor did this

14   program at Rhodes, this early admissions program,

15   play in your decision to attend Rhodes College?

16   **A.**    This was one of the most important factors

17   for attending Rhodes College.

18        When I was a junior at Lakeside High School

19   in Atlanta, Georgia where I grew up, I went with my

20   mom on a trip or I came with my mom on a trip to

21   Memphis and we visited the college.

22        And at first I was really tentative because

23   it was pretty far away from Atlanta, it was about

24   six hours of a drive.  And I like my home, so I was

25   pretty tentative about that, but once I got to the

```
 1   school the people were just so kind.
 2        And one of the first people that I met at
 3   Rhodes was my adviser, Dr. Gerecke in the
 4   neuroscience department and she told me about GWU
 5   and she referred me to Dr. Jaslow who told me more
 6   about GWU.
 7        And before I had come to Rhodes for that
 8   first visit, I was really tentative about med
 9   school, but after hearing about the GW Program, I
10   looked more into it when I got home.  I researched
11   George Washington as a school and I just fell in
12   love.  And I said, yeah, I have a year and a half
13   left before I go to college, this is the school I
14   want because I want that program.
15   Q.    Now, Ms. Bose, when did you first become
16   acquainted with the defendant doctor Robert de la
17   Salud Bea?
18   A.    January 14th of 2015.
19        MR. TIMMONS:  And, Your Honor, I will be
20   refer to him as a Dr. Bea for the rest of the
21   proceeding.
22        THE COURT:  All right.
23   BY MR. TIMMONS:
24   Q.    And in what context did you become acquainted
25   with him?
```

1    **A.**     Dr. Bea was my Organic Chemistry I professor

2    for the spring semester of 2015.

3    **Q.**     Now in the spring semester of 2015, what, if

4    any, events took place that prompted you to have

5    more than usual contact with Dr. Bea?

6    **A.**     On January 31st I was in a massive car

7    accident.  It -- my car was hit by two semis

8    briefly, we were hit by behind from the second semi,

9    I was badly injured and I sustained a really bad

10   concussion.  So I was out of school for the first

11   week and three days of February.

12   **Q.**     And then what did the school do as a result

13   of that?

14   **A.**     So when I discovered that on -- it was

15   February 1st that I woke up in the morning, and I

16   was dizzy and I couldn't see anything.

17        So my roommate, she took me to the athletic

18   facility to see a trainer.  And they had me take a

19   concussion test.  And I had a pretty bad one.  So

20   they put me -- they sent me to disability services

21   at Rhodes, which works with a lot of other students

22   for many different problems, such as ADD.

23        And after I talked to Ms. Butler, who is the

24   head of disabilities services, I was put on a

25   concussion protocol which stated two things:  That I

1    needed extended time on all of my quizzes and tests

2    in every class that I was taking, and that I was

3    given isolated testing environment to minimize noise

4    with low lighting and anything to help my concussion

5    recede faster.

6    **Q.**    So relating specifically to Dr. Bea, how did

7    Dr. Bea go about complying with that concussion

8    protocol?

9    **A.**    He was very compliant.  I gave him the letter

10   from Ms. Butler that it was signed, he signed it,

11   and he kept it so he would always give me isolated

12   testing environment along with other students.

13   **Q.**    What isolated testing environment?

14   **A.**    I always did it in his office.  And that was

15   the only environment I tested in until the

16   concussion protocol expired and then I took them all

17   in the classroom.

18   **Q.**    As a result of that concussion, the absences

19   and the concussion protocol, did you have any

20   additional contact with Dr. Bea in the spring of

21   2015?

22              **MS. KRUPICKA:**  Objection, hearsay.

23   **BY MR. TIMMONS:**

24   **Q.**    Did you have --

25              **MR. TIMMONS:**  I will rephrase.

1          **THE COURT:**   Rephrase it.

2   **BY MR. TIMMONS:**

3   **Q.**     Did you have more contact with Dr. Bea in the

4   spring of 2015 than you would have had absence that

5   concussion protocol?

6   **A.**     I do believe that the concussion protocol,

7   given the environment that it put me in to take

8   tests, prompted me to speak to him more.

9          I had never spoken to him the months before

10  that car accident, so I didn't really know him very

11  well.   And I was kind of tentative to ask questions.

12         But he was so nice about letting me really

13  take my time to get back into things.   And he told

14  me, he said, well, if you need extra help, come by

15  after class.   If you need anything at all, just tell

16  me and I will provide it for you.

17  **Q.**     How would you describe your relationship with

18  Dr. Bea from that point onward in the spring of

19  2015?

20  **A.**     I would describe it as very professional

21  except for the few instances when he would mention

22  things to me.   There was one instance in April of

23  2015 where he told me he didn't have a girlfriend

24  and that he wasn't married.

25         And there was another instance where we were

PRIANKA BOSE - DIRECT

33

1   working on practice problems, I always went to him

2   with practice problems because he put them on

3   Moodle, which is our teacher/student network.  And

4   the practice problems were intended to help us get

5   ready for the quizzes or the exams that were coming

6   up.

7            So I would always do them and then go to him

8   and ask him questions about all the ones that I

9   didn't understand or didn't complete.  And so during

10  those times is the only time where he and I would be

11  alone and he would say stuff like that.  By stuff

12  like that, I mean, he would tell me that he was --

13  he didn't have a girlfriend.  One time he told me

14  that he liked cats and another time he told me that

15  he didn't like to fly on planes, that he was scared

16  of them.

17  **Q.**    Now did you consider at that time any of

18  those statements to be inappropriate in any way?

19  **A.**    I thought they were kind of weired given the

20  context of why I went to the office to talk to him,

21  but I dismissed it as just small talk, filling

22  space.

23  **Q.**    Now how did you do in the Organic Chemistry I

24  class that you took the spring of 2015?

25  **A.**    I received an A minus.

1    **Q.**     An A minus.

2          **MR. TIMMONS:**  Your Honor, pardon my

3    coughing, I've been laid up for the last week.

4          And I would love to thank Ms. Krupicka for

5    her gracious extensions of time.

6    **BY MR. TIMMONS:**

7    **Q.**     Now in the summer of 2015, during the break,

8    did you have any interactions with Dr. Bea?

9    **A.**     Yes.  In late July of 2015 Dr. Bea approached

10   me in the parking lot in front of the Bellingrath

11   Residence Hall at Rhodes College.

12   **Q.**     Okay.  Can you describe the nature of that

13   interaction with Dr. Bea?

14   **A.**     The nature of the interaction was that I

15   heard my name, so I turned around and I saw Dr. Bea

16   approaching me from behind.  So I stopped to wait

17   for him since he was coming towards me.  And then I

18   realized he was not stopping coming towards me.  So

19   I just took a step back and we were about an arm's

20   length from each other, and he stopped when I

21   stepped back.

22   **Q.**     Okay.  What did -- what happened next?

23   **A.**     Well, we just started to talk.  He said, hi,

24   it's really good to see you, I'm excited about

25   having you in class for the fall semester, it will

PRIANKA BOSE - DIRECT

35

1    be really fun.

2          And then I asked him, well, what are you

3    doing here for the summer, are you doing research,

4    because most of our professors do research over the

5    summer.  And that's when he told me that he was up

6    for tenure or working on his tenure package to be

7    reviewed for tenure.  And that he was also doing

8    research as well.

9          So we talked about that for a little, and I

10   told him that the reason that I was in Memphis was

11   because I was here for an internship.

12         And then the conversations took a sudden

13   turn, there was really no segway for the way the

14   conversation went, it just started with, so how do

15   you spend your evenings.  It just threw me off.  And

16   I didn't know really how to respond, so I said,

17   well, I play tennis.

18         And then the questions just kept leading

19   towards so where do you like to go in Memphis, do

20   you like Memphis, do you get to hangout with your

21   friends.  And then he said, do you get to hangout

22   with your boyfriend.  And at this point I stopped,

23   and I felt so uncomfortable.  I didn't understand

24   where the idea of a boyfriend even came from because

25   I had never mentioned that to him.  And it was just

1    such a difference from all the other conversations

2    that we had had prior because they were always

3    about, so what are your academic aspirations, what

4    do you like to do, what are you majoring in, stuff I

5    think that normal professors ask students that

6    didn't seem out of place to me.

7         But when he asked me about my boyfriend, I

8    just didn't get it.  So I didn't answer it.  And I

9    told him that I had to leave because I was on my way

10   to a friend's house, and that I would see him in

11   class in August.

12        And so I was about to turn and leave, and he

13   reached out his hand to me.  So I stepped away again

14   and I stopped.  And he said, wait, so what are you

15   doing.  And I asked what do you mean.  He goes,

16   well, I meant, you know, would you like to go out to

17   dinner with me just to catch up.  And I said, no, I

18   don't, but thank you.  I -- I just tried to get out

19   of there as fast as possible after that.  It sounded

20   like he was asking me out on a date and that did not

21   make me comfortable.

22        So the minute that I got back into my car, I

23   called my mom and I told her.  And I said, I don't

24   know if I'm taking this the wrong way, but this is

25   what happened.  So I told her, and then she told me,

1    you know, be professional, you don't -- some people

2    just don't know how to have like small talk.  So I

3    said, okay, yeah, I can be professional.  And that's

4    what I did.

5        So I went to my friend Chelsea's house.  And

6    I asked her, because she's my age, so I figured,

7    okay, am I taking this the wrong way, I want to get

8    a second opinion, I don't want to make a mistake, so

9    she said the same thing my mom said.

10           **MS. KRUPICKA:**  Objection, Your Honor,

11   hearsay.

12           **THE COURT:**  Okay.

13           **MR. TIMMONS:**  I'm certainly not offering

14   what Chelsea Dezfuli said for the matter asserted

15   therein.  I -- I honestly didn't even hear what she

16   said because of Ms. Krupicka's objection.

17           **THE COURT:**  I will allow it, but try to

18   stay away from the hearsay type.

19           **MR. TIMMONS:**  Certainly.  I -- I -- I

20   wasn't asking about it.

21           And, you know, please try not to tell me

22   what Chelsea said.

23           **THE WITNESS:**  Okay.  I apologize Your

24   Honor.

25

1    **MR. TIMMONS:**  All right.

2    **BY MR. TIMMONS:**

3    **Q.**    All right.  Ms. Bose, from that incident in

4    July of 2015 until, let's say November of 2015, what

5    were your interactions with Dr. Bose (sic) like?

6    **A.**    Dr. Bose?

7    **Q.**    I'm sorry, Dr. Bea.  Dr. Bose is your father.

8    **A.**    Yes.

9    **Q.**    What were your actions with Dr. Bea like from

10   July 2015, after that incident, until, say, November

11   of 2015?

12   **A.**    Well, I was -- I was very timid.  I didn't

13   put myself in a position where I would be alone with

14   him again.

15   **Q.**    Okay.  When you say you didn't put yourself

16   in that position, did you continue to go to office

17   hours with him?

18   **A.**    Not by myself.

19   **Q.**    Okay.  When you say "not by yourself," what

20   did you do, what steps did you take to avoid being

21   alone with him, if any?

22   **A.**    Well, I took my friends with me, or, if I had

23   questions, I told them what my questions were and if

24   they didn't understand it, they'd go and get the

25   information for me.

PRIANKA BOSE - DIRECT

39

1   **Q.**    Okay.  Now from -- what other organic

2   chemistry related courses were you taking in the

3   fall semester of 2015?

4   **A.**    So the fall semester of 2015 was the second

5   unit, organic chemistry, so I took Orgo I first

6   semester of 2015 and then the fall semester of 2015

7   I took Organic Chemistry II.  Organic Chemistry II

8   at Rhodes combines what would have been Orgo I Lab

9   and Orgo II Lab, so it is a two credit class called

10  Orgo II Lab.

11  **Q.**    So who taught the Organic -- who -- who

12  taught the lecture portion of the Organic Chemistry

13  II course?

14  **A.**    It would be Dr. Kimberly Brien.

15  **Q.**    The lecture portion?

16  **A.**    Oh, I thought you said of the lab course.

17       The lecture portion was Dr. Bea.

18  **Q.**    Okay.  And Dr. Brian then taught the lab

19  portion, is that what your testimony --

20  **A.**    Yes.

21  **Q.**    -- was intended to be?

22  **A.**    Yes.  Sorry.

23  **Q.**    Okay.  Now was Dr. Bea in any way associated

24  with the Organic Chemistry II Lab course?

25  **A.**    He had his own section on Fridays we went

PRIANKA BOSE - DIRECT

40

1    for.

2    **Q.**      Your lab course I'm asking about?

3    **A.**      No.

4    **Q.**      Okay.  He didn't -- it wasn't a teacher for

5    that course in any way?

6    **A.**      No.

7    **Q.**      All right.  Did Dr. Bea -- did you have any

8    interactions with Dr. Bea during your Organic

9    Chemistry II Lab course?

10   **A.**      Yes, almost every week.

11   **Q.**      Can you describe those interactions with

12   Dr. Bea, the frequency and when they took place?

13   **A.**      Organic II Lab at Rhodes is once a week.

14   Most labs are once a week.  He -- course starts the

15   second week of school to give students a chance to

16   acclimate.

17          So every week Dr. Bea started coming to my

18   lab session.  And he would walk in the lab, talk to

19   the teacher, walk around a little bit, but he would

20   always come to me and talk to me.

21   **Q.**      Okay.  Did he talk to other students?

22   **A.**      Only if they asked him a question, from what

23   I could tell.

24   **Q.**      Did you initiate these conversations with

25   Dr. Bea?

1   **A.**     No.  Most of it didn't even see him

2   approaching me, he would often because the -- if my

3   lab desk or portion of the lab desk is right here,

4   then the relativity of the door would be right

5   there.  So I was not looking at the door so I

6   wouldn't see him coming towards me as long as he

7   came around.

8   **Q.**     So he would then initiate these

9   conversations?

10  **A.**     Always.

11  **Q.**     Okay.  To your knowledge did Dr. Bea have any

12  legitimate pedagogical reason, legitimate

13  educational reason to be present there in your lab?

14           **MS. KRUPICKA:**   Objection, Your Honor.

15  This witness is not qualified to answer that

16  question?

17           **THE COURT:**   You have to lay a better

18  foundation for that.

19           Sustained.

20  **BY MR. TIMMONS:**

21  **Q.**     Did Dr. Bea -- well -- let me just ask you

22  this, what did Dr. Bea talk to you about?

23  **A.**     Well, he would come and say, hi, like usual

24  and ask me what I was doing, I was doing the lab, so

25  I would say, oh, well, I'm at this step of the

PRIANKA BOSE - DIRECT

42

1    experiment, this is where I'm stuck, if I was stuck,

2    or this is what I'm about to do.

3         And then I would just keep on doing my work.

4    And he would look at my experiment.  And then, if I

5    was doing something wrong, he would tell me what I

6    was doing wrong and how to fix it, or if I had

7    skipped a step and I said the wrong thing to him, he

8    would fix it for me.

9         And often times if I told him, Dr. Bea, I

10   don't need help, but thank you right now, and he

11   would say, oh, but you really need to do this.  And

12   he would just do it.

13   **Q.**    Did Dr. Bea ever talk to you about anything

14   not related to organic chemistry in those labs?

15   **A.**    Yes.  He --

16   **Q.**    Okay.  Can you describe that?

17   **A.**    Well, it's simply personal questions like,

18   you know, how is your day going, what are you up to

19   tonight, just really interested in what I did after

20   lab, how I conducted my extracurricular activities.

21        I already established in my mind from July

22   that I didn't want to talk to him about stuff like

23   that.  So anytime he would mention anything other

24   than school, I would immediately become

25   uncomfortable so I didn't know if it was to lead to

PRIANKA BOSE - DIRECT

43

1   him asking me about my boyfriend again or him asking

2   me something even more intimate like, you know,

3   where do you see yourself marriage-wise or I don't

4   know, I mean, imagination can do anything.  I

5   didn't -- I wanted to prevent any topic like that

6   from coming up again.

7   **Q.**      When he asked you about personal matters, was

8   there ever any incident when you or what, if any,

9   incident ever was there when you asked him to stop?

10  **A.**      Yes.

11  **Q.**      Okay.  Can you describe that incident?

12  **A.**      There's one day very early on in September, I

13  think it was September 14th, it was a Monday, it was

14  right before fall break, and he came in, and I was

15  just really struggling with this experiment.  I kept

16  messing up.  And when you mess up in Orgo you have

17  to start all over again, it just takes forever.  So

18  I was getting really frustrated, but I like to do

19  things on my own.

20       So I was reworking it from the beginning

21  because I had already messed up twice, and he came

22  up to me and I told him, I said, Dr. Bea, I really

23  cannot talk right now, I have to focus on this

24  titration, it's not working for me, could I talk to

25  you later, sorry, I just can't talk to you right

PRIANKA BOSE - DIRECT

44

1   now.  And he was really persistent, he leaned on my

2   table and he goes, oh, let me help you.  I said,

3   I -- I really don't need your help, I want to do

4   this on my own, I have to learn that.

5          So he just kept coming closer.  And so I

6   backed away and, I said, Dr. Bea, stop, I am going

7   to do this on my own.  I'm fine, I promise, if I

8   need help I will go ask Dr. Brien.

9          And so he backed away and he said, okay, I

10  really need to talk to you, can you come see me

11  after class.

12  **Q.**    Okay.  Did you go see him after class?

13  **A.**    Well, he was waiting outside the door, so I

14  didn't really have a choice because he was waiting

15  there.

16  **Q.**    Okay.  And what did he talk to you about?

17  **A.**    So I went to his office, and I sat across

18  from his chair, we were across the desk from each

19  other.  So I sat across from him, and I said, so

20  Dr. Bea, what's up, how can I help you.

21         And he told me, you know, I've been thinking

22  about this for a while, I'm wondering if you have

23  any publishing experience.  So I said, publishing,

24  I -- like what do you mean, for research.  And he

25  said, yeah, have you ever done research before, have

PRIANKA BOSE – DIRECT

45

1    you ever written a paper before.  And I said, I told

2    him what little publishing experience I had, what I

3    had done in high school.  And that ranged from

4    English to history.

5         So, but I told him what I had done.  And then

6    I thought that would be the end of it.  And he asked

7    me, he said, well, you know, if you need help

8    getting publishing experience or having research

9    experience, it will look really good for med school,

10   so I can help you with that.  If you want to do

11   research with me, that would be perfectly fine, I

12   would like that.

13        And I didn't want to do it with him because

14   that meant more time outside of school with him and

15   it would be in a closed space, it was not good.

16        And so I told him thank you for the offer,

17   but no, thank you, I don't think I have the time to

18   take on a research experiment with my course load

19   this semester, but it was very kind of him.

20        And I got up and I said, well, I will see you

21   in class tomorrow or on Wednesday, and he said,

22   wait, wait, wait, I have more questions for you.

23        So I sat back down and I said, okay, is it

24   about research.  And he said, no, I was just

25   wondering because you're Indian, and I have a lot of

PRIANKA BOSE - DIRECT

46

1    Indian friends, like, where are you from in India.

2    I said, well, India, I'm from the north.

3         And he goes where -- where exactly are you

4    from.  And he's very persistent, he wanted to know

5    about my family.  And I said, look, I'm an American,

6    I live here.  My family is all over the place, I'm

7    pretty mixed.

8         So he asked me about my family in Atlanta and

9    how I liked my family, what we did, did we get to --

10   did I get to go home often.  And so I just didn't --

11   he asked a lot of questions on a row so I didn't

12   catch all of them, but I didn't really answer them

13   either.  And I told him, I said, look, Dr. Bea, I

14   have to go.  And he goes, well, I'm just really, you

15   know, interested.  So what do you like to do, are

16   you in a sorority.  I said, Dr. Bea, I have to go, I

17   have -- I have a meeting I need to get to.  And he

18   goes, I just want to make sure that you're being

19   safe.  Like, if you party, I just need to know.  I

20   said, well, I'm sorry, I have to go.

21        So I got up to leave, and that wasn't good

22   enough for him.  So he got up and he said, I will go

23   with you, I will take you outside and we can talk

24   some more.  So he walked me outside and I said,

25   okay, well, I'm going this direction, so I'll see

```
 1   you later, I'll see you in class.  And he said, oh,
 2   are you sure, I will walk you to class -- I mean,
 3   walk you to the meeting.  And I said, no, you don't
 4   need to do that.  Look, I need to call my dad.  I
 5   just -- at that point I said, I just said anything
 6   to make an excuse to getaway from him.  Because
 7   walking me outside of the building was unnecessary,
 8   asking me those questions was unnecessary.
 9           I remembered what my mom said about being
10   professional and that just didn't seem professional
11   to me.
12           So I drew that line and I said no, and I
13   walked away.  And then he followed me for a little
14   bit, and by a little bit, I mean, like just a few
15   feet, took a few steps forward.  And I immediately
16   got on the phone and I called my dad.  And then my
17   dad and I just had a conversation as I was walking
18   away, and I basically just said to my dad, hey,
19   what's up, how are you, talk to me, I'm bored, I
20   just need to talk to somebody right now.  And so we
21   had a little bit of a conversation, but I didn't
22   bring any of this up except for that Dr. Bea asked
23   me about research.  And my dad said --
24           **MS. KRUPICKA:**  Objection, hearsay.
25   **A.**      Oh, sorry, sorry.
```

1    **BY MR. TIMMONS:**

2    **Q.**      Don't tell -- don't tell me --

3    **A.**      I apologize.

4    **Q.**      -- what anybody else said.

5    **A.**      And so I talked to my dad.  And then I called

6    my mom after that, and I was sitting outside the

7    steps of Palmer Hall, which is an English hall and

8    just called my mom and I told her exactly what

9    happened because I told her about the incident in

10   July.  So that -- that was the end of that.

11   **Q.**      Did you discuss that incident with anybody

12   besides your mother?

13   **A.**      No.

14   **Q.**      Now was there an incident in November of 2015

15   that caused you particular concern?

16   **A.**      On November 19th I was sitting in the Rat

17   with Chelsea Dezfuli.  We were waiting for one of my

18   friends to come and eat lunch.

19   **Q.**      Can you explain -- say what the Rat is?

20   **A.**      Oh, my apologies.

21          The Rat is the Refectory, the cafeteria at

22   Rhodes, we call it the Rat.

23   **Q.**      Okay.  So you were sitting in the Refectory

24   at Rhodes Chelsea Dezfuli waiting on another friend,

25   and then what happened?

1   **A.**      So I was sitting with my back turned towards

2   her, but she was sitting -- she was -- she was

3   proximated towards the door of the Rat, and I was

4   proximated this way, so kind of right-angled, and we

5   were both looking at our phones.  And Dr. Bea

6   walked -- I don't know how he reached me, but he

7   came from behind me.  And he leaned over my

8   shoulder.  And he was this far (indicating) from me,

9   so about three inches and he put his head there and

10  he looked at my phone and he asked me very sternly

11  are you texting your boyfriend.  I didn't take it as

12  a joke.  Because I didn't see him coming I was

13  startled and I jumped and I looked at him, and I

14  didn't say anything.  I gaped at him basically.  And

15  he just smiled and walked away.  And I turned around

16  and Chelsea and I talked about it and I told her

17  that I felt this was -- this was not good, he was

18  getting way to close to me.  And she encouraged me

19  to go and report it.

20        **MS. KRUPICKA:**   Objection, hearsay again.

21  **BY MR. TIMMONS:**

22  **Q.**      Don't -- don't tell me what Chelsea told you

23  to do.

24  **A.**      Sorry.

25  **Q.**      You can tell me what you said, but don't tell

1   me what Chelsea said?

2   **A.**      So I said I felt uncomfortable.  And then

3   I -- I decided that it was time to do something

4   about it.  So one our other friend came, I stepped

5   aside and I called my mother and I told her what

6   happened again.  And after talking to my mom I went

7   and ate lunch.  And then we, Chelsea and I, we were

8   walking outside, and I saw Dr. Bea outside the

9   Kennedy Hall, which is the chemistry building at

10  Rhodes, so I thought that was a pretty good time to

11  go catch him because the incident just happened.

12  And I figured if I told him that his -- that I was

13  perceiving him to make advances on me and that I was

14  getting really uncomfortable with the questions he

15  was asking me.  And that he was always around when I

16  was in class for a lab, then it would stop, I hadn't

17  told him before, I hadn't really addressed it with

18  him, so I wanted to say it to him first before I did

19  anything else.

20          So I approached him and Chelsea stayed behind

21  me, like, I could see her, so I felt very

22  comfortable going up to him and telling him, and so

23  I walked up to Dr. Bea, hey, Dr. Bea, can I talk to

24  you for a second.  And he turned around and he was

25  very happy to see me, it seemed like, so he said,

PRIANKA BOSE - DIRECT

51

1    hey, Prianka, like whatever you need, what's going

2    on.  And I said, look, Dr. Bea, I don't know if you

3    mean it this way, but I feel really uncomfortable

4    when you ask me questions about my boyfriend, when

5    you ask me anything about my family, I don't want

6    personal questions, I want to keep our relationship

7    strictly professional.

8          And his reaction was just so opposite of what

9    I thought he was going to -- I thought he was just

10   going to say, you know, I'm so sorry, like that's

11   not what I meant, I'm your professor, I didn't mean

12   to make you feel uncomfortable.  I got nothing.  I

13   got no comment.  He just looked at the ground and he

14   walked away.  And I just, I knew -- I knew it didn't

15   go well.

16         So I walked back to Chelsea and I told her, I

17   said, that didn't go well, I don't know what to do

18   now.

19   **Q.**    So that was November 19th.

20         How many -- on November 20th did you have

21   another class with Dr. Bea?

22   **A.**    On November 20th, it's Monday, Wednesdays and

23   Fridays are Orgo II I think, Orgo II.  And on

24   Friday, November 20th, I had a test.

25   **Q.**    Okay.  Did you have any interaction with

PRIANKA BOSE - DIRECT

52

1    Dr. Bea on the 20th?

2    **A.**      I woke up with a hundred and two fever.  I

3    wasn't planning on taking the test early, but I

4    didn't want to keep coughing because it's so

5    disrupting for everybody else.

6            So I went to his class and I told him, I

7    said, I went -- sorry -- I went to his office and I

8    said, can I please take the test early, I went very

9    early, it was like 7:30.

10           And so I started taking the exam, but usually

11   when I go to his office to take an exam or a quiz,

12   he usually engages me in conversation, like, he asks

13   me, how are you, are you prepared for the test, do

14   you have any last minute questions, I can help you

15   with them.  He didn't say anything to me, he just

16   printed it out and tossed it on the desk, he didn't

17   say anything.

18           And so I started taking my exam like I always

19   do.  And he was in there for 30 minutes with me, and

20   then I continued taking the exam after he left.

21   **Q.**      Did his behavior to you seem unusual?

22   **A.**      It did because he usually talks to me.

23   Usually when I take an exam or a quiz he's talking

24   to me during the whole thing, it's really

25   disruptive.  The last time he didn't talk to me at

PRIANKA BOSE - DIRECT

53

1    all, he treated me like I wasn't even there.

2    **Q.**      On the subsequent Monday, you said that was

3    on a Friday, on the subsequent Monday, the 23rd, did

4    you have another class with Dr. Bea?

5    **A.**      Yes.

6    **Q.**      Okay.  How would you describe Dr. Bea's

7    conduct towards you in that class?

8    **A.**      Chelsea and I were doing practice problems

9    over the weekend.  So there were a few we didn't

10   understand.  And we were just starting a new unit

11   right before the final exam, so we finished the

12   practice problems and I had questions.

13          So we always go to class early and sit there

14   and wait for him on Tuesdays.  So I waited for him

15   to come.  And he was writing the beginning of the

16   lesson on the board.  So while he was doing that, I

17   walked up to the board and said, hey, Dr. Bea, I

18   have a few questions for you about the practice

19   problems.  And he didn't respond.  He didn't even

20   look at me.  So I asked again a little louder and he

21   still didn't respond at all.  And I was pretty sure

22   he heard me, but I wasn't getting any response, so I

23   asked again.  And after that, the third time, he

24   looked at me and he shrugged his shoulders, and that

25   was -- that was it.  He didn't answer the questions.

PRIANKA BOSE - DIRECT

54

1        So I went back and I told Chelsea that he

2   didn't know the answer.

3   **Q.**    Now did that seem unusual to you?

4   **A.**    Yes.  I always take practice problems to him

5   and he's never shrugged his shoulders at me when I

6   asked the questions.

7   **Q.**    All right.  Did you decide to or, rather,

8   what, if anything, did you decide to do as a result

9   of Dr. Bea's conduct?

10  **A.**    I felt that his new attitude towards me

11  stemmed from the fact that I talked to him and

12  maybe --

13        **MS. KRUPICKA:**  Objection, Your Honor, pure

14  speculation, it's irrelevant.

15        **MR. TIMMONS:**  Your Honor, she's testifying

16  as to why she did something.

17        **THE COURT:**  I will allow it.

18        Go ahead.

19  **A.**    So I felt very uneasy and I wanted to make

20  sure that there wasn't anything off, that I was

21  still a student and that he wanted to teach me.

22        So I went to his office after class, and I

23  walked in and I said, Dr. Bea, can I talk to you.

24  And he didn't look at me, he was on his computer.

25  And so I sat down and I said it again, Dr. Bea, can

PRIANKA BOSE - DIRECT

55

1    I please talk to you, I really need to talk to you.

2    And he didn't look at me.

3         So I just went ahead and said what I needed

4    to say.  And what I said was, look, since Friday I

5    don't know what's happened, but it doesn't seem like

6    you want to teach me anymore, it doesn't seem like

7    you want to answer my questions, so it's not like

8    I'm going to report you, I just want to continue

9    learning, so can you just answer my questions.  And

10   he didn't respond, so I left.

11   **Q.**    Right.

12        After that what, if any, interactions did you

13   have with Dr. Bea?

14   **A.**    After that I had been traveling over the

15   holidays, so when I came back, we had a quiz and a

16   final to prepare for, this would be the first week

17   of December.

18        On November 30th, the last day in November,

19   on -- it was a Monday, and I had already been

20   studying over the break, so I had questions, but my

21   problem was I had lost all my tests and my quizzes

22   before the break even began.  So I didn't have any

23   of my study materials with me and I needed extra

24   practice problems, and I had already done all the

25   other practice problems, and Dr. Bea was the only

PRIANKA BOSE - DIRECT

56

1   person I thought could give me practice problems

2   that would best prepare me for the final.  Which is,

3   the final in chemistry is a standardized final,

4   everyone takes that at all the schools.

5          So it was something I was pretty nervous

6   about and I wanted to make sure I got in as much

7   practice as I possibly could.  So I went to Dr. Bea,

8   just like I did on November 23rd, I was waiting for

9   him in class.  And when he came to class, he started

10  writing on the board, I walked up to him and I said,

11  Dr. Bea, I lost my testing quizzes over the break,

12  do you have anything that I could study with to

13  replace them, any old tests or quizzes, any new

14  practice problems, is there anything that you have.

15  And he didn't respond at first.  And so I was about

16  to walk away, but before I walked away, he said,

17  just see me -- come about five minutes after class

18  ends and I will find something for you.

19         So I got a little happy at that, I said,

20  okay, new practice problems.  And then I went around

21  five minutes after class and he just -- he was on

22  his computer.  And when I waked in, I said, hey,

23  Dr. Bea, can I have those practice problems that you

24  found.  And he pointed to a stack of papers and he

25  said take what you want.  And that was the only

PRIANKA BOSE - DIRECT

1  conversation we had at that time.  I took what I

2  needed and I left.

3  **Q.**     All right.  Now about what date was this?

4  **A.**     The last day of November.

5  **Q.**     November 30th?

6  **A.**     Yes.

7  **Q.**     Okay.  All right.  Now I'm going to show you

8  a document.

9          Can you identify that document for me?

10  **A.**     This is the letter I received on December

11  4th, it was the day before my sister's birthday.  He

12  told me that I was suspected of cheating.

13  **Q.**     Okay.  Was this the first notice that you

14  received that you had been accused of cheating?

15  **A.**     Yes.

16          **MR. TIMMONS:**  All right.  Your Honor, I

17  would like to make that the first exhibit.

18          **THE COURT:**  Any objection?

19          Have you seen it?

20          **MS. KRUPICKA:**  No, no objection.

21          **THE COURT:**  All right.  We will go ahead

22  and receive the document that has been identified,

23  it will be Exhibit Number 1 to the hearing.

24          **MR. TIMMONS:**  Right.

25          (Exhibit Number 1 was marked; Description:

PRIANKA BOSE - DIRECT

58

1    Letter.)

2    **BY MR. TIMMONS:**

3    **Q.**     Now, Ms. Bose, I will try and make sure that

4    I can get the entire body of the letter here.

5         Other than the body of the letter that is

6    visible to you right now, did you receive anymore

7    detailed comment from anyone on the Honor Council or

8    anybody in the school administration about the basis

9    for the allegation that you were accused of

10   cheating?

11   **A.**     Within an hour of reading this letter, I read

12   this letter when I got into the car, because I just

13   surprised my little sister at our old high school

14   because I drove all the way from Memphis to Atlanta

15   to surprise her for her 16th birthday because I

16   missed it the last two years, so I read this e-mail

17   before I drove her back home.

18        And I -- within an hour or two of reading

19   this letter, I called President Adolph, and I asked

20   her about it, but she's the president so she can't

21   give me any details.

22        And then I called Mr. Trychta my peer who is

23   stated to be the investigator in this case.

24             **THE COURT:**  What was his name?

25             **THE WITNESS:**  Mitch Trychta.

PRIANKA BOSE - DIRECT

59

1          **THE COURT:**  Trychta.

2          **THE WITNESS:**  T-r-y-c-h-t-a.

3  **BY MR. TIMMONS:**

4  **Q.**     And is that the gentlemen referenced here at

5  the beginning of the second paragraph of the letter?

6  **A.**     Yes.

7  **Q.**     Okay.  And who is Mitch Trychta?

8  **A.**     He's a junior biology major at Rhodes.

9  **Q.**     Okay.  So he's student at Rhodes?

10  **A.**     Yes.

11  **Q.**     Not a member of the administration?

12  **A.**     No, no, I had no contact with the

13  administration.

14          The next person I talked to was Dr. Bea after

15  talking to Mitch and Regan.  And -- but that was on

16  Monday -- 5th, 6th -- December 7th, Dr. Bea -- that

17  was the last time I talked to Dr. Bea before the

18  Honor Council hearing.

19          And I never had any contact with

20  administration until Dean Blaisdell saw me after my

21  second meeting with Mitch.

22  **Q.**     Okay.  Now in addition to this statement,

23  specifically it's alleged that you cheated on

24  multiple assignments in Organic Chemistry II

25  Lecture.

PRIANKA BOSE – DIRECT

60

1       Did anybody provide you the specifics of the

2   allegations against you.

3   **A.**     On December 4th?

4   **Q.**     On December –– between this letter and the

5   meeting that you had with Mitch Trychta, did you

6   ever get anything in writing, let me rephrase this?

7   **A.**     No.  No.  I –– the only thing I have is what

8   you're reading right now is I was suspected of

9   cheating on multiple assignments in my Organic

10  Chemistry II Lecture, and I was accused by my

11  professor.

12  **Q.**     Right.

13      I'm going to show you another document and

14  ask you to identify it.

15          **THE COURT:**  Why don't you pass it to her

16  and get her to identify it ––

17          **MR. TIMMONS:**  Certainly.

18          **THE COURT:**  –– before you put it on the ––

19          **MR. TIMMONS:**  Certainly.

20          May I approach, Your Honor.

21          **THE COURT:**  Sure, go ahead.

22          **MR. TIMMONS:**  Thank you.

23  **BY MR. TIMMONS:**

24  **Q.**     Can you identify that document, please?

25  **A.**     Oh, this is the document that I provided my

1    investigator with in order to provide witnesses for

2    my hearing.

3    **Q.**     Okay.  Now did this document -- was that

4    generated before or after your meeting with Mitch

5    Trychta?

6    **A.**     This was a week after my meeting with Mitch.

7    **Q.**     All right.

8            **MR. TIMMONS:**  Your Honor, I would like to

9    make that Exhibit 2.

10           **THE COURT:**  I'm assuming all the documents

11   the other side has seen?

12           **MR. TIMMONS:**  Yes --

13           **MS. KRUPICKA:**  I haven't seen it, Your

14   Honor.

15           **MR. TIMMONS:**  -- I will be happy to

16   provide copies, Your Honor.

17           **MS. KRUPICKA:**  We have no objection, Your

18   Honor.

19           **THE COURT:**  All right.  Then we will go

20   ahead and receive the document.

21           I need to know what it's entitled, what is

22   it?

23           **MR. TIMMONS:**  Your Honor, this is the --

24   an e-mail from Regan Adolph, R-e-g-a-n A-d-o-l-p-h,

25   December 13th, 2015.

PRIANKA BOSE - DIRECT

62

1           (Exhibit Number 2 was marked; Description:

2    E-mail.)

3    **BY MR. TIMMONS:**

4    **Q.**     Before I get into that e-mail, in your

5    meetings with Mitch Trychta, what, if any,

6    information were you provided about the specifics of

7    the allegations against you?

8    **A.**     In my first meeting with Mitch he told me a

9    very vague description of what I was being accused

10   of.  He said that -- well, I'm sorry, that's

11   hearsay.

12   **Q.**     That's fine, I'm not asking for the truth of

13   the matter asserted therein, I'm asking what

14   information you were provided, so I'm not calling --

15   not asking for hearsay.

16           **MS. KRUPICKA:**  Your Honor, I think that's

17   still hearsay, but I have no objection.

18   **A.**     I don't know how to tell the information

19   without saying how he told me.

20   **Q.**     She is not objecting, go ahead and answer.

21           **THE COURT:**  Go ahead and answer.

22   **A.**     Okay.  What I was told was that Dr. Bea had

23   suspected me of cheating and then he still needed

24   hard evidence against me and that he had finally

25   gotten hard evidence against me, so that's why I was

PRIANKA BOSE - DIRECT

63

1    being interviewed, like that's why I was talking to

2    the investigator, that's how the beginning of the

3    conversation went.

4         And so my responding questions were, well,

5    what does hard evidence entail, is it videotapes, is

6    it photos, is it physically watching me cheat, I

7    don't understand what that means.  And Mitch said,

8    well, we will get more into that later.  We never

9    got into that at that time.

10   **Q.**    Okay.  You said you had another meeting with

11   Mitch Trychta, correct?

12   **A.**    Right.

13   **Q.**    Okay.  Did you get into the specifics of the

14   allegations of cheating or the evidence against you

15   at that meeting with Mr. Trychta?

16   **A.**    The only evidence presented to me at that

17   meeting was my own quiz.  So Mr. Trychta put my quiz

18   in front of me and asked me to identify it.  And

19   then he asked me how I felt about the quiz.  And so

20   I went through the quiz with him and told him why I

21   put down what I put down.

22        And then we had a break.  And he came back

23   and he gave me my quiz again and then he put what

24   they called Dr. Bea's hard evidence on the table

25   which was another answer key.  And he asked me to

PRIANKA BOSE - DIRECT

64

1   look at the answer key, and he identified it for me,

2   that this was the answer key that Dr. Bea had and to

3   examine my test answers and the answer key, the test

4   answers.

5        I never received my quiz with the other

6   students in the class, so I didn't -- this is the

7   first time I've seen my quiz since I took it.  And I

8   looked at them and they were similar.

9   **Q.**      Okay.  Did -- what, if anything, did

10  Mr. Trychta say about the answer key itself?

11  **A.**      After I said that they looked similar to me,

12  he said, well, that's because Dr. Bea planted this

13  on his computer so that you would find it.  And he

14  said this is a fake answer key that Dr. Bea

15  generated for you.

16       And I just got up and I started walking

17  around because I didn't understand what that meant.

18  So I sat back down and my Honor Council adviser was

19  with me, Ms. Tori Conklin.  I just didn't get it, it

20  didn't make sense, what's a false answer key, did

21  other student -- is this like a different test.

22       And then he put the real answer key, the one

23  that apparently has the correct answers on it that

24  matches what others students were supposed to get.

25  And he asked me, he said, why doesn't yours match

1    this one.  I said I don't know.  If Dr. Bea says

2    that those answers are wrong, that my answers are

3    wrong and those answers are correct, I guess I just

4    messed up on this quiz, but I never saw that key

5    before.

6         So I just started to cry, I said, I didn't

7    get it.  And that's when Dean Blaisdell came forward

8    and talked to me.

9    **Q.**    Who is Dean Blaisdell?

10   **A.**    The Dean of Academic Affairs, Student Affairs

11   at school.

12   **Q.**    Okay.  And what did Dean Blaisdell tell you

13   about the allegations against you, if anything?

14   **A.**    I don't think he -- he knew what I was being

15   accused of either.  I'm sorry, that's speculation

16   but from our conversation he -- he hadn't seen that,

17   he hadn't even heard of any answer key yet when he

18   talked to me.  Because I mentioned it to him and he

19   said to me, well, how that can be.  And it just

20   seemed to me that --

21        **MS. KRUPICKA:**  Objection, Your Honor.

22        **THE COURT:**  Yes, ma'am.

23        **MS. KRUPICKA:**  She is speculating.

24        **THE COURT:**  Don't speculate about what you

25   think other people thought or anything like that.

1              Go ahead.

2    **A.**     Well, he just asked me if I could call my

3    parents and I said I --

4              **MS. KRUPICKA:**  Your Honor, there is not a

5    question on the floor.

6              **MR. TIMMONS:**  She is correct.  Just wait

7    for me to ask a question.

8    **BY MR. TIMMONS:**

9    **Q.**     Ms. Bose, other than the statements that you

10   just described by Mitchell Trychta, prior to the

11   Honor Council hearing itself, were you ever

12   presented with any of the evidence against you or in

13   more detailed description of the allegations against

14   you?

15             **MS. KRUPICKA:**  Objection, Your Honor,

16   assumes facts not in evidence, she just testified as

17   to the details that she had been provided.

18             **THE COURT:**  Overruled.

19             Go ahead and answer.

20   **A.**     I -- can you repeat the question?

21   **Q.**     Other than the information that you just

22   described regarding your meeting with Mitchell

23   Trychta, were you ever provided any other

24   information about the allegations against you or the

25   evidence against you that was to be presented at

PRIANKA BOSE - DIRECT

67

1    this Honor Council hearing?

2    **A.**    I only knew by the time I got to my second

3    interview with Mr. Trychta was I had been accused of

4    cheating on multiple assignments.  I don't know what

5    quantifies multiple, so I assumed all of them.  And

6    that there was a fake answer key that I had never

7    seen before.  That -- that's all I had.

8    **Q.**    Now Mr. Trychta told you that Dr. Bea planted

9    this answer key on his computer.

10         Had you ever accessed Dr. Bea's computer to

11   or rather accessed any answer keys on Dr. Bea's

12   computer before?

13   **A.**    No.  I don't have his password, I don't know

14   how you can get into a computer without a password.

15   **Q.**    Okay.  Did you routinely utilized Dr. Bea's

16   computer for anything?

17   **A.**    No.  It's not my computer.

18   **Q.**    All right.  Now this e-mail, Exhibit 2,

19   actually page two.

20         Is this you advising the Honor Council that

21   you intend to call Chelsea Dezfuli and Matthew

22   Chapman as potential witnesses?

23   **A.**    Yes.

24   **Q.**    Okay.  Who is Chelsea Dezfuli?

25   **A.**    She's my friend.

PRIANKA BOSE - DIRECT

68

**Q.**      Okay.  Who is Matthew Chapman?

**A.**      He's my friend.

**Q.**      Are they students in that Orgo -- Organic
Chemistry II class or were they?

**A.**      Chelsea Dezfuli sat next to me in Organic
Chemistry II in Dr. Bea's lecture class.  She and I
were in different lab courses.

            Matthew Chapman is a chemistry major at the
University of Georgia and he drove up for it.

**Q.**      Okay.  Did you provide witness statements for
those two people to Rhodes College?

**A.**      Witness statements before the hearing?

**Q.**      Yes?

**A.**      No.

**Q.**      Okay.  I'm going to show you one more
document.

            **MR. TIMMONS:**  If I could approach?

**BY MR. TIMMONS:**

**Q.**      Ms. Bose, could you identify that document?

**A.**      This document is -- or, yes, it is --
contains copies of letters from Honor Council
President Regan Adolph.  This document details the
first time that I was being told what I was
specifically accused of.  This happened two days
before the actual -- two or three days before the

PRIANKA BOSE - DIRECT

69

1    actual hearing, and it was after the pre-hearing

2    that the Honor Council had to review all the

3    materials.

4    **Q.**    Okay.

5            **MR. TIMMONS:**  I would like to make that

6    Exhibit 3, Your Honor.

7            **MS. KRUPICKA:**  No objection, Your Honor.

8            **THE COURT:**  All right.  Then we will go

9    ahead and receive the document.  This will be

10   collective Exhibit Number 3.

11           (Exhibit Number 3 was marked; Description:

12   E-mails.)

13   **BY MR. TIMMONS:**

14   **Q.**    All right.  That document states that

15   specifically it's alleged that you stole from

16   Professor Bea and cheated in Chem 212, specifically,

17   but not limited to Quiz 3, Quiz 4, Quiz 5, Midterm

18   2, and Midterm 3.

19           It then goes on to state that the pre-hearing

20   committee, the Honor Council voted to take the

21   matter to a hearing.

22           Were you given any other specifics on the

23   allegations against you beyond this document and

24   what you previously testified to before the Honor

25   Council hearing itself?

PRIANKA BOSE - DIRECT

1    **A.**      No.

2    **Q.**      Right.

3           Now at the Honor Council hearing, did you

4    learn precisely what you were accused of having

5    done?

6    **A.**      Yes.

7    **Q.**      Okay.  What specifically were you -- now let

8    me backup and establish a few more parameters.

9           Did you have any counsel at this hearing,

10   whether an attorney or another person, to provide

11   you advice?

12   **A.**      No, there were no adults in the room.

13   **Q.**      When you say no adults, you mean no, no one

14   other than Rhodes College students.

15   **A.**      Yes.  Only the Honor Council members, Dr. Bea

16   and me were in the room until witnesses were called

17   forth and they were in the room.

18   **Q.**      Okay.  How many members did the Honor Council

19   consist of?

20   **A.**      I -- I don't have an exact number, I never

21   counted them.

22   **Q.**      Okay.  Do you recall -- I will ask you more

23   generally -- this hearing panel, the Honor Council,

24   who were the people that served on it?

25          Were they students, for example, or faculty

PRIANKA BOSE - DIRECT

71

1    members, et cetra?

2    **A.**     They were all my peers, they were students.

3    **Q.**     All of them undergraduate students?

4    **A.**     Yes.

5    **Q.**     All right.  Who conducted the hearing itself,

6    who presided over the hearing?

7    **A.**     The Honor Council President, Regan Adolph.

8    **Q.**     What's her role?

9    **A.**     She is a neutral -- neutral position.  She

10   starts off the conducting of the Honor Council

11   proceedings.  She concludes it.  She is supposed to

12   be neutral.

13   **Q.**     Okay.  Is she also a student?

14   **A.**     Yes.

15   **Q.**     Okay.  Who acted as the prosecutor, for lack

16   of a better term, in this hearing?

17          Who made the accusations against you, who

18   made the first statement of accusation against you?

19   **A.**     It would be Dr. Bea.

20   **Q.**     Okay.

21             **MR. TIMMONS:**  Pardon me, Your Honor, if I

22   may have just a minute so I don't have a coughing

23   fit.

24   **BY MR. TIMMONS:**

25   **Q.**     All right.  Now during Dr. Bea's opening

1    statement in this matter, did you learn the details

2    of the accusations against you?

3    **A.**      In his opening statement he talked about that

4    he was very upset and then he -- the Honor Council

5    asked Dr. Bea, so specifically what are you accusing

6    Ms. Bose of.  So he said he thought that it was

7    everything, but evidence he only had for Quiz 5.

8    **Q.**      All right.  Now did you ask my office, was

9    there an audio recording made of this Honor Council

10   proceeding?

11   **A.**      Yes.

12   **Q.**      Did you ask my office to have this

13   transcribed into a transcript by a court reporter?

14   **A.**      Yes.

15   **Q.**      Okay.

16           **MR. TIMMONS:**  Based on Ms. Krupicka's

17   previous comments about wanting to supplement the

18   record with these documents, I don't anticipate --

19           **MS. KRUPICKA:**  I have no objection.

20           **MR. TIMMONS:**  All right.  Your Honor, I

21   would like to go ahead and make the next exhibit a

22   transcript of the Honor Council hearing from

23   December 17th, 2015.

24           **THE COURT:**  All right.  We will go ahead

25   and receive it.  It will be Exhibit Number 4.

1              (Exhibit Number 4 was marked; Description:

2     Transcript.)

3     **BY MR. TIMMONS:**

4     **Q.**     Now as -- as this hearing began, did you

5     believe there was any relationship between your --

6     the interactions with Dr. Bea that you've described

7     previously today and the allegations of cheating?

8     **A.**     I didn't think about it.  This happened to me

9     during finals week.  So I'm studying for five exams,

10    and literally accused of cheating, so I -- I just

11    had to come up with some sort of defense.  But I

12    didn't put two and two together.  I went to Atlanta

13    to talk to my parents in person, but I just -- it

14    completely escaped me because I got that letter.

15    **Q.**     All right.  Now did Dr. Bea present certain

16    exhibits to -- to the Honor Council during the

17    course of that proceeding?

18    **A.**     Oh, he presented my final exam that I took

19    two days before the hearing, I took it on Tuesday.

20    **Q.**     I -- I'll go through them.

21             I'm just asking did -- were there exhibits

22    presented?

23    **A.**     Yes.

24    **Q.**     All right.  Now I'm going to pass you

25    another -- I'm going to pass you another document.

PRIANKA BOSE – DIRECT

74

1        Can you identify this, please?

2   **A.**     This is a copy of his grading roster.

3   **Q.**     Okay.  Was that presented as an exhibit

4   during the Honor Council proceeding?

5   **A.**     Yes.

6   **Q.**     Okay.

7            **MR. TIMMONS:**  Your Honor, I would like to

8   make that the next exhibit.

9            **THE COURT:**  All right.  Ms. Krupicka, let

10  me know if you object to any of these.

11           That will be Exhibit 5.

12           (Exhibit Number 5 was marked; Description:

13  Grading roster.)

14           **MR. TIMMONS:**  Hold that for a second.

15           Your Honor, just to get these out of the

16  way, I'm going to go ahead and get the exhibits

17  entered and marked and then we'll come back and ask

18  questions about them.

19           **THE COURT:**  Okay.

20  **BY MR. TIMMONS:**

21  **Q.**     Can you identify that document for me?

22  **A.**     Dr. Bea has two grading rosters which I found

23  out about during my hearing.  The previous exhibit

24  was his paper roster.  This paper depicted an

25  electronic grading roster.

PRIANKA BOSE - DIRECT

75

1   **Q.**    All right.

2          **MR. TIMMONS:**  I'm trying to speed this

3   along, Your Honor, and just go ahead and pass all of

4   these.

5          **THE COURT:**  The electronic one will be

6   number six.

7          (Exhibit Number 6 was marked; Description:

8   Grading roster.)

9          **MR. TIMMONS:**  Say again, Your Honor?

10          **THE COURT:**  Are we going to have all of

11   them as a collective exhibit or each individually?

12          It doesn't matter.

13          **MR. TIMMONS:**  I don't -- I was planning on

14   introducing them individually --

15          **THE COURT:**  That's fine.

16          **MR. TIMMONS:**  -- just in the interest of

17   not pacing back and forth, I was going to pass all

18   of these documents to Ms. Krupicka.

19          **THE COURT:**  That'll work.

20   **BY MR. TIMMONS:**

21   **Q.**    Ms. Bose, I'm going to pass you a couple of

22   documents, a series of documents.

23          Can you identify those for me?

24   **A.**    This is my Midterm 1 exam.

25   **Q.**    Okay.  Is that the original document?

PRIANKA BOSE – DIRECT

76

1    **A.**      Yes.

2              **MR. TIMMONS:**  Your Honor, I would like to

3    make that the next exhibit.

4              **THE COURT:**  I think the electronic grading

5    roster was number six, is that right, Ross?

6              **THE CLERK:**  Yes, sir.

7              **THE COURT:**  So this will be number seven.

8              (Exhibit Number 7 was marked; Description:

9    Midterm 1.)

10   **BY MR. TIMMONS:**

11   **Q.**      Ms. Bose, can you identify that document?

12   **A.**      This is my second quiz.

13   **Q.**      Okay.

14             **MR. TIMMONS:**  Make that number eight, Your

15   Honor.

16             **THE COURT:**  Yes.

17             (Exhibit Number 8 was marked; Description:

18   Quiz 2.)

19   **BY MR. TIMMONS:**

20   **Q.**      Can you identify that document?

21   **A.**      This is my second test.

22             **MR. TIMMONS:**  Make that one number nine,

23   Your Honor.

24             (Exhibit Number 9 was marked; Description:

25   Midterm 2A.)

PRIANKA BOSE - DIRECT

77

1   **BY MR. TIMMONS:**

2   **Q.**     Can you identify that document?

3   **A.**     This my third quiz -- yes, this is my third

4   quiz.

5   **Q.**     Okay.

6           **MR. TIMMONS:**  I'd like to make that number

7   ten, Your Honor.

8           **THE COURT:**  All right.

9           (Exhibit Number 10 was marked;

10  Description:  Quiz 3.)

11  **BY MR. TIMMONS:**

12  **Q.**     And, Ms. Bose, can you identify that

13  document.

14  **A.**     This is my third midterm.

15  **Q.**     Midterm 3?

16  **A.**     Midterm 3, third test.

17  **Q.**     Thank you.

18          **MR. TIMMONS:**  I would like to make that

19  one number 11, Your Honor.

20          (Exhibit Number 11 was marked;

21  Description:  Midterm 3.)

22  **BY MR. TIMMONS:**

23  **Q.**     And, Ms. Bose, do you still have a copy of

24  the physical grade roster?

25  **A.**     Yes.

PRIANKA BOSE - DIRECT

78

1   **Q.**    With regard to that physical grade roster,

2   which is Exhibit Number 5, are there any allegations

3   made against you that related directly to that

4   document?

5   **A.**    Dr. Bea accused me of accessing his physical

6   grade roster, paper roster and changing four of my

7   grades.

8   **Q.**    Okay.  Of those, the grades on this document,

9   can you tell which ones that he accused you of

10  changing?

11  **A.**    He in numbers on the roster which are struck

12  out are the grades that I have been accused of

13  changing.  And the numbers are next to them are the

14  numbers that Dr. Bea says I'm supposed to have in

15  accordance with the electronic grade roster.

16  **Q.**    So, now you testified earlier that you lost

17  certain documents over the course of the

18  Thanksgiving break, correct?

19  **A.**    Yes.

20  **Q.**    All right.  Are the tests that I just asked

21  you to identify, the tests and quizzes, the grades

22  for which are reflected on this roster, are those

23  among the documents that you misplaced while

24  traveling?

25  **A.**    Yes.

1   **Q.**     Okay.  How did you come to be back in

2   possession of those documents?

3   **A.**     A really nice person found them.  I was --

4   since I was traveling over the holidays, I lost them

5   on one of the flights that I was traveling from, so

6   one day in January --

7             **MS. KRUPICKA:**  Your Honor, I'm going to

8   object.  This is all hearsay.

9   **A.**     It's not --

10            **MR. TIMMONS:**  She hasn't said anything

11  about what anyone said, Your Honor.

12            **THE COURT:**  She's -- just confine it to,

13  you know, how she came back in contact with these

14  documents.

15  **A.**     I received them anonymously through the mail.

16  **Q.**     Okay.  So you got -- you got a package that

17  had your Organic Chemistry notebook in it?

18  **A.**     Yes, the package that I lost.

19  **Q.**     Okay.  Now were these the only documents that

20  were in that package?

21  **A.**     No.

22  **Q.**     Okay.  What -- what did the package consist

23  of?

24  **A.**     I had taken an Urban Outfitters bag and I put

25  one of my notebooks in it.  And in that notebook I

1  had just taken tests and quizzes and notes from all

2  my classes and put them in that notebook so that I

3  could have those materials to study from over the

4  break.

5  **Q.**     Okay.  Now as of the December 4th hearing,

6  did you have those materials with you?

7  **A.**     No.

8  **Q.**     Were they -- had you gotten that package in

9  the mail yet?

10  **A.**     No.

11  **Q.**     Okay.  So as you were presented this

12  document, could you refute what documentary evidence

13  any of the testimony that Dr. Bea gave about the

14  documents?

15  **A.**     No.

16  **Q.**     Okay.  Did -- was Dr. Bea to your knowledge

17  aware of this fact?

18  **A.**     Yes.

19  **Q.**     Okay.  How did he know about that?

20  **A.**     Because on November 30th I went up to him and

21  I said twice, because I lost my tests and my quizzes

22  I need extra material to study for -- to study with.

23  **Q.**     All right.  Now, Dr. Bea represented to the

24  Honor Council that you earned a 47 on Midterm 3, is

25  that correct?

PRIANKA BOSE - DIRECT

81

1    **A.**     Yes.

2    **Q.**     Did you agree that you earned a 47 on

3    Midterm 3?

4    **A.**     I didn't remember it being that low, but --

5    because I didn't remember my grade, I couldn't say

6    anything about it.

7              **MR. TIMMONS:**  If I could have that

8    document back, which it should have been the last

9    one marked.

10   **BY MR. TIMMONS:**

11   **Q.**     Is that Midterm 3?

12   **A.**     Yes.

13   **Q.**     Okay.

14             **THE COURT:**  That's Exhibit Number 11?

15             **MR. TIMMONS:**  Correct, Your Honor.

16   **BY MR. TIMMONS:**

17   **Q.**     What is your actual grade on Midterm 3?

18   **A.**     74.

19   **Q.**     So Dr. Bea, when he testified that you earned

20   a 47, must have altered your grade in his grade

21   roster, Dr. Bea was not making an accurate statement

22   to the Honor Council, correct?

23   **A.**     No.

24             **MR. TIMMONS:**  I will need to -- I'll be

25   going back and forth between those.

PRIANKA BOSE – DIRECT

82

1    **BY MR. TIMMONS:**

2    **Q.**     Now on Midterm 2 Dr. Bea indicated that you

3    actually earned a 93, correct?

4    **A.**     Yes.

5    **Q.**     And that was the statement that he made to

6    the Honor Council, right?

7    **A.**     Yes.

8    **Q.**     Actually this one.

9          And that's the original of Midterm 2,

10   correct?

11   **A.**     Yes.

12        **THE COURT:**   Counsel, I need for you to

13   refer to the exhibit number.

14        **MR. TIMMONS:**   Yes, Your Honor.

15   **BY MR. TIMMONS:**

16   **Q.**     That's Exhibit 9 which is the original of

17   Midterm 2, correct?

18   **A.**     Yes.

19   **Q.**     All right.  What did you actually earn on

20   Midterm 2?

21   **A.**     A 97.

22   **Q.**     Now Dr. Bea testified in that hearing that

23   you accessed his grade roster and changed your

24   grades in such a way as to be beneficial to you.

25        Would it have benefited your grade to change

PRIANKA BOSE – DIRECT

1  your grade on Midterm 3 from a 74 to a 77 (sic)?

2  **A.**      I don't think so.

3  **Q.**      Now Dr. Bea then presented another document

4  that I'm going to pass you.

5          Can you tell me what --

6          Now can you identify that document, please?

7  **A.**      This is the fake answer key that he created

8  for me.

9  **Q.**      Okay.

10         **MR. TIMMONS:**  I would like to make that

11  the next exhibit, Your Honor.

12         **THE COURT:**  All right.  I believe it will

13  be number 12.

14         **THE CLERK:**  Yes, sir.

15         (Exhibit Number 12 was marked;

16  Description:  Fake Answer Key.)

17  **BY MR. TIMMONS:**

18  **Q.**      And Dr. Bea contended that he placed this

19  document on his computer as a trap for you to find

20  and copy on Quiz Number 5, correct?

21  **A.**      Yes.

22  **Q.**      All right.  Now prior to your meeting with

23  the Honor Council investigator, had you ever seen

24  this document before?

25  **A.**      No.

PRIANKA BOSE - DIRECT

84

Q.      Okay.  Did Dr. Bea present any other evidence
at the hearing that that document was created prior
to your taking Quiz Number 5?

        **MS. KRUPICKA:**  Your Honor, I'm going to
object.  The evidence that was presented is in the
transcript, it's been introduced into evidence.  And
whether or not this witness believes that Dr. Bea
introduced any other evidence is just not probative
or relevant.

        **THE COURT:**  I have to sustain the
objection.

        Let's go ahead and finish getting the
facts in so we can move on.

**BY MR. TIMMONS:**

Q.      Now in the Honor Council hearing, what, if
any, efforts did you make -- during Ms. Krupicka's
opening statement that you had ample opportunity to
get in to the allegations of sexual harassment by
Dr. Bea and their relationship to the accusation of
cheating --

        **MS. KRUPICKA:**  Your Honor, I make the same
objection, whatever efforts she made are in the
transcript.

        **THE COURT:**  Where are we going with this,
counsel?

1          **MR. TIMMONS:**  Your Honor, the point here

2     is that the efforts that she made aren't in the

3     transcript.  So I need to ask her what it was that

4     she did to try and introduce this information in --

5     into that Rhodes College administrative record.

6          **MS. KRUPICKA:**  Your Honor, there certainly

7     is a record of her being this topic up in the

8     transcript.

9          If she wants to testify about something

10    that happened outside of the hearing, then let her

11    testify about that.  But I don't -- there is no

12    reason to go through what she did during the hearing

13    when it's in the transcript.

14         **MR. TIMMONS:**  Your Honor, I am actually

15    very specifically --

16         **THE COURT:**  Now I will allow it.  Okay.

17    But I really want us to get to the facts so we

18    can -- so we can move along.  I understand it may be

19    in the transcript, but I will allow you to explore

20    this to a -- to a, you know, a limited degree, so

21    let's move this along.

22         **MR. TIMMONS:**  Your Honor, I'm not going to

23    ask about anything in the transcript.

24         **THE COURT:**  Go -- let's move it along.

25

PRIANKA BOSE - DIRECT

86

1          **MR. TIMMONS:**  Right.

2    **BY MR. TIMMONS:**

3    **Q.**     Now you did reference in the transcript

4    the -- that towards the end of the proceedings that

5    you were concerned that Dr. Bea may be making these

6    allegations for some improper purpose, right, do you

7    recall that?

8    **A.**     Yes, in my closing statement.

9          **MS. KRUPICKA:**  I'm sorry, I didn't hear

10   her last answer.

11         Could you speak up a little.

12   **A.**     Sorry.

13         In my closing statement.

14   **Q.**     So prior to the end of the hearing, had it

15   occurred to you that may be the reason that Dr. Bea

16   had made these allegations?

17   **A.**     No.  Like -- like I said before, I'm taking

18   my finals and I'm trying to prepare a defense.  And

19   it just didn't click for me, it's not the first

20   thought that comes to my mind that my professor is

21   mad at me, that I -- I did something wrong and

22   trying to tell him that I didn't want to talk about

23   more than school.  I thought that maybe he genuinely

24   thought I did something wrong.

25         And I was stuck in August when we started

PRIANKA BOSE - DIRECT

87

1   school because the complaint I heard against me was

2   that I was being suspected of cheating on multiple

3   assignments which dates us back to the beginning of

4   the semester.

5           My confrontation with him didn't happen until

6   November 19th.  I had no timeframe of which to even

7   isolate any sort of reason why.

8           It wasn't until I got to the hearing and I

9   heard him speak for the first time about it that I

10  started to see that he was upset with me.

11  **Q.**     Now towards the end of the hearing did you

12  make an effort, not in the hearing room but outside

13  the hearing room, did you make an effort to put on

14  another witness to demonstrate the facts to which

15  you've testified earlier today about your

16  confrontation with Dr. Bea or what, if any, effort

17  did you make to that effect?

18  **A.**     I told President Adolph that I had a witness

19  who could testify and corroborate my story against

20  Dr. Bea.

21  **Q.**     Okay.  That was -- this was outside the

22  hearing room, correct?

23  **A.**     Yes, it's not on record -- it's not on

24  record.

25  **Q.**     So that's not on the recording and not in the

1    transcript, right?

2    **A.**      No.

3    **Q.**      Now did you -- now did President Adolph

4    permit you to put this witness on?

5    **A.**      No.

6    **Q.**      Okay.  Was that witness present and able to

7    testify?

8    **A.**      Yes.

9    **Q.**      Okay.  Who was that witness?

10   **A.**      Chelsea Dezfuli.

11   **Q.**      All right.  Now after you -- this hearing was

12   concluded, were you immediately notified of any

13   result?

14   **A.**      Yes.  Oh, pardon.  At the conclusion of the

15   hearing, do you mean on the same day or prior?

16   **Q.**      Right, just contemporaneously with the

17   hearing.

18   **A.**      No.

19   **Q.**      Okay.  After the hearing concluded and you

20   went home, were you notified of any result?

21   **A.**      No, because Dean Blaisdell and Regan told me

22   to just come in the morning and they would tell me.

23   **Q.**      All right.  Now did you -- did you receive a

24   notification that, eventually that you were

25   expelled?

PRIANKA BOSE - DIRECT

89

1    **A.**      Yes, after I got the verbal expulsion.

2    **Q.**      Okay.  So they were -- you were verbally

3    advised and then you got an e-mail?

4    **A.**      Yes.

5    **Q.**      Now during the course of this hearing, I'm

6    not asking about the material that's ascertainable

7    from reading that transcript, where was Dr. Bea

8    sitting in proximity to you?

9    **A.**      If I'm sitting here (indicating), President

10   Adolph is sitting next to me on my right and Dr. Bea

11   is sitting next to her, so two seats from where I'm

12   sitting.

13   **Q.**      All right.  Now, so he's sitting a little

14   more than an arm's length from you?

15   **A.**      Yes.

16   **Q.**      Now when -- I want to make sure I ask a

17   question here.

18           When you were asked -- when you asked

19   President Adolph if you could present additional

20   testimony from Chelsea Dezfuli, what did President

21   Adolph actually tell you?

22   **A.**      That the time for witnesses had passed.

23   **Q.**      Okay.  And you wouldn't be permitted to

24   present her as a witness?

25   **A.**      Yes.

1              **MR. TIMMONS:**  If I can get my computer to

2    cooperate, I will play a portion of this audio

3    transcript.

4              **THE CLERK:**  I've got to switch it over off

5    the Elmo.

6              **MS. KRUPICKA:**  You're playing a portion of

7    the audio of the transcript that's in the record?

8              **MR. TIMMONS:**  Of the hearing.

9              **MS. KRUPICKA:**  Okay.  Your Honor, I'm

10   going to object to that, it's in the transcript and

11   I understand we won't have to listen to it, too.

12             **MR. TIMMONS:**  Well, Your Honor, tone of

13   voice is important to convey certain information.

14             **MS. KRUPICKA:**  All right.  I withdraw my

15   objection.

16             **MR. TIMMONS:**  Ms. Krupicka may get her way

17   for technical reasons though.

18             She is going to get her way for technical

19   reasons.

20             All right.  Well, I'm going to ask you a

21   question about the transcript.

22   **BY MR. TIMMONS:**

23   **Q.**    I'm going to pass you a copy of the

24   transcript of that proceeding.

25             I believe that -- do you need a copy?

PRIANKA BOSE - DIRECT

91

1          **THE COURT:**  I do have to ask you, it is in

2     the transcript.  Now a couple of references I don't

3     mind, but we are not going to be reading page after

4     page of transcript that's already admitted.

5          **MR. TIMMONS:**  Not going to do that, Your

6     Honor.

7          **THE COURT:**  All right.

8     **BY MR. TIMMONS:**

9     **Q.**    All right.

10          **MR. TIMMONS:**  Could I ask the court be

11    passed the original.

12    **BY MR. TIMMONS:**

13    **Q.**    Ms. Bose, would you join me on page 195 of

14    this transcript.  I'm sorry, page 194.

15          193, I'm sorry.

16          All right.  Ms. Bose, is this where Dr. Bea

17    starts asking you about why you believe that he is

18    bringing these allegations against you?

19    **A.**    Yes.

20    **Q.**    Okay.  And you attempt to explain.  And would

21    you join me now on page 195.

22          All right.  Ms. Bose, would you read me your

23    statement or, rather, really starting Professor Bea

24    says:

25          "It should be something really, really,

PRIANKA BOSE - DIRECT

92

1  really bad you've done to me in order to get revenge

2  against you.  Really, really bad.  Anything in

3  particular?  A joke, really?  For just a joke, I'm

4  doing all of this?  Tell me."

5        And, Ms. Bose, what did you say in response

6  to that?

7  **A.**    "I don't know how you think.  I do know we've

8  spoken a lot about many different things, your

9  tenure, mostly professional.  And I mean, this kind

10  of relationship between a teacher and a student

11  should remain professional, but, I mean, we were

12  close, so --"

13  **Q.**    And Professor Bea then says:  "Careful what

14  you say in close or not close relationship."

15        After Professor Bea made that statement, did

16  you feel -- how did you feel?

17  **A.**    Scared.

18  **Q.**    Intimidated?

19  **A.**    Yes.

20  **Q.**    Did you feel like you could continue down

21  that line of -- of thought --

22  **A.**    No.

23  **Q.**    -- that line of testimony?

24  **A.**    He interrupted me while I was trying to

25  collect my thoughts together to explain it the best

PRIANKA BOSE - DIRECT

93

1    way that I could.  This was the first time that I

2    attempted to even talk about it.  And I was going to

3    say everything, but --

4    **Q.**    Did you feel like you could say anything

5    after that?

6    **A.**    No.  Because after he interrupted me, you

7    can't -- you can't feel the time between phrases

8    when you read this, but Dr. Bea said that and I felt

9    threatened to not say anything.

10         And then President Adolph asked:  "Do you

11   have a question?"

12         And so he started talking, it was really

13   fast, there is no way to even get it back on track

14   to what I was trying to say in the first place.

15   **Q.**    Now this point in the hearing, when you

16   started to talk about this, is this when you

17   realized that you -- that there was a connection

18   between Dr. Bea's allegations of cheating and your

19   confrontation of Dr. Bea about his personal and

20   inappropriate comments to you?

21   **A.**    Yes.

22         **MS. KRUPICKA:**  Objection, leading, Your

23   Honor.

24         **THE COURT:**  That's true, don't lead the

25   witness.

PRIANKA BOSE - DIRECT

94

1        **MR. TIMMONS:**  I will rephrase.

2    **BY MR. TIMMONS:**

3    **Q.**    Now let me rephrase that question.

4        When, during this proceeding, did you

5    realize, if, in fact, you realized, that there was a

6    connection between Dr. Bea's allegations of cheating

7    and your confrontation of Dr. Bea about his

8    inappropriate behavior.

9        **MS. KRUPICKA:**  Lack of proper foundation,

10   Your Honor.

11       **THE COURT:**  I will overrule it.

12       Go ahead.

13   **A.**    When he said, careful what you say in a close

14   or not close relationship, because I was going to

15   talk about what just happened three weeks prior that

16   was -- that was when I made a connection and then he

17   said tenure and jeopardy and I realized that he was

18   scared that I was going to hurt his career.

19   **Q.**    All right.  Now after this hearing, after you

20   were notified of the expulsion, that was when you

21   retained me to assist you, correct?

22   **A.**    Yes.

23   **Q.**    Right.

24       Now did you file a -- an appeal to the

25   faculty at Rhodes?

PRIANKA BOSE - DIRECT

95

1    **A.**      Yes.

2    **Q.**      Okay.  And did you advise the Rhodes faculty

3    of your concern that there may be a connection

4    between the allegation of cheating and your

5    confrontation of Dr. Bea?

6    **A.**      Yes.

7    **Q.**      Did they permit the Honor Council to conduct

8    investigations into that matter?

9    **A.**      No.

10   **Q.**      Okay.  Did you or when, if ever, did you

11   bring a complaint through the school's Title IX

12   coordinator?

13   **A.**      Yes.

14   **Q.**      You did -- you did do one?

15   **A.**      I did bring a complaint, I -- I wrote it

16   online.

17   **Q.**      Okay.  And did you do that contemporaneously

18   with bringing that appeal?

19   **A.**      Yes.

20   **Q.**      Okay.  Now did the school investigate the

21   Title IX complaint before the Faculty Appeals

22   hearing?

23   **A.**      No, it was after.

24   **Q.**      Okay.  Did the school investigate the

25   Title IX complaint before the Honor Council

1   reconvened and reconsidered and considered the

2   results of the Faculty Appeals hearing?

3   **A.**    No, it was after.

4   **Q.**    Okay.  When did the school conduct the

5   Title IX investigation?

6   **A.**    After I had been told that I was officially

7   expelled from school in March.

8   **Q.**    Okay.  Now I'm going to pass you another

9   document.

10       Is this a transcript of your statements made

11   to the Title IX investigator for Rhodes, Whitney

12   Harmon?

13   **A.**    Yes.

14   **Q.**    Okay.

15       **MR. TIMMONS:**  Your Honor, absent

16   objection -- absent objection I would like --

17       **MS. KRUPICKA:**  I've never seen this, Your

18   Honor.

19       **MR. TIMMONS:**  Your Honor, this -- Rhodes

20   hired this investigator who is an attorney working

21   four Rhodes College, and there was a court reporter

22   for this -- for, I believe, all the witnesses in

23   this investigation.

24       **MS. KRUPICKA:**  Was this at Ms. Bose's

25   instance that there be a court reporter there, I

 1   have never seen this transcript until today.  I
 2   wasn't aware that the matter had been transcribed.
 3         **THE COURT:**  Do you need time?
 4         Are you objecting, the basis, you need
 5   time to take a look at it?
 6         **MS. KRUPICKA:**  Not really, Your Honor,
 7   I -- I continue to not understand the relevance of
 8   this.  But -- so I don't -- I don't have any
 9   objection right now, I guess, I will just see what
10   he asks about it.
11         **THE COURT:**  All right.  Go ahead and
12   receive it.
13         I believe that will be Exhibit 13?
14         **THE CLERK:**  Yes, sir.
15         **THE COURT:**  It will be Exhibit 13.
16         (Exhibit Number 13 was marked;
17   Description:  Transcript.)
18         **MR. TIMMONS:**  Your Honor, I'm sure if I
19   ask any questions about the transcript, Ms. Krupicka
20   will say that it speaks for itself and I would agree
21   with her.  So I'm going to mark it and place it into
22   evidence.
23         But that's --
24         **MS. KRUPICKA:**  Your Honor, actually I will
25   object because there's -- there's no indication of

1  either the Honor Council or the Faculty Appeals

2  Committee ever saw this document.  So whatever is in

3  it is not relevant to the determination that she

4  should be expelled for cheating.

5          **THE COURT:**  How do you respond?

6          **MR. TIMMONS:**  Your Honor, the issue before

7  the court today is not whether she should or

8  shouldn't have been expelled for cheating based on

9  the information presented to the Faculty Appeals

10 Committee or the Honor Council.  The question is

11 whether Rhodes violated Title IX.

12         This is the first instance in which Rhodes

13 heard a -- or permitted Ms. Bose to tell her story

14 about her allegations against Dr. Bea on

15 February 26th of this year, long after all of this

16 had concluded.

17         The court is not deciding today whether to

18 reverse the Honor Council.  The Honor Council is not

19 a lower court, it's a body of students who don't

20 have bachelor's degrees.

21         **MS. KRUPICKA:**  Your Honor, I would submit

22 that there -- there is -- that the issue today is

23 whether this court determines that a preliminary

24 injunction should issue expunging Ms. Bose's

25 expulsion from the school's records.  And I see

PRIANKA BOSE - DIRECT

99

1    absolutely no relevance to this if it wasn't

2    considered by Rhodes at the time she was expelled.

3             MR. TIMMONS:  Your Honor, the fact that

4    Rhodes didn't consider it is precisely the issue.

5             MS. KRUPICKA:  Your Honor, there is ample

6    evidence in the record of these allegations.

7             THE COURT:  I will allow it.

8             We will go ahead and receive it into

9    evidence.

10            Number 13.

11            MR. TIMMONS:  All right.  Thank you, Your

12   Honor.

13            (Exhibit Number 13 was marked;

14   Description:  Transcript.)

15   BY MR. TIMMONS:

16   Q.    All right.  Now after your expulsion from

17   Rhodes, were you able --

18            MR. TIMMONS:  I'm going to try and move

19   this along, Your Honor, I realize I've taken longer

20   than I intended to.

21   BY MR. TIMMONS:

22   Q.    Were you able to obtain admission to any

23   other institutions?

24   A.    Yes.

25   Q.    Okay.  Where do you attend school now?

PRIANKA BOSE – DIRECT

100

**A.**      I attend school in Atlanta, Georgia at
Oglethorpe University.

**Q.**      Is Oglethorpe aware of these proceedings?

**A.**      Yes.

**Q.**      Okay.  Is Oglethorpe aware that Rhodes
elected to expel you?

**A.**      Yes.

**Q.**      Okay.  Are there any conditions attached to
your admission to Oglethorpe University as a result
of these proceedings?

**A.**      I have to check in with the Provost and the
Dean of Academic Affairs at the school.  I just have
to do my work and keep them updated about what's --
how this hearing and the trial, how everything is
going.

**Q.**      Is your admission to Oglethorpe a provisional
admission?

**A.**      Yes, I was very transparent with them about
what's happening.  And they said, well, as long as
you keep us updated and as long as you do your work
here, okay.

**Q.**      Okay.  But they're monitoring this
proceeding?

**A.**      Very closely.

**Q.**      Okay.  Right now are you in the process of

PRIANKA BOSE - DIRECT

101

1    trying to make -- provisions for attending graduate

2    school?

3    **A.**      I'm trying.

4    **Q.**      Okay.  Are you -- is it necessary, as a

5    practical matter, for you to disclose to any

6    potential graduate institution the nature of your

7    expulsion from Rhodes College?

8          Do you have to tell graduate schools or

9    medical schools that you were expelled from Rhodes?

10   **A.**      Yes.

11   **Q.**      Okay.  How does that impact, how has that

12   impacted your ability to find a graduate program?

13   **A.**      It's very difficult to find a graduate

14   program because you, when you apply they'll ask --

15   they ask you the question, and if you send your

16   transcript, they'll know whether you were withdrawn

17   from school voluntarily or involuntarily.  So it's

18   best to be honest upfront, tell them exactly what's

19   happening and take that chance.

20         Do she see in me the hard work that I have

21   been putting forward or did I lose it because of the

22   decision of the college, I don't know.

23   **Q.**      Now as we -- as it stands today, if you hoped

24   to attend a medical program or a graduate school

25   after graduation, what steps do you need to be

1    taking in order to gain admission?

2    **A.**    It's impossible.

3    **Q.**    What is your --

4           **MS. KRUPICKA:**   Objection, Your Honor.

5    This witness is not qualified to say what effect

6    that this -- her expulsion is going to have on her

7    admission to graduate school.

8           **MR. TIMMONS:**   It wasn't actually the

9    answer I was trying to elicit, Your Honor, I will

10   rephrase the question.

11          **THE COURT:**   All right.

12   **BY MR. TIMMONS:**

13   **Q.**    As we sit here right now, what is it that you

14   need to be doing in order to get admitted to

15   graduate school?

16   **A.**    I'm supposed to be taking the MCAT, and after

17   studying for the MCAT and taking it, you have to

18   send them your scores, you have to fill out all

19   their essays, those two, book interviews if they

20   even give you one.

21   **Q.**    So you're supposed to be making application

22   right now, correct?

23   **A.**    Yeah, I should be in my secondary application

24   right now.

25   **Q.**    Okay.   Now as a result of this expulsion from

1    Rhodes, where are you in terms of applying to

2    graduate programs?

3    **A.**     I haven't even started.

4    **Q.**     All right.  Have you -- when you say you

5    haven't even started, have you started the process

6    in terms of making inquiry of graduate programs and

7    the like?

8              **THE COURT:**  Mr. Timmons, let's -- let's

9    move on to something that's going to help me.

10             **MR. TIMMONS:**  I understand, Your Honor.

11             **THE COURT:**  Okay.  Bring it to a close if

12   we're at the end.

13             **MR. TIMMONS:**  All right.

14   **BY MR. TIMMONS:**

15   **Q.**     Ms. Bose, do you anticipate that without the

16   court granting a preliminary injunction today that

17   you will be able to obtain admission to any medical

18   program?

19   **A.**     It's going to be really hard.

20             **MS. KRUPICKA:**  Objection, Your Honor.

21   Again, this witness is not qualified to answer that

22   question.

23             **THE COURT:**  I sustain it.

24             **MR. TIMMONS:**  All right.

25             Your Honor, if I can check with my

1   cocounsel, I think I'm finished.

2          (Conference between cocounsel.)

3          **MR. TIMMONS:**  Your Honor, I do have one

4   last question, it's just a technical matter.

5   **BY MR. TIMMONS:**

6   **Q.**     Ms. Bose, did you receive any federal

7   assistance while you were a student at Rhodes

8   College?

9   **A.**     Yes.

10  **Q.**     Okay.  What -- what did you receive?

11  **A.**     The federal Perkins loan.

12  **Q.**     All right.

13          **THE COURT:**  Say that again.

14          Speak up a little bit.

15          **THE WITNESS:**  The federal Perkins loan.

16          **THE COURT:**  Okay.

17          **MR. TIMMONS:**  Your Honor, I'm just

18  establishing that Rhodes is a recipient --

19          Your Honor, I pass the witness.

20          **THE COURT:**  One last thing, I believe

21  Exhibit 6, Mr. Timmons wasn't presented to the clerk

22  for -- for marking, that's the electronic grading

23  roster.  I believe the witness identified it but it

24  was not passed forward.

25          I think the witness has it.

PRIANKA BOSE – DIRECT

1           Mr. Timmons.

2           Mr. Timmons.

3           **MR. TIMMONS:**  Oh.

4           **THE COURT:**  The witness has it.

5           **MR. TIMMONS:**  Thank you, Your Honor.

6           **THE COURT:**  Pass that to the clerk if you

7    would.

8           **THE CLERK:**  Thank you.

9           (Exhibit Number 6 was marked; Description:

10   Grade roster.)

11          **THE COURT:**  I don't know that you all need

12   a break, but I need a break for about ten minutes.

13   Okay.  Then we will come back and there will be

14   cross.

15          All right.

16          **MR. TIMMONS:**  Thank you, Your Honor.

17          **THE COURT:**  All right, thank you.

18          We're going to go ahead and take about a

19   ten minute break at which time we will continue with

20   this witness.

21          And let's see, yeah, we are going to

22   continue with this witness.

23          Ms. Bose, don't talk with anyone about

24   your testimony over the break if you wouldn't.

25          **THE WITNESS:**  Yes, sir.

1          **THE COURT:**  Okay.  You can step down.

2          And we will be in recess.

3          **THE CLERK:**  Court stands in recess.

4          **THE COURT:**  Just leave all of it right

5    there.

6          (Recess at 4:20 p.m.)

7          **THE CLERK:**  This honorable court is now

8    back in session.

9          You may be seated.

10          **THE COURT:**  Okay.  And prior to the break

11   I believe Mr. Timmons finished his direct, so now is

12   the time for cross.

13          And I'm assuming that will be Ms.

14   Krupicka.

15          **MS. KRUPICKA:**  Your Honor, before I -- I

16   cross Ms. Bose, I would like to point out to the

17   court that there has been nothing offered on behalf

18   of Ms. Bose to establish that she's entitled to a

19   preliminary injunction expunging her record of

20   expulsion.  There is no indication that the record

21   is not temporally expunged right now that she will

22   suffer irreparable harm.

23          What she is attempting to establish is

24   that she will suffer -- that she needs a permanent

25   injunction to expunge her record.  And to me, Your

1    Honor, that's what the purpose of this hearing --

2             **THE COURT:**  Ms. Krupicka, I'm -- I'm fully

3    aware of that.  Okay.  I understand the nature of

4    the questions that Mr. Timmons asked at the end and

5    I understand what the burden is, what has to be

6    shown today.  So I'm fully aware of that.

7             Now, if you don't want to cross based on

8    that, that's -- that's fine, but this is your

9    opportunity to cross examine the witness.

10            **MS. KRUPICKA:**  Well, I guess I would like

11   some -- some direction from Your Honor, if Your

12   Honor would like to hear me cross examine the

13   witness, if you think there is still additional

14   evidence that you would like to hear, I'm happy to

15   do it.

16            **THE COURT:**  Counsel, do you have any cross

17   or not?

18            **MS. KRUPICKA:**  I do.

19            **THE COURT:**  All right, then proceed.

20                    <u>**CROSS EXAMINATION**</u>

21   BY MS. KRUPICKA:

22   **Q.**    Ms. Bose, do you believe that Dr. Bea asked

23   you about your family because he was romantically

24   interested in you?

25   **A.**    At the time, yes.

1    **Q.**      You did --

2    **A.**      Yes.

3    **Q.**      -- you thought --

4    **A.**      -- yes --

5    **Q.**      -- he was flirting with you --

6    **A.**      -- and I still do.

7    **Q.**      -- is that what you thought?

8    **A.**      -- I still do.

9    **Q.**      All right.  And he told you about his fear of

10   flying because he was romantically interested in

11   you?

12   **A.**      You're referencing to the spring semester of

13   2015.

14   **Q.**      Whenever he said he was afraid of flying?

15   **A.**      Not at that time --

16   **Q.**      Okay.

17   **A.**      -- because that was the spring semester of

18   2015.

19   **Q.**      And how in your mind is asking someone about

20   their family indicate romantic interest?

21   **A.**      Within the context of asking me about my

22   boyfriend in late July of 2015, proceeding with

23   personal questions, such as, family in India, family

24   in Atlanta, and proceeding to ask even more

25   questions about my sorority life, about my drinking

1   life or my --

2   **Q.**     But you --

3          **MS. KRUPICKA:**  Objection, Your Honor, I

4   move to strike.  She has never testified about that

5   on direct.

6          **THE COURT:**  It's overruled.  You asked the

7   question and she is answering it.

8   **BY MS. KRUPICKA:**

9   **Q.**     When did Dr. Bose (sic) ask you about your

10  personal life -- I mean, Dr. Bea?

11  **A.**     Dr. Bea asked me about my personal life in

12  late July of 2015, in September of 2015, in November

13  of 2015, the entire semester.

14  **Q.**     So according to your testimony, he said how

15  do you spend your evenings, this is in the July of

16  2015, he said where do you like -- what do you like

17  to do in Memphis, do you get to hangout with your

18  friends, do you get to hangout with your boyfriend,

19  would you like to go to dinner with me to catch up,

20  and to me that indicated to you that he was

21  romantically interested in you?

22  **A.**     Yes.

23  **Q.**     And yet you still took his class, is that

24  correct?

25  **A.**     Yes.

PRIANKA BOSE - CROSS

110

1  **Q.**      There were two other professors you could

2  have taken Organic Chemistry II from, weren't there?

3  **A.**      Yes.  But that -- it's very difficult for me

4  to change my classes because I was taking 19

5  credits.  So Dr. Bea's time slot was the best for me

6  to take during the fall semester of 2015.

7  **Q.**      And you were alone in his office with him

8  multiple times when you took quizzes and tests, is

9  that not correct?

10  **A.**      Yes.

11  **Q.**      Weren't you afraid that he was going to

12  attack you if you were alone with him in his office?

13  **A.**      At the beginning of the semester, when I had

14  to take my quizzes and tests early --

15  **Q.**      Ms. Bose, this is a yes or no question.

16  **A.**      I'm trying to answer.

17  **Q.**      Well, I would like a yes or no and then you

18  can explain your answer.

19  **A.**      Yes.

20  **Q.**      So you thought Dr. -- Dr. Bea might

21  physically grab you or try to kiss you while you

22  were taking quizzes in his office, is that correct?

23          Yes or no?

24  **A.**      No.

25          Can I explain why?

1   **Q.**      You can say yes or no and then you can

2   explain why.

3   **A.**      I did not believe at the beginning of the

4   semester that I should be afraid to take my exams

5   and quizzes because it's an exam room quiz and no

6   one is supposed to talk to you.

7   **Q.**      Yes or no, Ms. Bose.

8   **A.**      No.

9   **Q.**      Thank you.

10          You were interviewed -- interviewed by the

11   investigator three times -- three times prior to the

12   hearing, is that correct?

13   **A.**      Yes.

14   **Q.**      At no time did you tell the investigator that

15   Dr. Bea was falsely accusing you of cheating to

16   retaliate against you for rejecting his advances, is

17   that correct?

18   **A.**      Yes.

19   **Q.**      Okay.  And when you were first asked in the

20   hearing why Dr. Bea would falsely accuse you of

21   cheating, your first answer was, I think that I may

22   have done something or said something, maybe I meant

23   it as a joke or not and you might have taken it the

24   wrong way and now we have some bad blood.  I

25   honestly can't tell what you're thinking or why you

PRIANKA BOSE - CROSS

112

1   would do the things you, you're a different person

2   than I am.

3           That was your answer, was it not?

4   **A.**      That was part of my answer.

5   **Q.**      That was your first answer, was it not?

6   **A.**      Part of my answer.

7   **Q.**      Would you like to look at the transcript and

8   show me --

9   **A.**      I know the transcript --

10          **MR. TIMMONS:**  Your Honor --

11  **A.**      -- that's on page 198.

12          **MS. KRUPICKA:**  All right.  Well --

13          **MR. TIMMONS:**  I'm just going to register a

14  running objection, the same objection that

15  Ms. Krupicka made that the transcript speaks for

16  itself.

17          **MS. KRUPICKA:**  Your Honor, I'm trying

18  to --

19          **THE COURT:**  You know that's overruled.

20          Go ahead and proceed.

21          **MS. KRUPICKA:**  Oh, I'm sorry, Your Honor.

22          **THE COURT:**  I have the exhibit here if you

23  want to use it.

24          **MS. KRUPICKA:**  I've got it, I just wanted

25  to get my copy that's got my notes on it.  Apologize

PRIANKA BOSE - CROSS

113

1    to the court.

2    **BY MS. KRUPICKA:**

3    **Q.**    I want to bring your attention to page 194 of

4    the transcript, could you turn to that, please.

5        Are you there?

6    **A.**    Yes, ma'am.

7    **Q.**    Actually I looked -- it starts on 193,

8    Professor Bea asked you:

9        (Reading)  ...would be the reason I'm doing

10    all these things?  For hurting you, for what purpose

11    do you think?

12        And you answered:  "You tell me.  I don't

13    know."

14        Is that correct?

15    **A.**    Yes.

16    **Q.**    And then Professor Bea says:  "No, no, I'm

17    asking you."

18        President Adolph says:  "Would you like to

19    answer his question?"

20        And you said:  "I have questions for him."

21        And President Adolph says:  "You have a time

22    to ask him questions."

23        "Right, but to answer his question, I have

24    questions for him."

25        Is that what you said?

PRIANKA BOSE - CROSS

114

1   **A.**      Yes.

2   **Q.**      Okay.  And then President Adolph asked you to

3   answer his question with an answer.

4              And your complete answer to the question was:

5              "I think that I may have done something or

6   said something.  Maybe I meant it as a joke or not,

7   he might have taken it the wrong way and then now we

8   have some bad blood.

9              "I honestly can't tell what you're thinking

10  or why you do the things you do.  You're a different

11  person that I am."

12             Is that not your complete answer to that

13  question?

14  **A.**      That is the first part of my answer to his

15  complete line of questioning.

16  **Q.**      There's a question after that, you stopped

17  answering and you were asked another question.

18             So that is your complete answer to that

19  question, is it not?

20  **A.**      Okay.

21  **Q.**      And then you were asked again, you know, by

22  Dr. Bea, must have been something awful that I did

23  to you, why would I do this to you, for a joke?

24             Then your answer was:  "I don't know -- I

25  don't know how you think.  I do think we've spoken a

1  lot about many different things, your tenure, mostly

2  professional.  And, I mean, this kind of

3  relationship between a teacher and a student should

4  remain professional, but, I mean, we were close,

5  so --"

6        That's what you said, right?

7  **A.**    You -- he said something before that.

8  **Q.**    I'm asking about your answer to his question,

9  what you said?

10  **A.**    It started with, I don't know, and I started

11  to talk about --

12        **THE COURT:**  Excuse me, Ms. Bose, you're

13  going to have to answer her questions.

14        Now you will have an opportunity to

15  explain, but you have to answer her question.  Okay.

16        **THE WITNESS:**  Sorry.

17        **THE COURT:**  All right.

18  **A.**    Yes.

19  **Q.**    And you said, I mean, we were close.

20        Is that what you said?

21  **A.**    Yes.

22  **Q.**    You described yourself as being close with

23  Dr. Bea, is that correct?

24  **A.**    I was cut off.

25  **Q.**    Did you or did you not say we were close?

1    **A.**     I say we were close, but I was cut off from

2    further explanation.

3    **Q.**     My question is, did you say we were close?

4            **MR. TIMMONS:**  Your Honor --

5    **A.**     Yes.

6            **MR. TIMMONS:**  -- asked and answered.  She

7    said that she said it and then she tried to make an

8    explanation, she is permitted to do that.

9            **THE COURT:**  I understand.

10           Go ahead and answer and you will have an

11   opportunity to explain.

12   **A.**     Yes, it says we are close.

13   **Q.**     Was that truthful, that you were close with

14   Dr. Bea?

15   **A.**     Can you define close?

16   **Q.**     Well, what did you mean?

17   **A.**     I just meant that I talked to Dr. Bea a lot

18   about school, so it was more than just I'm going to

19   your class and I'm leaving your class.

20   **Q.**     You engaged in causal conversations with him,

21   correct?

22   **A.**     I engaged in academic conversations with him.

23   **Q.**     So he never -- he never -- you never told him

24   anything about your family, anything about how your

25   day was, anything about that?

PRIANKA BOSE - CROSS

117

1  **A.**      He asked me about my family.  No, I didn't

2  respond.

3  **Q.**      You didn't tell him anything about your

4  family?

5  **A.**      I said I'm from -- my family is from India

6  and I'm from Atlanta.  But I didn't go into the

7  details of the individuals of my family.

8  **Q.**      And so when Dr. Bea would ask you a causal

9  question like that, would you -- would you be

10  affronted, would you think it was too personal?

11  **A.**      He was asking those questions after he

12  already got personal.  Any questions that happened

13  after July -- late July of 2015 I was already

14  sensitive to.

15  **Q.**      And yet you describe yourself as close to him

16  in this hearing, is that correct?

17  **A.**      Yes.

18  **Q.**      And you did bring up these allegations

19  against Dr. Bea in your -- prior to your closing

20  statement, did you not?

21  **A.**      I'm sorry, could you repeat that?

22  **Q.**      Did you ask Dr. Bea a series of questions

23  designed to elicit his recollection of the meeting,

24  the alleged meeting in the parking lot in the summer

25  and other conversations in which you claimed you

PRIANKA BOSE - CROSS

1  asked him not to talk about your boyfriend?

2  **A.**    Yes.  I asked him questions about whether he

3  remembered specific encounters.

4  **Q.**    In fact, you were reading from a typewritten

5  list of questions when you asked him those, were you

6  not?

7  **A.**    What -- I had made some questions.

8  **Q.**    And those were on the typewritten sheet that

9  you were reading from, isn't it true?

10  **A.**    If I read questions, it was from whatever I

11  had brought to the hearing.

12  **Q.**    So you, in advance of the hearing, had

13  already determined to ask Dr. Bea questions about

14  what happened -- allegedly happened in the parking

15  lot that summer, it wasn't in the middle of the

16  hearing it suddenly hit you that this was the

17  reason?

18          **MR. TIMMONS:**  Objection, was that a --

19  **BY MS. KRUPICKA:**

20  **Q.**    Isn't that true?

21  **A.**    No.

22  **Q.**    So it just -- you never even thought about

23  the idea that he was coming after you because you

24  rejected his advances, yet you had questions about

25  his advances, his alleged advances on a typewritten

PRIANKA BOSE - CROSS

119

1   sheet that you had prepared in advance of the

2   hearing, is that not correct?

3           **MR. TIMMONS:**   Your Honor, I'm going to

4   object.   It assumes facts not in evidence.

5           **THE COURT:**   That's -- that's overruled.

6   **A.**   I can't begin to explain to you my mentality

7   of trying to figure out --

8   **Q.**   I didn't ask you about your mentality,

9   Ms. Bose, I asked you whether or not you had

10  prepared those questions in advance of the hearing?

11  **A.**   I had questions to ask him about that --

12  **Q.**   That's a yes or no question and then you can

13  explain.

14  **A.**   Okay.   It's yes and no.

15  **Q.**   Did you prepare the questions about Dr. Bea's

16  alleged behavior in advance of the hearing?

17  **A.**   Yes.

18  **Q.**   Thank you.

19  **A.**   But --

20          **THE WITNESS:**   Can I explain?

21          **THE COURT:**   Go ahead.

22  **A.**   Okay.   You're getting at that I had a list of

23  questions.   The questions I asked, the questions I

24  typed, they weren't questions, they were prompting

25  for me, it was a word here and there, kind of like

1    did he have a camera, was the -- was the answer

2    sheet in his possession only.

3          And then I might have thought about it, but

4    to be honest with you, when I heard him say that, it

5    was during the hearing when I figured it out.   I

6    cannot accuse a teacher in front of --

7          **THE COURT:**   All right.   Now you are going

8    beyond the question she asked you.   It was only

9    about the prepared questions.   Okay.

10   **A.**      I did not make a list of questions about each

11   of those incidents.   I simply stated on the paper,

12   mention it, ask about it.

13   **Q.**      Okay.   Let me turn -- have you turn to page

14   212 of the transcript.

15          Are you there?

16   **A.**      Yes, ma'am.

17   **Q.**      There's a question at the bottom of the page.

18          Ms. Bose:   You asked me before what I thought

19   or what I think you would, why I believe my fake

20   answer -- my answers matched your fake answers.   I'm

21   going to ask you a few questions that might bring to

22   light perhaps what could have happened that's

23   different.

24          Is that what you said?

25   **A.**      Yes.

PRIANKA BOSE - CROSS

121

1    **Q.**     And you were reading from your list of

2    prompts at that point, is that correct, when you

3    asked those questions?

4    **A.**     No.  I had written those questions down when

5    I started thinking about it after --

6    **Q.**     In the middle of the hearing?

7    **A.**     In the middle of the hearing along with the

8    prompts before the hearing.

9    **Q.**     So there was nothing on your paper about

10   Dr. -- Dr. Bea acting inappropriately towards you,

11   you just thought of it in the middle of the hearing,

12   is that correct?

13   **A.**     I already stated that I had written -- I had

14   written to acknowledge it and to bring it up.

15   **Q.**     Okay.  In your closing statement you made

16   reference to the fact that you believed Dr. Bea had

17   made inappropriate advances to you, and that after

18   you told him you didn't want to be personal with

19   him, you though he had -- he had retaliated against

20   you, is that correct, in your closing statement?

21   **A.**     Yes.

22   **Q.**     Okay.  And you've testified that Ms. Adolph

23   would not permit you to call your friend to

24   corroborate some of your testimony about Dr. Bea's

25   actions, is that correct?

PRIANKA BOSE - CROSS

122

1    **A.**     Yes.

2    **Q.**     Didn't that conversation occur after the

3    hearing had ended when everyone was gone?

4    **A.**     I'm not sure what break it was.

5    **Q.**     Well, the hearing had concluded, had it not?

6    **A.**     It concluded with my closing statement, yes.

7    **Q.**     Okay.  And the hearing lasted over five

8    hours, did it not?

9    **A.**     Yes.

10   **Q.**     You were permitted to call your tutor, right,

11   your classmate, Ms. Dezfuli, she testified directly

12   about the tests.

13          You didn't ask Ms. Dezfuli at that time to

14   corroborate your allegations against Dr. Bea, did

15   you?

16   **A.**     No.  Because I wasn't sure whether that was

17   the reason or not.

18   **Q.**     Okay.  But you didn't ask her anything about

19   it while she was there testifying, is that correct?

20   **A.**     No.

21   **Q.**     Okay.  And you called your -- your chemistry

22   tutor from Georgia, he drove up for the event, is

23   that correct?

24   **A.**     Yes.

25   **Q.**     You called, actually called telephonically

1   two chemistry Ph.D.'s who offered online tutoring

2   service to try to explain how you could have gotten

3   the answers to the test without cheating, is that

4   correct?

5   **A.**      Yes.

6   **Q.**      And you tried to call two additional ones,

7   but they didn't answer their phones, is that right?

8   **A.**      Yes.

9   **Q.**      And one of the professors was Dr. Shimkus, is

10  that correct?

11  **A.**      Yes.

12  **Q.**      When Dr. Shimkus was asked how to explain the

13  fact that your wrong answers was the same as the

14  fake answer key prepared by Dr. Bea, he said, well,

15  if everything is completely identical, I must admit

16  that this does raise a red flag, did he not say

17  that?

18          **MR. TIMMONS:**  Your Honor, I'm going to

19  object at this point.

20          Ms. Krupicka objected vociferously to my

21  continuous recitation of the contents of this

22  transcript.  And I agreed that I wasn't going to do

23  that.  And I only addressed a couple of very limited

24  portions of the transcript.  And now Ms. Krupicka is

25  doing exactly what she didn't want me to do.

1              So I'm going to object that the transcript

2      speaks for itself, and that if she has anything else

3      is made, absent the specific things that Ms. Bose

4      testified about, aren't proper questions for this

5      witness.

6              **MS. KRUPICKA:**  This is cross examination,

7      Your Honor.

8              **THE COURT:**  I don't about -- I understand

9      it's cross, but I did limit him in asking that in

10     light of the objection.

11             How much more are you going to deal with

12     as far as the transcript is concerned?

13             **MS. KRUPICKA:**  I don't think much else,

14     Your Honor.

15             **THE COURT:**  Okay.  What do you mean by

16     "much else?"

17             **MS. KRUPICKA:**  I want refer to it anymore,

18     Your Honor.

19             **THE COURT:**  Okay, then let's move forward.

20     **BY MS. KRUPICKA:**

21     **Q.**     In the theory you offered at the hearing

22     about the allegations was that Dr. Bea knew so well

23     how you thought that he could have designed the quiz

24     in ways that you would give the wrong answers on

25     his -- on his test -- on his fake answer key, is

1    that correct?

2              **MR. TIMMONS:**  Same objection, Your Honor.

3              **THE COURT:**  I don't think -- are you

4    referring to the transcript?

5              **MS. KRUPICKA:**  No.

6              **THE COURT:**  Okay.  You're just referring

7    to her theory?

8              **MS. KRUPICKA:**  Yes.

9              **THE COURT:**  Overruled.

10             **MR. TIMMONS:**  Objection withdrawn.

11   **A.**    Yes.

12   **Q.**    But that theory did not explain how your

13   answers could match Dr. Bea's fake answer key on

14   every question without accessing Dr. Bea's computer,

15   did it?

16   **A.**    No.  And I myself stated that as a whole it

17   was bizarre, that I never looked at his computer, I

18   never seen that false answer key before the hearing,

19   so I didn't know what to think.

20   **Q.**    So it was just an amazing coincidence that

21   you got exactly the wrong answers on your quiz that

22   were on Dr. Bea's fake answer key?

23   **A.**    No, it's not an amazing coincidence because

24   he had no proof that I physically answered his -- I

25   physically accessed his computer.

PRIANKA BOSE - CROSS

126

**Q.**     What are the odds that your answers would be

the same as the fake answer key if you didn't access

the answer key on his computer?

**A.**     That means he changed it, that's the odds.

**Q.**     That's not my question.  I'm talking about

what are the odds that you and Dr. Bea would have

the exact wrong answers to the quiz if you didn't

access his computer?

**A.**     Because I didn't access his computer, there

are no odds for me to consider.

**Q.**     Well, that's your -- your word.  But, in

fact, there's no explanation other than cheating for

the reason that your answer key matched his fake --

your answers matched his fake answer key, is that

not correct?

**A.**     I don't care about the fake answer key

because I never saw it.  The odds don't --

**Q.**     How can you say that when your answers are

identical to what's on there -- what's on the answer

key?

**A.**     You're asking me a question because you're on

the opposing side, but you are not hearing the

facts.  I didn't see it.

**Q.**     So how did you come up with the identical

answers?

1   **A.**      I didn't come up with identical answers, I

2   came up with my answers.

3   **Q.**      Which were wrong in exactly the same way as

4   Dr. Bea's answer key were wrong, is that right?

5   **A.**      That's what he's saying.  But they were --

6   **Q.**      Well, aren't they wrong in exactly the way

7   that Dr. Bea's answer key was -- fake answer key

8   was?

9   **A.**      He's the one that says I was wrong --

10  **Q.**      Yes or no, Ms. Bose?

11  **A.**      -- I never -- I never --

12  **Q.**      Were they -- were they the same wrong answers

13  as on Dr. Bose -- Dr. Bea's answer key?

14  **A.**      The answer key that he says is fake --

15  **Q.**      Yes or no?

16  **A.**      They're exactly the same as the answer key

17  that he created and planted for me, but I never saw

18  it.

19  **Q.**      But somehow they're the same, is that right?

20  **A.**      Well, he had custody of my quiz.

21  **Q.**      What does that mean?

22  **A.**      It means I didn't have my quiz, I didn't have

23  his computer.

24  **Q.**      So was that not your handwriting on Quiz

25  Number 5?

PRIANKA BOSE - CROSS

128

1    **A.**     It is my handwriting because I took the quiz

2    and I answered the questions to the best my ability.

3    I took it early.  Those are the facts.  That's what

4    happened.

5    **Q.**     Okay.

6    **A.**     I did it exactly like I did every other quiz

7    and every other test.

8    **Q.**     Prior to Quiz 5 you had a 106 average in the

9    class, including bonus points, is that correct?

10   **A.**     A 106 -- according to Dr. Bea that's what he

11   calculated.  I haven't confirmed whether that is

12   true or not.  I haven't calculated it myself.

13   **Q.**     Do you think -- we looked at all the tests,

14   is there any reason to conclude that any of those

15   tests are false?

16   **A.**     My original test that I submitted are

17   accurate, but they're inconsistent with the grades

18   that he put down in his electronic grade --

19   **Q.**     That's not my any question.

20          My question is, what was your actual average

21   in the class, your tests have been introduced into

22   evidence, does that not indicate that you had a

23   hundred and six average in the class?

24   **A.**     I haven't calculated it myself.

25   **Q.**     Well, you had a high average, did you not?

1    **A.**     Yes, I was doing very well, I worked hard.

2    **Q.**     And yet suddenly on Quiz Number 5 you got

3    every answer wrong but one, is that right?

4    **A.**     I don't know.  He never graded my test.

5    **Q.**     You've seen the real answer key and you've

6    seen the fake answer key, you know what questions

7    are right and what are wrong --

8    **A.**     I know what questions --

9    **Q.**     -- isn't that true?

10   **A.**     -- he says are wrong and I know what

11   questions he says are right.

12   **Q.**     So is it your testimony that actually the

13   questions on Quiz Number 5 your answers were correct

14   and he's just saying they're wrong?

15   **A.**     I don't know because I didn't grade my test.

16   **Q.**     You have your test though?

17   **A.**     Yes.

18   **Q.**     Well, are your answers wrong or right or do

19   you not know?

20              **MR. TIMMONS:**  Object.  Asked and answered.

21              **MS. KRUPICKA:**  It hasn't been answered.

22              **THE COURT:**  I will allow this answer, go

23   ahead.

24   **A.**     I made mistakes on each question, some of

25   them worse than others.  But I didn't miss

PRIANKA BOSE - CROSS

130

1   everything, I would have gotten partial credit on

2   all of those answers.

3   **Q.**     Okay.  So are you saying that your answers

4   were -- you looked at yours answers closely enough

5   to determine if they're right or wrong, is that

6   correct?

7   **A.**     Yes.

8   **Q.**     Okay.  Are you saying that the points on the

9   quiz that you actually would have gotten a good

10  grade on the quiz if they -- the points had been

11  added correctly?

12  **A.**     No, I'm not saying -- it would have scored

13  lower than I usually did.

14  **Q.**     Well, you got every answer wrong but one,

15  isn't that correct?

16  **A.**     I would argue, if I may, that I didn't get

17  every question wrong.  I think that my answer to the

18  bonus was perfectly acceptable, but because the quiz

19  wasn't graded, I don't know.

20          I did get some completely wrong.  But

21  depending on how the quiz is graded, it's up in the

22  air.  I could have gotten three correct, I could

23  have gotten two correct, but it depends.

24  **Q.**     But the fact is that your answers on the quiz

25  matched Dr. Bea's fake answer key, is that correct?

1    **A.**      Or if his fake answer key matches my quiz.

2    **Q.**      What proof do you have that he created the

3    answer key after the fact, what proof of any of

4    that?

5    **A.**      The same amount of proof that you have the

6    key, created it before or after, that wasn't brought

7    up in the hearing.

8    **Q.**      No, it wasn't, was it?

9           In fact, this theory just came up in your

10   complaint in this lawsuit, is that correct?

11   **A.**      No.  I actually state in my hearing, it's on

12   the hearing transcript on page 200, right after

13   Dr. Bea said be careful.  On page 200, I asked when

14   was the quiz last modified.  And he again taunted to

15   me with let me bring my computer, let me show you.

16          But the fact of the matter is, you can do

17   anything with your computer and you can modify

18   dates, times, it's up in the air.

19          I never saw that answer key.  I answered

20   those questions.  If I made errors or mistakes, it

21   was because I was rushing and I make mistakes.

22   **Q.**      So Dr. -- Dr. Bea, even though the screenshot

23   that was introduced at the hearing so that he -- it

24   was created on 11-26-15 and modified on

25   December 2nd, 2016, I mean, 2015, he changed that,

1   is that right?

2   **A.**      There's no modification date --

3             **MR. TIMMONS:**  Objection --

4   **A.**    On that screenshot --

5             **THE COURT:**  Hold -- hold on just one

6   moment.

7             What's your objection?

8             **MR. TIMMONS:**  That assumes facts not in

9   evidence.  There is no digital document here showing

10  metadata for when this file was created or not

11  created.

12            **MS. KRUPICKA:**  I didn't ask her about

13  digital metadata, I asked about the screenshot that

14  was in the investigator's packet.  And I will be

15  happy to introduce that into evidence, Your Honor.

16            **THE COURT:**  All right.  Let's take a look

17  at it.

18  **BY MS. KRUPICKA:**

19  **Q.**      The first page on -- what I've just handed

20  you has already been marked as an exhibit, is that

21  correct?

22  **A.**      Yes.

23            **THE COURT:**  Which exhibit are we talking

24  about?

25            **MS. KRUPICKA:**  Exhibit 1, I believe, Your

1    Honor.

2             **THE COURT:**  All right.

3    **A.**      No.   This is Exhibit 3 or 4.

4             **MS. KRUPICKA:**   4.

5             I'm sorry, Your Honor.

6    **BY MS. KRUPICKA:**

7    **Q.**     And in Exhibit 4, which is from Regan Adolph,

8    it says your case packet is also attached, is that

9    correct?

10   **A.**     Can you please tell me what paragraph you're

11   in?

12   **Q.**     The second full paragraph, the very last

13   sentence?

14   **A.**     Okay.  I'm with you.

15            Yes, it's a fact.

16   **Q.**     And, in fact, behind the e-mail is the case

17   packet, is that correct?

18   **A.**     Yes.

19   **Q.**     Did you receive that case packet along with

20   this e-mail from Ms. Adolph?

21   **A.**     Yes.

22   **Q.**     Yes, you did?

23   **A.**     Yes.  Yes.

24   **Q.**     And in this case packet there's actually a

25   summary of the presenting information that caused

PRIANKA BOSE - CROSS

134

1   the Honor Council to have the hearing, is that

2   correct?

3   **A.**      Yes.

4   **Q.**      And, in fact, the summary tells you in detail

5   why Dr. Bose (sic) -- Dr. Bea suspected you of

6   cheating and why he suspected you of cheating, is

7   that not correct?

8              **MR. TIMMONS:**  Your Honor, I'm going to

9   object to hearsay.  The case packet that she

10  described is a series of notes about the hearing

11  itself.

12             We have a complete transcript of the

13  hearing.  The notes that the Honor Council took are,

14  first of all, hearsay; secondly, they're not the

15  best evidence.  The best evidence is the hearing

16  transcript or the recording, which we have.

17             So that's my objection.

18             **MS. KRUPICKA:**  Your Honor, this witness

19  testified that she had no idea about the details of

20  the cheating allegations against her until the

21  hearing.

22             **THE COURT:**  What's the date of the

23  documents that you passed forward?

24             **MS. KRUPICKA:**  December 14th, Your Honor,

25  three days before the hearing.

1              **THE WITNESS:**  I said before that I

2    received this packet two days before the hearing and

3    that was the first time that I received any specific

4    allegation.

5              **THE COURT:**  I remember her testifying

6    about that.

7              So, if we can get her to identify the

8    documents, we will go ahead and introduce them.

9              **MS. KRUPICKA:**  Certainly.

10   **BY MS. KRUPICKA:**

11   **Q.**     And is this the packet that you were given on

12   December 14th?

13   **A.**     Yes.

14   **Q.**     Okay.

15             **THE COURT:**  Are you moving its -- its

16   introduction?

17             **MS. KRUPICKA:**  Yes, Your Honor, I would

18   move that it be introduced.

19             **THE COURT:**  Okay.

20             **MR. YOUNG:**  I'm still going to object that

21   it's hearsay.

22             **THE COURT:**  Well, I understand, but I'm

23   going to overrule it in light of her previous

24   testimony as well as the cross, we're going to go

25   ahead and receive -- 14?

1          **THE CLERK:**  Fourteen.

2          **THE COURT:**  Okay.  It will be marked as

3     Exhibit Number 14.

4          Ms. Krupicka, if you could get the

5     document so Mr. Herrin can mark it, I would

6     appreciate it.

7          If you could, please, get the documents

8     and have Mr. Herrin mark it.

9          **MS. KRUPICKA:**  Sure.

10          She has taken it apart.

11          So I will give it back to you when I have

12     finished.

13          If that is okay.

14          (Exhibit Number 14 was marked;

15     Description:  Packet.)

16     **BY MS. KRUPICKA:**

17     **Q.**     So there's a photograph of a screenshot in

18     the packet, is that correct?

19          It's about the third, fourth or fifth page

20     from the back.

21     **A.**     Yes, I'm on it.

22     **Q.**     Okay.

23          **MR. TIMMONS:**  May I -- can I just be clear

24     on what we're -- all right.

25          **THE WITNESS:**  It's this desktop, Your

PRIANKA BOSE - CROSS

137

1  Honor.

2  **BY MS. KRUPICKA:**

3  **Q.**     And that was in the package, is that correct?

4  **A.**     Yes.

5  **Q.**     And that shows a desktop icon with the fake

6  answer key on it, is that correct?

7  **A.**     I -- yes.  Yes.

8  **Q.**     Dr. Bea so testified at the -- at the

9  hearing, did he not?

10  **A.**     Yes, but this is the desktop that he gave to

11  the investigator, Mitch Trychta.

12  **Q.**     In fact, it was Dr. Bea's practice not to log

13  out of his laptop when he left his office, isn't

14  that correct?

15  **A.**     That's what he says.

16  **Q.**     So that if he didn't, if he didn't log out,

17  you wouldn't need a password to get on his computer,

18  is that correct?

19  **A.**     That is correct.  But I don't know how he

20  uses his computer.

21  **Q.**     Well, all you would have to do is get on it

22  and see that he hadn't logged out, right?

23  **A.**     I don't have any reason to be on his

24  computer.

25  **Q.**     Except to get the answers to the quiz?

PRIANKA BOSE - CROSS

138

1    **A.**      But I didn't get the answers to the quiz.

2    **Q.**      Do you recall making a statement in the Honor

3    Council proceeding that, I think to intentionally

4    create a fake answer key is to know your student is

5    able to access your answer key?

6    **A.**      Yes.

7    **Q.**      So, you think --

8    **A.**      May I elaborate?

9    **Q.**      Sure.

10   **A.**      May I elaborate?

11   **Q.**      I was about to ask you.

12   **A.**      To intentionally create a fake answer key is

13   to know that your student has access to an answer

14   key which means you're putting your student in an

15   environment intentionally to have access to

16   documents that shouldn't be available to anybody.

17   **Q.**      But they were and you --

18   **A.**      -- but that's all --

19   **Q.**      -- took advantage of that, isn't that true?

20          **MR. TIMMONS:**  Objection, Your Honor,

21   she's --

22   **A.**      -- it wasn't --

23          **THE COURT:**  Hold on just one moment.

24          Yes, sir, I'm sorry.

25          **MR. TIMMONS:**  She is in the middle of

PRIANKA BOSE - CROSS

139

1   answering her question.  Ms. Krupicka interrupted

2   her.  I just ask that she be given the opportunity

3   to finish her answer.

4            THE COURT:  Well, I will allow her finish

5   her answer, but I thought she had finished it and

6   Ms. Krupicka had asked the next one.

7            But you may finish your answer and then

8   listen to her next question.

9            THE WITNESS:  Yes, Your Honor.

10           THE COURT:  Go ahead and ask your next

11  question, Ms. Krupicka.

12  BY MS. KRUPICKA:

13  Q.     Was your adviser present during the Honor

14  Council hearing?

15  A.     My Honor Council adviser?

16  Q.     Yes.

17  A.     Yes.

18  Q.     Okay.  Did you seek his or her advice during

19  the hearing?

20  A.     Are you allowed to do that?  I -- I wasn't --

21  Q.     Your Honor Council adviser?

22           THE COURT:  Just answer the question --

23  A.     No, I did not, I did not seek her advice.

24  Q.     Okay.  Now your appeal letter extensively

25  discusses your allegations against Dr. Bea in terms

1    of inappropriate conduct, is that not correct?

2    **A.**    Yes.

3            **MS. KRUPICKA:**   May I approach the witness,

4    Your Honor?

5            **THE COURT:**   Go ahead.

6    **A.**    Thank you.

7    **Q.**    If you would turn to -- well, I guess the

8    easiest thing to do, can you find the appeal -- your

9    appeal letter prepared by your attorney in the

10   packet and go to that.

11           **THE COURT:**   Is this in evidence already?

12           **MS. KRUPICKA:**   No, Your Honor.

13           **THE COURT:**   Okay.  We need to get the

14   witness to identify the document.  See if there is

15   any objection, get them mark and then we can

16   proceed.

17           **MS. KRUPICKA:**   I'm sorry, Your Honor.

18           **MR. TIMMONS:**   No objection to the appeal

19   packet, Your Honor.

20           **THE COURT:**   All right.  I'm assuming

21   you're asking that they be introduced?

22           **MS. KRUPICKA:**   Yes, Your Honor.

23           **THE COURT:**   All right.  Then we will go

24   ahead with the documents that the witness has, we

25   will go ahead and admit them in essence as a

1   collective exhibit, Number 15.

2            (Exhibit Number 15 was marked;

3   Description:  Appeal packet.)

4   **BY MS. KRUPICKA:**

5   **Q.**    Now as part of that appeal packet is your

6   appeal letter to the Faculty Appeals Committee

7   prepared by your attorney, is that correct?

8   **A.**    Yes, ma'am.

9   **Q.**    All right.  And that letter devotes several

10  pages to discussing your allegations of

11  inappropriate conduct against Dr. Bea, is that

12  correct?

13  **A.**    Yes.

14  **Q.**    And this was the packet that was submitted to

15  the Faculty Appeals Committee in advance of the

16  hearing, is that correct?

17  **A.**    Yes.

18            **THE COURT:**  I would like to get the date

19  of when it was transmitted.

20  **BY MS. KRUPICKA:**

21  **Q.**    This is -- this is an e-mail, it was

22  transmitted to you via e-mail from Dean Blaisdell,

23  is that correct?

24  **A.**    This entire package?

25  **Q.**    Yes.

PRIANKA BOSE – CROSS

142

1    **A.**     Yes.

2    **Q.**     And the e-mail is dated January 21st, 2016,

3    is that right?

4    **A.**     Yes.

5    **Q.**     And the Faculty Appeals Committee hearing was

6    held on January 28th, is that correct?

7    **A.**     Yes.

8    **Q.**     I would like to hand the witness a document

9    that was prepared as a transcript of the proceedings

10   before the Faculty Appeals Committee.

11        Do you identify it as such?

12   **A.**     Yes.

13        **MS. KRUPICKA:**  I would like to have that

14   marked as the next exhibit, Your Honor.

15        **MR. TIMMONS:**  No objection.

16        **THE COURT:**  All right.  Then we will

17   receive it.

18        That will be number 16.

19        (Exhibit Number 16 was marked;

20   Description:  Transcript.)

21   **BY MS. KRUPICKA:**

22   **Q.**     Now at the Faculty Appeals Committee hearing

23   you presented new evidence, is that correct,

24   evidence that was not heard by the Honor Council?

25   **A.**     Yes.

1    **Q.**    And that new evidence consisted of the

2    quizzes you said you had lost, is that correct?

3    **A.**    The quizzes and the exams that I had lost

4    from many classes.

5    **Q.**    Okay.  And you said that you had lost the --

6    these quizzes and tests at the airport, is that

7    correct, over the Thanksgiving break?

8    **A.**    I lost them while traveling, I switched

9    flights three times, so I'm not sure whether it was

10   an airport or a flight that I left my bag at.

11   **Q.**    Okay.  But this is when you were traveling

12   with your family back to and from Hawaii during the

13   Thanksgiving break, is that correct?

14   **A.**    I was traveling by myself.

15   **Q.**    Were you going to and from Hawaii?

16   **A.**    Yes.

17   **Q.**    Okay.  And you represented to the Faculty

18   Appeals Committee hearing that this -- that a

19   package containing these missing tests and quizzes

20   was delivered to your house the day before the

21   Faculty Appeals Committee hearing, is that correct?

22   **A.**    I'm not sure what day it was, but it was

23   delivered to my house and my father received the

24   package.

25   **Q.**    Right.

PRIANKA BOSE - CROSS

144

1          And your father brought it to Memphis with

2     him from Atlanta, is that correct?

3     **A.**     Yes.

4     **Q.**     So it -- and just to be sure the court is

5     clear on this, the package is delivered to your home

6     in Atlanta, is that correct?

7     **A.**     Yes.

8     **Q.**     Was it right before the hearing that it was

9     delivered?

10    **A.**     Yes.

11    **Q.**     Okay.  And there was no -- no indication of

12    who had sent it to you, is that correct?

13    **A.**     No -- there was a note just telling me to

14    study well.

15    **Q.**     It was not signed, is that correct?

16    **A.**     No, the note was not signed.  As I stated

17    previously, an anonymous person sent me my testing

18    quizzes back.

19    **Q.**     Okay.  And do you recall during the Faculty

20    Appeals Committee hearing you were asked by one of

21    the members of the -- of the committee if the

22    purpose of introducing the tests was to refute

23    Dr. Bea's claim that he was a careful recordkeeper

24    and you answered yes, is that correct?

25    **A.**     Yes, I answered yes.

1          But --

2               **THE WITNESS:**  May I elaborate, Your Honor?

3               **MS. KRUPICKA:**  Your Honor, I don't have a

4     question --

5               **THE COURT:**  Just go ahead and ask your

6     next question.

7          Your lawyer will have an opportunity to

8     question you again if he so desires.

9     **BY MS. KRUPICKA:**

10    **Q.**     So the Faculty Appeals Committee had the

11    allegations you made against Dr. Bea in full, is

12    that correct, at the time of the hearing?

13    **A.**     Yes, but they never asked me about it.

14    **Q.**     But they were -- it was submitted to the

15    Faculty Appeals Committee in your appeals packet, is

16    that correct?

17    **A.**     Yes, the faculty was aware.

18    **Q.**     Okay.  So is -- is Oglethorpe University

19    going to expel if you are not successful in this

20    lawsuit?

21    **A.**     I do not know the details of my provisional

22    agreement.  All I know is that I'm supposed to keep

23    them informed on the progress, and as long as I

24    continue to keep doing my work and be a good

25    student, I will graduate.

1    **Q.**       Okay.  So there's no -- there's no

2    contingency on the outcome of this lawsuit in terms

3    of your matriculating at Oglethorpe, is that

4    correct?

5    **A.**       That is correct.

6    **Q.**       And how old are you, Ms. Bose?

7    **A.**       I just turned 21.

8    **Q.**       So you were 20 when -- when the events that

9    are the subject of this lawsuit occurred, is that

10   correct?

11   **A.**       That's correct.

12   **Q.**       Did you consider yourself an adult at that

13   time?

14   **A.**       Legally I am an adult.

15   **Q.**       Okay.  Are you saying that you -- that --

16   that sounds like a but to me?

17   **A.**       It's not a but, legally I am an adult.

18   **Q.**       Okay.  Do you consider yourself an adult?

19   **A.**       I consider myself a student that is

20   subordinate to a professor who is in a more

21   authoritary --

22            **MS. KRUPICKA:**   Objection, Your Honor,

23   non-responsive.

24            **THE COURT:**  You are going beyond the

25   question that she asked you.

1            Just answer her questions and we can get

2      through this.

3      **A.**     I'm an adult.

4      **Q.**     Did you meet with Dr. Bea after you received

5      the Honor Council packet but before the hearing?

6      **A.**     Yes.

7      **Q.**     You went to his office alone, is that

8      correct?

9      **A.**     Because he told me to.

10     **Q.**     You -- he told you to come see him, is that

11     right, after you received the Honor Council packet?

12     **A.**     On Monday, December the 7th -- 7th I was in

13     Class.  He handed back all the quizzes to everybody

14     else but me and in front of the whole class he said,

15     Prianka, since you took your quiz early, I didn't

16     bring it down, so, please see me after class.

17     **Q.**     And did you see him after class?

18     **A.**     Yes, because I thought he was going the give

19     me my quiz.

20     **Q.**     And didn't you ask him what -- what was all

21     this about in terms of the Honor Council?

22     **A.**     I did.

23     **Q.**     Okay.  And he said I can't talk to you about

24     it, isn't that right?

25     **A.**     He said I don't know what to say.  You will

PRIANKA BOSE - CROSS

148

1    find out shortly.  When is your meeting with the

2    investigator.

3    **Q.**     Okay.  And you weren't afraid to go to his

4    office alone at that time, were you?

5    **A.**     I was afraid.  I'm -- I was scared.  I just

6    got accused of being -- of cheating from a man who I

7    didn't want anything to do with at that point.  But

8    he told me to come, so I wanted my quiz --

9    **Q.**     Okay.

10   **A.**     -- so I went.  He's still my professor.  I'm

11   not ignoring him.  I still have two weeks with him

12   because I have to take the final.  I have one more

13   class with him after Monday the 7th.

14   **Q.**     Well, you, in fact, took your final with

15   another professor, did you not, at your request?

16   **A.**     Yes --

17   **Q.**     Okay.

18   **A.**     -- because I didn't want to be in the same

19   room with him.  He told me himself that he didn't

20   want me coming around him anymore.

21          **MS. KRUPICKA:**  Your Honor, I think she has

22   answered my question.

23          **THE COURT:**  Go ahead and ask your next

24   one.

25          **MS. KRUPICKA:**  That was my last question,

1      Your Honor.

2                      **THE COURT:**  All right, thank you.

3                      And is there any redirect?

4                      **MR. TIMMONS:**  Just a little bit, Your

5      Honor.

6                      <u>**REDIRECT EXAMINATION**</u>

7      **BY MR. TIMMONS:**

8      **Q.**     Ms. Bose, did -- I want to be clear about

9      something because I didn't quite understand your

10     answer and Ms. Krupicka's question.

11                     Ms. Krupicka asked you whether you advised

12     the Honor Council investigator, not the Honor

13     Council, but the investigator prior to the hearing,

14     that you suspected that there was a link between

15     Dr. Bea's accusations of cheating and your

16     confrontation of him about what you perceived as --

17     as unwelcomed advances.

18                     Did you advise the investigator of that or

19     did you only bring that up in the hearing?

20     **A.**     I only brought that up in the hearing.

21     **Q.**     Okay.  Ms. Krupicka asked you about your

22     notes that you prepared for the hearing, and asked

23     specifically whether you had prepared questions

24     about Dr. Bea's conduct towards you in those notes.

25                     Can you describe for the court what, if

1  anything, was in those pre-prepared notes about the

2  allegations that Dr. Bea made unwelcomed advances

3  towards you?

4  **A.**     The only pre-prepared aspect of those notes

5  was that I had a typed up piece of paper without

6  four or five questions on it relating to the first

7  four to five, six questions that I state in the

8  transcript.  Everything else I had handwritten

9  midway through the actual hearing.

10 **Q.**     So is it your testimony that you didn't

11 pre-prepare any questions for Dr. Bea about that

12 interaction between you and Dr. Bea in July or in

13 November?

14 **A.**     No.

15 **Q.**     No, you did not?

16 **A.**     No, I did not have any questions typed up

17 before the hearing.

18 **Q.**     All right.  Ms. Krupicka asked you about

19 evidence submitted that the answer key that Dr. Bea

20 provided and claimed was your fake answer key was

21 made prior to you taking Quiz 5.

22         Was -- and I believe through a screenshot, I

23 think that was --

24            **MR. TIMMONS:**  Was that marked individually

25 or was that just part of the packet?

PRIANKA BOSE – REDIRECT

151

1          **MS. KRUPICKA:**  It was part of the packet.

2          **MR. TIMMONS:**  Okay.

3          Could I ask that the witness be passed --

4          **THE WITNESS:**  I have -- I have it.

5          **THE COURT:**  Are you talking about the

6    transcript of the appeal hearing?

7          **MR. TIMMONS:**  No.  Maybe it wasn't marked.

8          Well, I'm going to pass you a document.

9          **THE COURT:**  Because that's -- because

10   that's the one that was not passed to the clerk to

11   get it mark as Exhibit 16.

12         **MR. TIMMONS:**  Okay, this document.

13   **BY MR. TIMMONS:**

14   **Q.**    Ms. Bose, you have this document, correct?

15   **A.**    Yes.

16   **Q.**    Okay.  This screenshot that purports to

17   shoot -- that Ms. Krupicka indicated shows the fake

18   answer key.

19         Do you see a fake answer key on this

20   document?

21         Or do you see any -- anything that purports

22   to be an answer key on this document?

23   **A.**    Only because it was pointed out to me at the

24   hearing.

25   **Q.**    As we sit here today, do you see that

1    document?

2    **A.**      It's in the middle.

3    **Q.**      Right about here (indicating)?

4    **A.**      Yes.

5            **MR. TIMMONS:**  Your Honor, can I approach

6    the Elmo?

7            **THE COURT:**  Please do.

8            **MR. TIMMONS:**  Make this a little bit

9    easier for everybody.

10   **BY MR. TIMMONS:**

11   **Q.**      All right.  Is this the document -- the icon

12   that you believe purports to be the fake answer key?

13   **A.**      Yes.

14   **Q.**      Do you see a date anywhere on that?

15   **A.**      No.

16           **MR. TIMMONS:**  Actually, Your Honor, there

17   is a date on it.

18   **BY MR. TIMMONS:**

19   **Q.**      Can you read the date?

20   **A.**      That date is the date the screenshot was

21   taken, not the date that anything was made.

22   **Q.**      Right, I understand it's not, but when was

23   the screenshot taken according to this --

24   **A.**      Before, two days after I took my quiz.

25   **Q.**      Okay.

PRIANKA BOSE – REDIRECT

153

1          **MR. TIMMONS:**  That's all I have, Your

2    Honor.

3          **THE COURT:**  Thank you.

4          I do allow recross.

5          Anything further?

6          **MS. KRUPICKA:**  No, Your Honor.

7          **THE COURT:**  All right, thank you.

8          Ms. Bose, you may step down.

9          You may step down.

10              (Witness excused.)

11          **THE COURT:**  That last exhibit, the

12    screenshot and all, was part of, I'm assuming it's

13    part of Exhibit Number 16, we've never gotten it

14    marked.

15          **MR. PEEPLES:**  Your Honor –– I'm sorry,

16    Your Honor, I believe that's part of the collective

17    Exhibit 15, it's part of that packet, I'm sorry,

18    Your Honor.

19          **MR. TIMMONS:**  I believe he is correct.

20          **THE COURT:**  Okay, thank you.

21          **MR. PEEPLES:**  Thank you, Your Honor.

22          **THE COURT:**  Okay.  We're about 5:25, we

23    finished our first witness.

24          I'm assuming you have additional

25    witnesses?

1        **MR. TIMMONS:**  Your Honor, I have two brief

2   corroborating witnesses.

3        **THE COURT:**  Okay.  I need to get from your

4   perspective what you mean by brief?

5        **MR. TIMMONS:**  Your Honor, Ms. Chelsea

6   Dezfuli is present and I anticipate that she is

7   going to testify that the -- that Ms. Bose's

8   testimony about the events of July were --

9        **THE COURT:**  I understand what you mean

10  about corroborating, but how long do you think it

11  will take for us to get through that witness?

12       **MR. TIMMONS:**  With regard to the incident

13  in July and the incident in November, I anticipate

14  about five questions for each one of those

15  incidents.

16       **THE COURT:**  All right.  And what about the

17  other witness.

18       **MR. TIMMONS:**  It's similar testimony, Your

19  Honor, basically the same thing.

20       **THE COURT:**  All right.  Call your next

21  witness.

22       **MR. TIMMONS:**  All right.  Chelsea Dezfuli,

23  Your Honor.

24       **THE COURT:**  Okay.  You're good right

25  there.

1              Hold it.

2              **THE WITNESS:**  Okay.

3              **THE COURT:**  Face me.

4              Raise your right hand.

5              Do you solemnly swear or affirm, under the

6    penalties of perjury, the testimony that you are

7    about to provide the court in this matter will be

8    the truth, the whole truth and nothing but the

9    truth, so help you God?

10             **THE WITNESS:**  Yes.

11             **THE COURT:**  Be seated, please.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ILLENE CHELSEA DEZFULI - DIRECT

156

1       **CHELSEA DEZFULI,**

2   was thereupon called as a witness on behalf of the

3   Plaintiff, and having been first duly sworn,

4   was examined and testified as follows:

5                   **DIRECT EXAMINATION**

6   **BY MR. TIMMONS:**

7   **Q.**     Would you please state your name.

8   **A.**     Yes.  Illene Chelsea Dezfuli.

9   **Q.**     Okay.  Would you spell that, please.

10  **A.**     Yes.  It's Illene, I-l-l-e-n-e, Chelsea, C --

11  C-h-e-l-s-e-a, Dezfuli, D-e-z-f-u-l-i.

12  **Q.**     All right.  Ms. Dezfuli --

13              **MR. TIMMONS:**  And with my opposing

14  counsel's permission, I'm going to engage in some

15  quick leading to just get us to the relevant

16  material.

17              **MS. KRUPICKA:**  I have no objection.

18  **BY MR. TIMMONS:**

19  **Q.**     Ms. Dezfuli, you are friends with Prianka

20  Bose, right?

21  **A.**     Yes, sir.

22  **Q.**     Okay.  And you -- you know her because you're

23  in the same sorority -- you were in the same

24  sorority at Rhodes, correct?

25  **A.**     Yes.

1    **Q.**      Okay.  And you also attended the Organic

2    Chemistry II class that Dr. Bea taught in the fall

3    of 2015, correct?

4    **A.**      Yes, I did.

5    **Q.**      Okay.  And you sat next to Ms. Bose?

6    **A.**      Yes.

7    **Q.**      And you studied with Ms. Bose?

8    **A.**      Yes.

9    **Q.**      All right.  In July of 2015 did Ms. Bose

10   appear at your home after an incident involving

11   Dr. Bea in which she after -- in which she appeared

12   unsettled?

13   **A.**      Yes.  She came to my house every weekend or

14   so.  And one day she came in, she -- like she felt

15   uncomfortable and I had to like engage her in

16   conversation.  And she told me that Professor Bea

17   had asked her a series of questions that seemed to

18   take a more romantic interest than a personal kind

19   of academic interest.

20   **Q.**      Okay.  And Ms. Bose told you that in July of

21   2015?

22   **A.**      Yes, she did.

23   **Q.**      Okay.  Did you have any advice for her?

24   **A.**      Well, I told her that it could just be a

25   research opportunity because many professors do ask

1    students to help with research.  But it -- I told

2    her, you said no to dinner, so that's -- you did

3    your part, and that was that.

4    **Q.**      Did Ms. Bose indicate what she thought the

5    invitation to dinner was about?

6    **A.**      Yes.  She felt that it was more romantic and

7    I -- I see that as well.

8    **Q.**      All right.  Moving forward to November of

9    2015.

10        Was there an incident that happened in the

11   Rhodes refectory involving Prianka Bose and Dr. Bea

12   that you were present for?

13   **A.**      Yes.

14   **Q.**      Can you describe that incident for the court?

15   **A.**      Yes. Prianka and I were sitting perpendicular

16   to each other and Dr. Bea came up kind of around

17   both of us, and so I had to really scoot back as if

18   like I was totally out of the picture, and got

19   really close to her and just peered over her

20   shoulder and not in joking tone, but in a kind of

21   serious tone asked, oh, is that your boyfriend?  And

22   just kind of walked away.

23   **Q.**      What was your perception of that event?

24   **A.**      I -- I thought it was odd, never ever heard

25   of a professor asking about anything personal,

1    especially a boyfriend, like a love life kind of

2    thing.  So I told her you need to definitely say

3    something, it's not okay.  So I really encouraged

4    her to go talk to Professor Bea.

5    **Q.**     Okay.  And did you, in fact, accompany her to

6    do that?

7    **A.**     Yes, I did.  But I was not in earshot,

8    however, I could see her.

9    **Q.**     Would you just describe what happened next?

10   **A.**     Yes.  We were standing in front of the

11   chemistry building, I was closer to the cafeteria,

12   and I saw them engaging in conversation.  Professor

13   Bea seemed very attentive when first approached by

14   Prianka and near the end of the conversation, he

15   looked down, shook his head and kind of angrily

16   walked away.

17   **Q.**     All right.  Then -- then did Prianka return

18   to you?

19   **A.**     Yes.  She same back.  You know, I said that

20   didn't seem like it went very well.  And she said

21   she no.  She -- no, it didn't.  Yeah.

22   **Q.**     Did you attend Professor Bea's class with

23   Ms. Bose on the subsequent Friday and Monday?

24   **A.**     Yes.

25   **Q.**     Okay.  Did you make any observations about

ILLENE CHELSEA DEZFULI - DIRECT

160

1    Dr. Bea's conduct towards Ms. Bose in those classes?

2    **A.**    During that whole class it seemed a little

3    tense.  Both of us asked questions and tried to

4    answer questions during lecture time.  However, it

5    didn't seem like our questions or our answers were

6    welcomed.

7    **Q.**    Okay.  When -- when you or Ms. Bose asked

8    questions, he wouldn't call on you, is that what

9    you're saying?

10   **A.**    Right.  And so at that time I thought, okay,

11   maybe someone else raised their hand before me or --

12   **Q.**    All right.

13          **MR. TIMMONS:**  All right.  Your Honor, pass

14   the witness.

15          **THE COURT:**  All right, thank you.

16          Is there any cross?

17          **MS. KRUPICKA:**  I have no questions, Your

18   Honor.

19          **THE COURT:**  All right.  Ms. Dezfuli --

20          **THE WITNESS:**  Yes, sir.

21          **THE COURT:**  All right, thank you very

22   much.

23          You can step down?

24          **THE WITNESS:**  Thank you.

25          **THE COURT:**  You're excused.

1                    (Witness excused.)

2              **MR. TIMMONS:**  Your Honor, my next witness

3    is Rathi Bose.

4              **THE COURT:**  All right.

5              Yes, ma'am, you are good right there.

6              If you would, please, raise your right

7    hand.

8              Do you solemnly swear or affirm, under the

9    penalties of perjury, the testimony that you are

10   about to provide the court in this matter will be

11   the truth, the whole truth and nothing but the

12   truth, so help you God?

13             **THE WITNESS:**  Yes.

14             **THE COURT:**  Be seated, please.

15             **MR. TIMMONS:**  And, Your Honor, again with

16   permission from opposing counsel, I will engage in

17   some harmless leading to establish --

18             **MS. KRUPICKA:**  I have no objection.

19

20

21

22

23

24

25

1          **RATHI BOSE,**

2    was thereupon called as a witness on behalf of the

3    Plaintiff, and having been first duly sworn,

4    was examined and testified as follows:

5          **DIRECT EXAMINATION**

6    **BY MR. TIMMONS:**

7    **Q.**    Ms. Bose -- well, first of all would you

8    state your name and spell it, please.

9    **A.**    Rathi Bose, it's R-a-t-h-i.  And the last

10   name is Bose, B-o-s-e.

11   **Q.**    Right.

12         And you are Prianka Bose's mother, correct?

13   **A.**    Yes.

14   **Q.**    All right.  In July of 2015, did -- was there

15   an occasion in which Prianka Bose contacted you

16   about an incident involving Dr. Bea?

17   **A.**    Yes.  Middle of July or end of July she

18   called me up and she told me she had a very strange

19   encounter with Dr. Bea.

20         And I asked her what that was.  And she told

21   me that he had flagged her down in the parking lot.

22   And in the process of talking, he started asking

23   some personal questions of what she was doing in

24   Memphis and whether she had friends over, what was

25   she doing at night, and then went a little bit

1    deeper and started asking her about boyfriend, has

2    her boyfriend visited.  And I felt that was very

3    inappropriate.

4    **Q.**    Okay.  Did Prianka Bose express any concern

5    about that incident to you?

6    **A.**    Yes.  She was very uncomfortable, and she did

7    not know to do because this is the frist time that a

8    professor had approached her and was asking about

9    her boyfriend or any personal questions because she

10   had always tried to keep it at a very professional

11   level.

12   **Q.**    Okay.  Moving forward to November -- I'm

13   sorry, to, I believe, September of 2015, was there

14   another incident that Ms. Bose -- that Prianka Bose

15   contacted you about in which there were some

16   personal interactions with Dr. Bea that made her

17   uncomfortable?

18   **A.**    Yes.  It seemed that -- she told me that he

19   had came into the lab and asked to see her after

20   class.  And she went to his classroom, I mean, to

21   his office, and they were discussing research

22   opportunities.  And then after that he started

23   asking her much more detailed questions about family

24   life, sorority life, what she did in Atlanta,

25   started delving into what part of India she was from

1    and whether she still had family there.  So started

2    getting more and more into her life.

3    **Q.**    Did she indicate to you whether she was

4    uncomfortable about that?

5    **A.**    Yes, she felt very uncomfortable.  So she got

6    up and she started walking away.  And she told me

7    that he had kept walking behind her.  And that she

8    spoke out her father's number just to separate

9    himself from her.  And so she started talking to her

10   dad at that point.

11   **Q.**    All right.  Now moving on to November 2015,

12   was there an incident on November 19th, 2015, on

13   which Ms. Bose contacted you, Prianka Bose contacted

14   you about another incident involving Dr. Bea?

15   **A.**    Yes.  She told me that Dr. Bea approached her

16   from the back at the Rat and leaned over her

17   shoulders and asked her whether she was texting her

18   boyfriend.  And she felt extremely uncomfortable

19   because it's the first time that he had really come

20   into closeness -- a closeness.  And she felt like

21   she had to move away to getaway and she felt like it

22   was getting more and more uncomfortable for her.

23   **Q.**    Okay.  Did you -- now do you recall -- from

24   the time that she -- that that event occurred and

25   she called you, do you know how long it was?

RATHI BOSE - DIRECT

165

1   **A.**      I think it was shortly after, she was waiting

2   for somebody --

3            **MS. KRUPICKA:**  Objection, Your Honor, this

4   witness can't possibly know the answer to that

5   question.

6            **THE COURT:**  Lay a better foundation.

7   **BY MR. TIMMONS:**

8   **Q.**      Did Ms. Bose indicate to you whether this had

9   just happened?

10  **A.**      She said it had just happened like a few

11  minutes ago, and she just wanted to tell me about

12  it.

13  **Q.**      Okay.

14  **A.**      And what to do about it, so --

15  **Q.**      Right.

16           Did she give you -- did you give her any

17  advice?

18  **A.**      I told her that she was coming into town for

19  her sister's birthday and we would sit down as a

20  family and discuss.  Because school, there's only

21  about two or three weeks of school left and I wanted

22  it to be done so she can get through organic and

23  then we can try to make a decision at that point

24  what to do.  She was no longer going to be having

25  him as a professor and I was just trying to get her

RATHI BOSE – DIRECT

166

 1    through the class.

 2    **Q.**      Did she contact you again later that day?

 3            Did she contact you again after she

 4    confronted Dr. Bea?

 5    **A.**      No, she did not, no.

 6    **Q.**      All right.

 7            **MR. TIMMONS:**  I don't have anymore

 8    questions.

 9            **THE COURT:**  Thank you.

10            **MS. KRUPICKA:**  No questions, Your Honor.

11            **THE COURT:**  All right, thank you.

12            And thank you, Ms. Bose, you may step

13    down.  You are excused.

14            **THE WITNESS:**  Thank you.

15                 (Witness excused.)

16            **THE COURT:**  Anything further?

17            **MR. TIMMONS:**  Your Honor, that rest my

18    case.

19            **THE COURT:**  All right, thank you.

20            Defense, any proof?

21            **MS. KRUPICKA:**  We have a number of

22    witnesses, Your Honor.

23            How would you like me to handle that?

24            **THE COURT:**  We are not going to be able to

25    get to them today.  Okay.  So we are going to have

1    to identify another date so we can continue with the

2    testimony in the case.

3            I understand the nature of the issues and

4    all, but we are just not going to be able to finish

5    today.

6            **MS. KRUPICKA:**  I understand, Your Honor.

7            **THE COURT:**  Okay.  So pull out your

8    calendars.

9            Looking at Monday, June 27th.

10           **MR. TIMMONS:**  I am available, Your Honor.

11           We're -- we're both available, Your Honor.

12           **MS. KRUPICKA:**  Your Honor, Dr. Pohlmann,

13   one of our witness is scheduled to be out of town on

14   the 22nd.  If you would like to hear his testimony

15   out of turn, I'm happy to call him now.

16           **THE COURT:**  How long do you think it will

17   take?

18           **MS. KRUPICKA:**  I'm sorry, did you say the

19   22nd or the --

20           **THE COURT:**  The 27th.

21           **MS. KRUPICKA:**  The 27th, I'm sorry.

22           You're going to be in Denver?

23           Yes.

24           **THE COURT:**  So we're good?

25           **MS. KRUPICKA:**  No, he is going to be in

```
 1    Denver, Your Honor.

 2            THE COURT:  Oh, he's going to be out of

 3    town.

 4            MS. KRUPICKA:  Yes.

 5            THE COURT:  How long do you anticipate his

 6    testimony is going to take?

 7            MS. KRUPICKA:  Not long, Your Honor, 15

 8    minutes.

 9            THE COURT:  All right.  We will go ahead

10    and take it out of -- out of turn.  We will deal

11    with it now.  And then the rest of the hearing we

12    will put off -- we have one thing going on that

13    morning, and so we will pick it up on the 27th -- in

14    fact, we can start at 9:30.

15            MR. TIMMONS:  9:30, Your Honor?

16            THE COURT:  9:30 on the 27th.

17            MS. KRUPICKA:  That's fine, Your Honor.

18            THE COURT:  Okay.  It's good for everybody

19    else?

20            MS. KRUPICKA:  We can do that, Your Honor.

21            THE COURT:  Okay, thank you.

22            All right.  Why don't we go ahead and take

23    the one witness and then we will conclude for the

24    day.

25            Ms. Krupicka, I'm assuming this is your
```

1    witnesses here?

2              **MS. KRUPICKA:**  Yes, Your Honor, I'm sorry,

3    I was just trying to find my paper.

4              **THE COURT:**  That's quite all right, he

5    came forward without any prompting which is fine.

6              If you would, please, raise your right

7    hand.

8              Do you solemnly swear or affirm, under the

9    penalties of perjury, the testimony that you are

10   about to provide the court in this matter will be

11   the truth, the whole truth and nothing but the

12   truth, so help you God?

13             **THE WITNESS:**  Yes, Your Honor.

14             **THE COURT:**  Be seated here, please.

15

16

17

18

19

20

21

22

23

24

25

MARCUS POHLMANN - DIRECT

170

1              **MARCUS POHLMANN,**

2    was thereupon called as a witness on behalf of the

3    Defendants, and having been first duly sworn,

4    was examined and testified as follows:

5              **DIRECT EXAMINATION**

6    **BY MS. KRUPICKA:**

7    **Q.**    Could you state your name for the record,

8    please.

9    **A.**    Marcus Pohlmann.

10   **Q.**    And by whom are you employed?

11   **A.**    Rhodes College.

12   **Q.**    What is your job title?

13   **A.**    I'm a --

14             **THE COURT:**  Could we get him, please, to

15   spell his name, please.

16   **A.**    Yes.  P-o-h-l-m-a-n-n.

17   **Q.**    And what is your job title?

18   **A.**    I'm a professor of Political Science.

19   **Q.**    Are you currently chair of the Faculty

20   Appeals Committee?

21   **A.**    I am.

22   **Q.**    How long have you worked for Rhodes College?

23   **A.**    This is my -- I just completed my 30th year.

24   **Q.**    And how long have you served in the role of

25   chair of the Faculty Appeals Committee?

MARCUS POHLMANN - DIRECT

171

1   **A.**     This is my third stint.  You serve three year

2   stints, this is my third stint on that committee.

3   In this last stint, I just served as chair for this

4   past year.

5   **Q.**     Okay.  And you presided over Prianka Bose's

6   appeal, is that correct?

7   **A.**     I did, yes.

8   **Q.**     And you were asked to consider new evidence

9   during the hearing, is that correct?

10  **A.**     We were.

11  **Q.**     What was it?

12  **A.**     We were asked to consider a packet of

13  information that apparently had arrived at the

14  family's home at the last minute.  And it was a

15  packet of information that apparently was not

16  available to the Honor Council when they had their

17  original hearing.

18  **Q.**     All right.  Did Ms. Bose make a statement

19  during the hearing?

20  **A.**     She did.

21  **Q.**     Did Ms. Regan Adolph make a statement on

22  behalf of the Honor Council?

23  **A.**     She did.  I -- actually I don't recall if she

24  made any additional statement beyond -- they -- they

25  present us opening remarks in written form.  I

MARCUS POHLMANN - DIRECT

172

1  honestly don't remember whether she spoke beyond

2  those opening, that -- that was edited and presented

3  in written form, but she at least presented that as

4  her opening statement.

5  **Q.**     And the Honor Council submits a written

6  response to the appeal, is that correct, as part --

7  as part of the appeals packet?

8  **A.**     Yes, we do.

9  **Q.**     All right.

10       **MS. KRUPICKA:**  I'm sorry, Your Honor, just

11  one moment.

12  **BY MS. KRUPICKA:**

13  **Q.**     I'm going to hand you a document and ask you

14  if you can identify it.

15  **A.**     All right.

16       Yes.  This is the e-mail message I sent to

17  John Blaisdell, who -- who is the representative of

18  the -- of the college and the person to which we or

19  to whom we report at -- at the end of our hearings.

20  **Q.**     Is this the decision of the Faculty Appeals

21  Committee on Ms. Bose's appeal?

22  **A.**     It is.

23       **MS. KRUPICKA:**  I would like to have that

24  marked as the next exhibit, Your Honor.

25       **THE COURT:**  All right.  Any objection?

1              **MR. TIMMONS:**  No, Your Honor.

2              **THE COURT:**  Okay.  We will show it marked,

3    I believe it is number 17.

4              **THE CLERK:**  Yes, sir.

5              (Exhibit Number 17 was marked;

6    Description:  E-mail.)

7    **BY MS. KRUPICKA:**

8    **Q.**    And could you read that decision into the

9    record, please?

10   **A.**    Yes.  Dated January 29th, 2016.

11             It says:  Regarding –– and I was the author

12   of this –– "Regarding the Prianka Bose appeal, the

13   Faculty Appeals Committee carefully discussed the

14   appeal requests outlined in the formal appeals

15   packet provided to the committee and testimony given

16   during the appeals hearing.  The Appeals committee

17   did not find sufficient grounds for asking the Honor

18   Council to reconsider its decision in terms of

19   either the fairness of the original hearing process

20   or the sufficiency of their evidence.  We do

21   recommend that the Honor Council review the new

22   evidence presented at the appeals hearing, see list

23   below.  In our view the Honor Council needs to make

24   a determination as to its validity; and if

25   determined to be valid, the Honor Council should

 1   then review the penalty in light of the weight it

 2   gave that component of the case."

 3   **Q.**     And what do you list?

 4   **A.**     The Midterm 3, Quiz 4, Quiz 3, Midterm 2A,

 5   the shipping bill when it arrives, and the shipping

 6   box when it arrives.

 7   **Q.**     And so those last two items were not

 8   available for the Faculty Appeals Committee?

 9   **A.**     I'm not sure what you mean by that -- oh,

10   yeah, I see what you're saying now, yes.

11          The shipping bill and the shipping box were

12   not available to us.  So, when it arrives means when

13   they were able to go back home and send it to the --

14   to the Honor Council.

15   **Q.**     Okay.  Did the new evidence submitted affect

16   your -- your decision at all?

17   **A.**     The new evidence did not affect our decision,

18   but because it was new evidence, it was not

19   available to the Honor Council at the time, we felt

20   that they should have an opportunity to review it

21   for both validity and substance.

22   **Q.**     All right.  And Ms. Bose's appeal letter

23   discussed in detail her allegations against

24   Dr. Bea's conduct that she considered inappropriate,

25   is that correct?

MARCUS POHLMANN - DIRECT

175

1    **A.**      It did.

2    **Q.**      Did those allegations play any part in your

3    decision?

4    **A.**      They were certainly reviewed, both in their

5    written form and in the form of verbal testimony.

6    They were considered as part of the -- of the

7    overall case that Honor Council was considering.

8           Again, our job is appeal -- not again, but

9    our job as appeals is to determine if the process

10   was fair and if there was sufficient evidence to

11   reach the decision that Honor Council did.

12          And we reviewed that information in that

13   light and still felt, you know, even if that

14   information was valid, that there was still adequate

15   evidence for Honor Council to reach the conclusion

16   that they reached.

17              **MS. KRUPICKA:**  Thank you.

18              That's all I have, Your Honor.

19              **THE COURT:**  Thank you.

20              And is there cross?

21              **MR. COHEN:**  Yes, Your Honor.

22                   <u>**CROSS EXAMINATION**</u>

23   BY MR. COHEN:

24   **Q.**      Professor Pohlmann, what, in substance, is

25   your memory of the material submitted to you

MARCUS POHLMANN - CROSS

176

1    regarding Prianka Bose's allegation that the

2    cheating allegation was retaliatory?

3    **A.**      I'm not quite sure what the question is.

4            I -- the -- what we reviewed was pretty much

5    what we heard today in court, those two or three

6    events that -- that occurred and her conclusion

7    that -- that the professor's actions then must be

8    retaliatory.

9    **Q.**      Was it clear to you and the committee that

10   she had made a claim to this appeals committee that

11   she complained of unwanted romantic attention by

12   Professor Bea?

13   **A.**      That was conveyed to us, yes.

14   **Q.**      All right.  And was it conveyed to you that

15   within eight days thereafter she was accused of

16   cheating by Dr. Bea?

17   **A.**      Yes.

18   **Q.**      And were you familiar, as a long-time

19   professor, that your school had a Title IX

20   investigation process?

21   **A.**      The Title IX investigation process, I

22   believe, was created this year in much more detail,

23   but, yes, I knew there was such a thing.

24   **Q.**      And did you and the members of the committee

25   discuss that it would be more appropriate for this

1    sort of accusation to be fully investigated by the

2    Title IX folks at your college?

3           **MS. KRUPICKA:**  Objection, Your Honor, lack

4    of foundation.

5           **THE COURT:**  I will overrule it.

6           Go ahead and answer.

7    **A.**    To the -- ask the question again, I want to

8    be real clear.

9    **Q.**    Well, let me give it some context --

10   **A.**    Okay.

11   **Q.**    -- so you will understand the question

12   better.

13          You're being asked to review whether an

14   expulsion order is appropriate, correct?

15   **A.**    Yes.

16   **Q.**    And so you looked at the evidence about

17   grades and changed grades and answer keys and all of

18   that sort of thing, right?

19   **A.**    We did.

20   **Q.**    But you also had evidence of a significant

21   claim by a student that this cheating allegation was

22   motivated totally or to a great extent by the fact

23   that she had recently complained about unwanted

24   romantic or sexual attention by the very person

25   accusing her of cheating?

1          **MS. KRUPICKA:**  We object to the question

2     again, Your Honor.  It assumes facts not in

3     evidence, conclusory, it doesn't reflect the

4     testimony today.

5          **THE COURT:**  I think you are going to have

6     to lay a better foundation in order to go into that.

7          So at this point I'm going to sustain it.

8     **BY MR. COHEN:**

9     **Q.**     You testified on direct that part of what you

10    considered in the appeal packet was the student's

11    claim that she had complained to Dr. Bea about

12    unwanted romantic or sexual attention, is that

13    correct?

14    **A.**     We reviewed her claim to that effect, yes.

15    **Q.**     All right.  And was her claim clear enough

16    for you to understand what she was alleging?

17    **A.**     Yes.

18    **Q.**     And so, in your own words, please tell the

19    court what you recall that she alleged?

20    **A.**     One of the things that I recall that she is

21    alleging is that the cheating documents were -- were

22    contrived somehow by the professor and to retaliate

23    against her because of some sort of spurned advance.

24    **Q.**     And did you and your committee ever discuss

25    the fact that these sort of student complaints,

1   regarding inappropriate conduct of a sexual or

2   romantic nature by a professor, are to be

3   investigated by the Title IX coordinator of the

4   college?

5         **MS. KRUPICKA:**  Objection, Your Honor.

6   This witness is not a lawyer and he is not involved

7   in Title IX procedure.

8         **MR. COHEN:**  Your Honor, I asked if the

9   matter was discussed, it's pretty plain and simple

10   question.

11         **THE COURT:**  I'm going to overrule it.  He

12   will be allowed to go into that.

13 **A.**     I would say that we intentionally chose not

14   to discuss that at length because it did not seem

15   like what we were being primarily asked to decide.

16 **Q.**     And so is it correct that you really chose to

17   avoid the issue of whether this expulsion was tied,

18   in any respect, to a retaliatory motive?

19 **A.**     No, we did not choose to avoid that.  We

20   chose to not attempt to determine whether the

21   allegation was accurate and whether that allegation

22   would rise to the level of sexual harassment because

23   we didn't feel like that was our grounds to do.

24       But in light of the allegation, we still

25   found sufficient grounds to -- to reach the

1    conclusion the Honor Council reached.

2    **Q.**    So you've -- you've indicated you're pretty

3    experienced in this role as a faculty appeals

4    member, correct?

5    **A.**    Yes, eight years, I would say roughly, yeah.

6    **Q.**    And how much of the eight years have you been

7    chair of this group?

8    **A.**    I was probably chair at least once each

9    stint, so I would say this is probably the third

10   time that I have been chair of that committee.

11   Third year, yes.

12   **Q.**    Well, as a hypothetical, if a student, who

13   had an appeal in front of you, had what you believed

14   to be convincing, clear and convincing evidence that

15   his or her expulsion was retaliatory for having

16   complained about professor's misconduct, would it

17   still be your view that you just can't touch that?

18         **MS. KRUPICKA:**   Objection to the question,

19   it assumes facts not in evidence and it asks for

20   speculation on a hypothetical situation.

21         **THE COURT:**   How do you respond to that?

22         **MR. COHEN:**   I respond, Your Honor, by

23   telling you that this case is about Rhodes College

24   indifference --

25         **THE COURT:**   I'm fully aware of the issues

MARCUS POHLMANN - CROSS

181

1    in the case.  But I'm talking about the specific

2    objection that she's brought forth.

3            **MR. COHEN:**  Well, assumes facts not in

4    evidence is not relevant to the hypothetical, he's

5    testified about what his role is and the committee's

6    role, and I'm trying to establish whether if he and

7    the committee believed that there was a sufficient

8    connection between an expulsion and a retaliatory

9    motive, would that not cause them to look further.

10           **THE COURT:**  Why don't you ask him that.

11           **MR. COHEN:**  All right.

12   **BY MR. COHEN:**

13   **Q.**    If you found that there was a significant

14   connection between a student's expulsion and a

15   retaliatory motive by a professor, would it be your

16   job to look into that?

17   **A.**    Sure.  If the evidence -- if the evidence

18   presented was clear and convincing to that extent,

19   yes, of course.

20   **Q.**    But for reasons that you have explained to

21   some degree, in this case even though this student,

22   Ms. Bose, brought up the subject of there being a

23   retaliatory connection, you chose to ignore it

24   and -- and not really pursue that, correct?

25   **A.**    Oh, we pursued it.  We -- I mean, we -- we

MARCUS POHLMANN – CROSS

182

 1  considered the evidence presented and –– and

 2  determined that there was sufficient evidence of

 3  cheating regardless of that allegation.

 4          **MR. COHEN:**  All right.

 5          Thank you.

 6          **THE COURT:**  All right, thank you.

 7          Any redirect?

 8          **MS. KRUPICKA:**  No, Your Honor.

 9          **THE COURT:**  Okay.  Is it Pohlmann?

10          **THE WITNESS:**  Yes.

11          **THE COURT:**  Mr. Pohlmann, thank you very

12  much.

13          You can step down, you are excused?

14          **THE WITNESS:**  Thank you, Your Honor.

15              (Witness excused.)

16          **THE COURT:**  Okay.  I think we're going to

17  call our proceedings today to a close.  I think we

18  have another date to come back and finish the

19  testimony.  I will hear from both sides at that time

20  with regard to the arguments.  I think we had an

21  opening but I'm sure both sides will have something

22  to say with regard to what must be proven and

23  whether or not the burdens have been carried.

24          Anything else that we can deal with today?

25          Yes, sir.

1          **MR. TIMMONS:**  Oh, no, Your Honor, I just,
2    when you said you were closing, I stood up and I
3    didn't sit back down.
4          **THE COURT:**  All right.
5          Okay.  I'm assuming nothing from either
6    side?
7          **MS. KRUPICKA:**  No, Your Honor.
8          **THE COURT:**  Okay.  Let's go ahead and
9    adjourn court.
10          **THE CLERK:**  All rise.
11          This honorable court now stands in
12    adjournment sine die.
13          **THE COURT:**  Ms. Krupicka or someone on
14    your team, could you help me with regard to Exhibit
15    Number 16, it was never marked.  And unless, if we
16    don't get it marked, I'm not going to consider it
17    whatever the exhibit was.
18          **THE CLERK:**  The Faculty Appeals Committee,
19    I think it was a copy up here on the witness stand.
20          (Adjournment at 6:05 p.m.)
21
22
23
24
25

184

# **C E R T I F I C A T E**

       I, Lynn Dudley, do hereby certify that the foregoing 183 pages are, to the best of my knowledge, skill and ability, a true and accurate transcript from my stenotype notes of the TRO/Injunction Hearing on June 7, 2016, in the matter of:

JANE DOE

vs.

RHODES COLLEGE AND ROBERTO DE LA SAALUD BEA

Dated this 10th day of June 2016.

               ------------------------------
               Lynn Dudley
               Official Court Reporter
               United States District Court
               Western District of Tennessee