IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

PRIANKA BOSE,                        )
                                     )
     Plaintiff,                      )
                                     )
v.                                   )      16-cv-02308-JTF-tmp
                                     )
RHODES COLLEGE and ROBERTO DE        )
LA SALUD BEA,                        )
                                     )
     Defendants.                     )

ORDER DENYING MOTIONS TO COMPEL

     Before the court by order of reference are two motions to
compel.  (ECF No. 93.)  Defendants Rhodes College and Dr.
Roberto de la Salud Bea (collectively "Rhodes") filed their
Motion to Compel on July 6, 2017.  (ECF No. 75.)  Plaintiff
Prianka Bose ("Bose") filed a response on July 19, 2017.  (ECF
No. 80.)  Rhodes filed a reply on July 26, 2017, and Bose filed
a sur-reply on August 2, 2017.  (ECF Nos. 84, 94.)  Bose filed
her own Motion to Compel on July 27, 2017.  (ECF No. 86.)
Rhodes filed a response on August 1, 2017.  (ECF No. 88.)  On
August 31, 2017, the court conducted a hearing on both motions.
(ECF No. 101.)  Subsequently, on September 6, 2017, the court
conducted a telephonic conference to address additional issues
relating to Rhodes's Motion to Compel.  The court directed

Rhodes to submit for *in camera* review Bose's mental health records.

For the following reasons, the court DENIES both motions.

## I.   BACKGROUND

According to Bose, this suit stems from a collection of encounters that Bose had with Dr. Roberto de la Salud Bea beginning in July of 2015 and lasting until November of 2015. (ECF No. 1 at 2.)   In 2015, Bose attended Dr. Bea's Organic Chemistry I course in the spring and took his Organic Chemistry II course in the fall. (Id.)   After the spring semester, Bose alleges that Dr. Bea breached the professional nature of their relationship by giving her special assistance that he did not provide to other students, asking her personal questions about her family and her boyfriend, and inviting her to dinner. (Id. at 2–3.)   Bose states that she "confronted" Dr. Bea about this behavior on November 19, 2015, asking him to "maintain a strictly professional relationship with her." (Id. at 4.)   She alleges that, shortly after this confrontation, Dr. Bea retaliated against her by making it appear that she had cheated on various exams and quizzes in his Organic Chemistry II class. (Id.)   As a consequence of Dr. Bea's accusations of cheating, Rhodes expelled her. (Id. at 6.)

According to Rhodes and Dr. Bea, this suit is a result of Bose trying to avoid punishment for cheating. (ECF No. 84 at

4.)  They deny that Dr. Bea ever behaved in an unprofessional manner.  (ECF No. 53 at 3.)  Rather, they posit that Bose was "under enormous pressure (academic, personal, and otherwise)" and, as a result, she cheated, got caught, and then fabricated the encounters with Dr. Bea in an attempt to avoid expulsion. (ECF No. 84 at 4.)

Bose filed the present suit against Rhodes College and Dr. Bea on May 6, 2016.  (ECF No. 1 at 1–2.)  Bose initially asserted claims against Rhodes College for violating Title IX and Title VII, breach of contract, tortious interference with business relations, negligent failure to train or supervise, and violations of the Tennessee Consumer Protection Act.  (ECF No. 1 at 7–17.)  She initially asserted claims against Dr. Bea for defamation, intentional infliction of emotional distress, and tortious interference with business relations.  (Id. at 17–18.) Bose also sought a temporary restraining order and a permanent injunction.  (Id. at 14, No. 2.)  Following a hearing, the court denied Bose's motion for a temporary restraining order and permanent injunction on October 25, 2016.  (ECF No. 51.)  The court granted Rhodes's motion to dismiss the Title VII and defamation claims on October 26, 2016.  (ECF No. 52.)  Upon Bose's own motion, the court also dismissed the intentional infliction of emotional distress claim on August 31, 2017.  (ECF No. 102.)

The discovery disputes giving rise to the two motions to compel stem from two sets of interrogatories. Rhodes's Motion to Compel originates from Bose's refusal on May 22, 2017, to respond to the following interrogatories and requests for information about her medical history:

> INTERROGATORY NO. 13: Identify by name, current address and telephone number any and all physicians or other health care providers, psychologists, psychiatrists, therapists, counselors, social workers, or other mental health professionals from whom Plaintiff has sought treatment or advice for emotional, physical, or psychological issues in the last (6) years, including, but not limited to, any illness or condition that Plaintiff contends was caused or exacerbated by the actions of Defendants. For each such individual, describe the nature of the advice or treatment provided and the dates of such advice or treatment.
>
> REQUEST NO. 12: All documents or other tangible evidence relating to or concerning treatment provided to Plaintiff for any physical, mental or emotional problem in the last six (6) years, including medical records or other medical reports, correspondence, notes, test results, office notes or records, claim forms, psychological tests, vocational studies, prescriptions or any other record depicting or evidencing treatment, diagnosis, consultation or any other services rendered by any health care provider, psychiatrist, psychologist, therapist, counselor, social worker or any other mental health professional or health care provider.
>
> REQUEST NO. 21: Please execute the attached HIPPA Authorization for Release of Protected Health Information attached as Exhibit 1 hereto.

(ECF No. 75 at 2–3.) Bose refused to provide this information on the grounds that the requests were overly broad and not reasonably calculated to lead to discovery of admissible

evidence.  (Id.)  In a discovery deficiency letter sent on June 2, 2017, Rhodes took the position that a plaintiff who seeks damages for intentional infliction of emotional distress "automatically places in controversy a plaintiff's mental condition."  (ECF No. 75-2 at 2.)  In reply, Bose informed Rhodes she would be dismissing the intentional infliction of emotional distress claim and seeking only "garden variety" emotional distress damages.  (ECF No. 75-3.)  Dissatisfied with this response, on July 6, 2017, Rhodes filed a motion to compel a response to the interrogatories and requests.  (ECF No. 75.) Rhodes argues that it should have access to the information because Bose has a documented history of providing false information to Rhodes Campus Safety and because Bose placed her mental state at issue by seeking damages for emotional distress. (Id. at 4–6, No. 84 at 3–4.)  Bose has since disclosed that she received treatment from the Rhodes Student Counseling Center; however, she maintains that she has not put her mental state at issue and that it would violate her psychotherapist-patient privilege if the court compelled her to disclose any information relating to her treatment.  (ECF Nos. 80, 94, 96.)

After a telephonic conference on the matter, the court ordered production of records from Bose's counseling sessions at Rhodes for *in camera* review.  (ECF No. 104.)  Bose's treatment records reveal that Bose received treatment during three

different periods, first from a licensed clinical social worker (January 25, 2013 to May 1, 2014), then from a Master of Science counseling intern supervised by a licensed clinical social worker (February 13, 2015 to April 30, 2015), and last from a Master of Science psychology intern supervised by a licensed psychologist (October 26, 2015 to December 10, 2015).[1] The supervisors co-signed all of the treatment notes for each session that Bose had with these interns. To the extent that Bose's sessions were recorded, the records contain a form indicating that the supervisors were required to review any recorded sessions with the interns. For each of the three periods during which she received treatment, Bose signed an informed consent form indicating that her discussions with her treatment provider were confidential. These informed consent forms provided in part as follows:

>   Welcome to the Rhodes Student Counseling Center.
> We provide short-term, individual counseling to all
> Rhodes students free of charge. Students may meet for
> individual therapy up to eight times per semester.
> Please notify the Counseling Center in a timely
> fashion when you are unable to attend counseling
> sessions so that we may make that time available to
> other students. A pattern of missed appointments
> without notification may result in termination of
> services. The Counseling Center also offers
> psychiatric evaluation and treatment for students who
> wish to meet with Dr. Taylor Williams regarding
> medication prescriptions. Students meeting with Dr.

---

[1] These dates reflect the time periods when Bose had scheduled treatment sessions; however, they do not necessarily demonstrate whether she attended those sessions.

Williams will be billed through their Rhodes College student account for her services.

When you meet with a therapist for the first time, the therapist will ask you about your reasons for coming to the Counseling Center and will develop a plan with you to meet your goals for counseling.

Whatever you discuss with your treatment provider is confidential. The Counseling Center staff does not share information about students 16 years or older with parents, other students, or any College faculty or staff. Client information is reviewed in clinical supervision with other Counseling Center treatment providers to insure that we provide the highest quality of service possible. There may be times when you want the therapist to speak on your behalf to your parents or with a representative of the College. When this is the case, you will need to sign a release allowing your therapist to speak with that person.

There are several circumstances where a therapist or psychiatrist is required by law to share confidential information. When a student tells the therapist or psychiatrist about someone under the age of 18 who is being subjected to abuse or neglect, we are required to notify the Tennessee Department of Children's Services. If you inform us about a dependent elder who is being abused or neglected, we are required to notify Adult Protective Services. When a student is determined by the therapist or psychiatrist to be at imminent risk of killing himself/herself, or of killing someone else, we will share confidential information consistent with applicable laws to prevent or lessen that imminent threat. We may also disclose confidential information in the course of any judicial or administrative proceeding, in response to an order of a court or administrative tribunal (to the extent that such disclosure is expressly authorized), in certain conditions in response to a subpoena, discovery request or other lawful process. Under the Clery Act, therapists and psychiatrists at universities and colleges are required by law to provide statistics on sexual assault to the State Division of Health Statistics, but NO identifying information is included in that information. If you have any questions about

any aspect of confidentiality regarding your medical records, please ask your therapist.

When you meet with a therapist, he or she will open an electronic Counseling Center file which will contain information regarding your conversations with the therapist and the issues you wish to address. This file is confidential. The information in the file does not become part of a student's academic record, and the same rules that apply to conversations with your therapist will apply to the file . . . .

Bose's records also show that she signed three different Consent and Authorization to Release Information forms. Two of those forms authorized temporary and limited disclosure of her treatment session attendance records to certain Rhodes professors. The third form authorized temporary and limited disclosure of her "initial evaluation" and her "recommendations and coordination of care" to Ike Solas of Campus Safety. This release specifically excluded progress notes, diagnoses, and treatment notes, and it expired on November 15, 2014.

Bose's Motion to Compel stems from Rhodes's refusal to respond to the following interrogatory about Rhodes's case preparation, which Bose served on June 9, 2017:

Interrogatory No. 1: State the name, address, and telephone number of each individual who provided information to respond to these Interrogatories and/or who assisted in the preparation of your responses to these Interrogatories, and identify which Interrogatories each individual provided information in response to and/or assisted in answering.

(ECF No. 86 at 2, No. 86-3.) Rhodes declined to provide this information on the grounds that it was protected by the

attorney-client privilege and work-product doctrine. (Id.) In a discovery deficiency letter sent on July 25, 2017, Bose argued that the identities of the individuals who aided in answering interrogatories were not privileged but rather amounted to material fact. (ECF No. 86-2 at 1; No. 88-2.) In response, Rhodes pointed out that the 45-day deadline to file a motion to compel a response to this interrogatory — July 24, 2017 — had already passed. (ECF No. 86-3.) On July 27, 2017, Bose filed a motion to compel Rhodes to respond to this interrogatory. (ECF No. 86.) In addition to disputing the timeliness of the motion, Rhodes maintains that the work-product doctrine protects it from having to disclose the identities of those who helped respond to Bose's interrogatories. (ECF No. 88 at 3-4.)

## II. ANALYSIS

As this case is before the court on the basis of federal question jurisdiction, the court will "apply the federal law of privilege." Hancock v. Dodson, 958 F.2d 1367, 1373 (6th Cir. 1992); Pravak v. Meyer Eye Grp., PLC, No. 2:07-2433-MlV, 2009 WL 10664851, at *4 (W.D. Tenn. Oct. 22, 2009) (applying the federal law of privilege in a case based on both federal question and diversity jurisdiction). Accordingly, the court will apply the federal psychotherapist-patient privilege and the federal work-product doctrine.

## A. Disclosure of Bose's Mental Health Treatment

1. <u>The Reach of the Psychotherapist-Patient Privilege</u>

The Supreme Court, while acknowledging "the primary assumption that there is a general duty to give what testimony one is capable of giving," has found that the "privilege protecting confidential communications between a psychotherapist and her patient 'promotes sufficiently important interests to outweigh the need for probative evidence . . . .'" <u>Jaffee v. Redmond</u>, 518 U.S. 1, 9-10 (1996) (quoting <u>United States v. Bryan</u>, 339 U.S. 323, 331 (1950); <u>Trammel v. United States</u>, 445 U.S. 40, 51 (1980)). The Supreme Court extended the privilege to include communications made to licensed psychiatrists, psychologists, and social workers. <u>Id.</u> at 15-16. It also observed that "like other testimonial privileges, the patient may of course waive the protection" by disclosing the communications. <u>Id.</u> at 15 n.14. It left to the lower courts the tasks of shaping the "full contours" and "defin[ing] the details" of the psychotherapist-patient privilege. <u>Id.</u> at 18.

It is beyond dispute that the privilege protects Bose's sessions with the licensed clinical social worker. <u>See</u> <u>Jaffee</u> 518 U.S. at 15-17. Thus, all of Bose's communications with the licensed clinical social worker are privileged. With regard to Bose's communications with the two supervised, graduate-level interns, there is little consensus among the courts as to whether the psychotherapist-patient privilege extends to

unlicensed mental health treatment providers. Some find the privilege only covers licensed providers, see United States v. Wynn, 827 F.3d 778, 787 (8th Cir. 2016); United States v. Romo, 413 F.3d 1044, 1046-47 (9th Cir. 2005); Jane Student 1 v. Williams, 206 F.R.D. 306, 309-10 (S.D. Ala. 2002), while others have concluded that it includes unlicensed providers, see Oleszko v. State Comp. Ins. Fund, 243 F.3d 1154, 1157-58 (9th Cir. 2001); Richardson v. Sexual Assault/Spouse Abuse Res. Ctr., Inc., 764 F. Supp. 2d 736, 740 (D. Md. 2011); United States v. Lowe, 948 F. Supp. 97, 99-100 (D. Mass. 1996). Courts that oppose applying the privilege to unlicensed mental health treatment providers emphasize that Jaffee drew a clear line between unlicensed and licensed treatment providers. United States v. Durham, 93 F. Supp. 3d 1291, 1295 (W.D. Okla. 2015). They further explain that the public interest in "promoting mental health" that gives rise to the privilege is only protected when a mental health treatment provider "has demonstrated some threshold level of ability to assist the patient in improving her mental health" by obtaining a license. Jane Student 1, 206 F.R.D. at 309.

For the reasons discussed below, this court is persuaded that the psychotherapist-patient privilege may extend beyond licensed mental health treatment providers and, based upon the

facts in this case, covers Bose's communications with the two supervised, graduate-level interns.

To begin, given that the Supreme Court specified that the district courts would be tasked with shaping the privilege, the court is unconvinced that <u>Jaffee</u> established a bright line rule requiring treatment providers to be licensed. 518 U.S. at 18. Instead, the court finds that the rationale of <u>Jaffee</u> supports extending the privilege to cover Bose's communications with the two unlicensed, graduate-level interns who were supervised by licensed mental health treatment providers. The Supreme Court created the privilege in order to protect a relationship that can only flourish if the legal system recognizes and respects its "imperative need for confidence and trust." <u>Id.</u> at 10 (quoting <u>Trammel</u>, 445 U.S. at 51). "Effective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears." <u>Id.</u> Patients will be far less likely to trust a treatment provider to the extent necessary for effective treatment if they believe the information they share will be used against them. <u>Id.</u> at 10–12. This court believes that the need for confidence and trust exists regardless of whether a patient is speaking with a licensed mental health treatment provider or an unlicensed,

graduate-level intern who is supervised by a licensed treatment provider.

Furthermore, the two unlicensed interns who treated Bose provided the type of care that Jaffee sought to protect. As the Court explained, "[t]he psychotherapist privilege serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem." Id. at 11. Here, the treatment notes for the two interns demonstrate that their work was supervised by licensed treatment providers who co-signed all treatment notes and apparently were required to review any recorded treatment sessions with the interns. Further, the interns had graduate-level training in psychology and counseling. Thus, the therapist relationship and type of treatment that these two supervised, graduate-level interns provided to Bose mirrors the therapist relationship and type of treatment that Jaffee set out to preserve.

In addition, part of the reason the privilege should cover these communications is because Bose reasonably believed her treatment would be kept confidential. A patient's reasonable belief about the confidentiality of a communication is a valid consideration when determining if the privilege should apply. See United States v. Hayes, 227 F.3d 578, 587 (6th Cir. 2000) (noting it would be "grossly unfair" to deem communications

between a patient and unlicensed treatment provider not privileged where the patient had no reason to believe that the communications were unprotected); United States v. Landor, 699 F. Supp. 2d 913, 925 (E.D. Ky. 2009) (same). In this case, the circumstances of Bose's treatment indicate it was reasonable for her to believe that all of her communications over the course of her treatment would be treated as confidential, regardless of who treated her. At the start of each of her treatment periods, Bose signed informed consent forms. These forms reassured her that both her treatment sessions and her treatment file would remain confidential. These forms made no distinction between sessions with unlicensed treatment providers and sessions with licensed ones. Thus, it was reasonable for Bose to believe that all of her communications would remain confidential.

In sum, the court finds that, based on the court's application of Jaffee to the documents reviewed in camera, the psychotherapist-patient privilege applies to all of the treatment Bose received at Rhodes.[2]

### 2. Waiver of the Psychotherapist-Patient Privilege

Rhodes argues that, despite the application of the privilege, it is entitled to access Bose's mental health records

_____

[2]The issue of whether the privilege applies to communications between patients and _unsupervised_, unlicensed mental health treatment providers is not before the court. Therefore, the court does not reach this issue.

because Bose's purported history of making false reports overcomes the privilege and because she has put her mental condition at issue by seeking emotional distress damages. As to Rhodes's first point, the Supreme Court has dismissed this exact argument. In Jaffee, the Supreme Court expressly rejected a privilege balancing test utilized by the Seventh Circuit, finding that "[m]aking the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege." 518 U.S. at 17. Thus, any history Bose may have for making false reports does not render her psychotherapist-patient privilege waived.[3]

With respect to Rhodes's second point, Bose has not waived the privilege by placing her mental state at issue. In the process of defining the contours of the privilege, courts have developed "three divergent approaches" to determining if a plaintiff has waived the psychotherapist-patient privilege by "plac[ing] his psychological condition at issue." Burke v. Lawrence, No. 1:11-CV-1044, 2013 WL 2422883, at *2 (W.D. Mich.

_____

[3]The case Rhodes has cited to support its argument, Altman v. New Rochelle Public School District, is unpersuasive because it stands for a different proposition than the one Rhodes suggests. No. 13 CIV. 3253 (NSR), 2017 WL 66326, at *8–10 (S.D.N.Y. Jan. 6, 2017) (holding that evidence of a party's litigious character was inadmissible to show modus operandi since the evidence was overly prejudicial).

June 3, 2013). First, there is the broad approach, where a court finds a patient has waived her or his privilege when the patient simply "claims damages for emotional distress." Griffin v. Sanders, 914 F. Supp. 2d 864, 867–69 (E.D. Mich. 2012) (citations omitted). Then, there is the narrow approach, where a court finds a waiver of the privilege if the patient "puts a confidential communication expressly at issue as part of her case" such as when "the cause of action relies on advice or findings of the psychotherapist." Gray v. Romero, No. 113CV01473DADGSAPC, 2016 WL 6821855, at *3–4 (E.D. Cal. Nov. 17, 2016) (citations omitted). Finally, there is the middle-ground approach where a court finds waiver if a party seeks more than "garden variety emotional distress damages." See Santifer v. Inergy Auto. Sys., LLC, No. 5:15-CV-11486, 2016 WL 1305221, at *2–3 (E.D. Mich. Apr. 4, 2016) (collecting cases).

Under the middle-ground approach, courts have identified five occasions when a party claiming the privilege has asserted more than garden variety emotional distress, thereby waiving the privilege:

> (1) a tort claim is asserted for intentional
> infliction or negligent infliction of emotional
> distress; (2) an allegation of a specific mental or
> psychiatric injury or disorder is made; (3) a claim of
> unusually severe emotional distress is made; (4)
> plaintiff intends to offer expert testimony in support
> of a claim for emotional distress damages; and/or (5)
> plaintiff concedes that her mental health condition is
> in controversy within the meaning of Rule 35.

_Santifer_, 2016 WL 1305221, at *3 (quoting _Stevenson v. Stanley Bostitch_, Inc., 201 F.R.D. 551, 554 (N.D. Ga. 2001)); _Pliego v. Hayes_, 86 F. Supp. 3d 678, 691 (W.D. Ky. 2015)(listing the first four occasions); _Langenfeld v. Armstrong World Indus., Inc._, 299 F.R.D. 547, 552 (S.D. Ohio 2014) (listing all five occasions); _Johnson v. Peake_, 273 F.R.D. 411, 412 (W.D. Tenn. 2009) (listing all five occasions).

The court finds that the middle-ground approach is the appropriate test because it takes into account both the patient's privacy interests as well as circumstances in which a party in fairness should be allowed to access the patient's mental health information.[4]  At the start of this case, Rhodes had reason to argue that two of the five occasions that trigger waiver under the middle-ground approach were present.  However, Bose has since dismissed the intentional infliction of emotional distress claim.  Therefore, the only remaining basis for the

---

[4]During the phone conference on September 6, 2017, Rhodes argued that the court should not apply the garden variety approach because it has never been recognized by the Sixth Circuit and runs contrary to the holding in _Maday v. Public Libraries of Saginaw_, 480 F.3d 815 (6th Cir. 2007).  It is true that the Sixth Circuit has not addressed the application of the middle-ground approach.  However, with regard to _Maday_, that holding does not govern the outcome of this case because in _Maday_, the plaintiff put her mental state expressly at issue by introducing excerpts from her mental health records to support her emotional distress claim.  _Id._ at 820–21.  Unlike in _Maday_, Bose has expressly stated that she will not use her mental health information in this case.

waiver of the privilege would "a claim of unusually severe emotional distress."

Rhodes argued in its briefs, during the motion hearing, and during the phone conference that Bose's claims of emotional distress are especially severe and even "lurid." (ECF Nos. 84, 101, 104.) During the phone conference on September 6, 2017, Rhodes suggested that if this court reviewed the transcript from a preliminary injunction hearing on June 7, 2016, the court would hear in Bose's testimony proof that her allegations of emotional distress are more than garden variety. (ECF No. 104.) At Rhodes's suggestion, the court has reviewed all of Bose's testimony from the two-day preliminary injunction hearing that began on June 7, 2016, and finished on June 27, 2016. (ECF Nos. 40, 44.) Contrary to Rhodes's characterization of the testimony, the court has found no indication from Bose's testimony or her motions that she is claiming anything beyond garden variety emotional distress. At the hearings, Bose testified her interactions with Dr. Bea made her feel uncomfortable, intimidated, and at times afraid. (ECF No. 40 at 35, 42, 50, 51, 92, 110, 148.) Bose's statement that she is seeking damages for personal embarrassment is consistent with the general nature of her emotional distress claims. (ECF No. 80 at 3-5.) These types of generalized allegations of emotional distress are insufficient to put a party's mental state at

issue. See Ferrari v. Ford Motor Co., No. 13-CV-14857, 2014 WL 12550552, at *2 (E.D. Mich. Oct. 27, 2014) (finding that allegations of "emotional distress, outrage, and humiliation" were "garden-variety"); Johnson, 273 F.R.D. at 413 (finding that allegations of "deep pain, humiliation, anxiety, and emotional distress" were garden variety); cf. Langenfeld, 299 F.R.D. at 553 (finding emotional distress claims exceeded garden variety where "Plaintiff testified in her deposition that Defendant's conduct caused her to suffer stress and sleep deprivation that is still ongoing"). Thus, Bose has not waived her psychotherapist-patient privilege by pursuing emotional distress damages.

The court further finds that Bose did not waive the psychotherapist-patient privilege by signing three Consent and Authorization to Release Information forms. "A patient may waive the psychotherapist-patient privilege by knowingly and voluntarily relinquishing it, such as by disclosing the substance of therapy sessions to unrelated third parties." United States v. Kokoski, 435 F. App'x. 472, 476–77 (6th. Cir. 2011) (citing Hayes, 227 F.3d at 586). Two of the forms that Bose signed authorized releasing information about her attendance to Rhodes professors and one authorized releasing information about her initial evaluation and recommendations and coordination of care to Ike Solas of Campus Safety. The

disclosures that Bose allowed the counseling center to make to Rhodes professors did not amount to waiver because evidence that a patient is receiving treatment is not privileged. See In re Zuniga, 714 F.2d 632, 640 (6th Cir. 1983). The disclosure to Ike Solas of Campus Safety was not a waiver. The release was limited to her initial evaluation and recommendations and coordination of care; it excluded any progress notes, diagnoses, and treatment notes; and it expired on November 15, 2014. Based on the narrow parameters of the disclosure and the current record before the court, it does not appear that any confidential information was disclosed. Accordingly, the court finds that Bose did not waive the psychotherapist-patient privilege by disclosing information about her treatment sessions to third parties.[5] Thus, the court denies Rhodes's Motion to Compel disclosure of this information.

3. Relevance of Unprivileged Information Sought

_____

[5]The court notes that the Informed Consent forms, which Bose signed at the start of her three treatment periods, identified "several circumstances where a therapist or psychiatrist is required by law to share confidential information." However, the court finds that none of the circumstances apply to this case. The court reads the provision that Rhodes "may also disclose confidential information in the course of any judicial or administrative proceeding" to be limited to instances where Rhodes is required by law to disclose this information such as "in response to an order of a court." Otherwise, an interpretation of this language that would permit Rhodes to disclose a student's mental health information any time Rhodes is involved in litigation would be wholly inconsistent with the purpose of the consent form and Jaffee.

There is some information Rhodes seeks that is not covered by the psychotherapist-patient privilege but is nonetheless not discoverable. The specific dates when Bose received mental health treatment at Rhodes Student Counseling Center and, possibly, the contact information and identities of Bose's treatment providers are not privileged. See Zuniga, 714 F.2d at 640 (noting that the identities of patients and the dates of the treatment were not privileged); Langenfeld, 299 F.R.D. at 551-52 (noting that the identities of patients and providers and the dates of treatment were not privileged). However, this information must still be "relevant to any party's claim or defense" and not unreasonably cumulative or duplicative. Fed. R. Civ. P. 26(b)(1)-(2). It is unclear how the names and contact information of Bose's mental health care providers at Rhodes Student Counseling Center would be relevant, particularly in light of the fact that this order prohibits Rhodes from obtaining further information from the providers about Bose's treatment. As for the dates of treatment, Bose has already disclosed to Rhodes all of the time periods during which she received treatment from its counseling center, so further discovery on this point would be redundant. Thus, the court denies Rhodes's Motion to Compel disclosure of this information. For these reasons, the court denies Rhodes's Motion to Compel in its entirety.

**B.  Disclosure of Persons Responsible for Interrogatory Answers**

As an initial matter, Bose acknowledges that her Motion to Compel is untimely.  Courts have the discretion to accept a late filing when "the party failed to act because of excusable neglect."  Fed. R. Civ. P. 6(b).  The excusable-neglect determination requires balancing the following five factors: (1) prejudice to opposing party, (2) length of delay, (3) cause of delay, (4) if the late-filing party had control of delay, and (5) absence of good faith.  Nafziger v. McDermott Int'l, Inc., 467 F.3d 514, 522 (6th Cir. 2006)(citation omitted).  Here, there is no evidence that Rhodes was prejudiced by the delayed filing, which was only three days late.  The cause was an apparent misunderstanding by Bose while the parties were working toward agreed extensions of various deadlines in the scheduling order.  And, although Bose could have avoided the delay, she acted in good faith.  Thus, the court will address merits of the motion.

The information that Bose seeks in her Motion to Compel, identification of the persons who aided Rhodes in answering interrogatories, is protected by the work-product doctrine and not discoverable.  The Supreme Court adopted the work-product doctrine in Hickman v. Taylor.  329 U.S. 495, 507–511 (1947).  After recognizing that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper

litigation," the Supreme Court found that "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." Id. at 507.  Thus, the Supreme Court found that "tangible and intangible" evidence of how an attorney "sift[s] what he considers to be the relevant from irrelevant facts" fell into the privileged category of work product.  Id. at 511-12.

There are two different types of work product.  Upjohn Co. v. United States, 449 U.S. 383, 401 (1981).  The first type, opinion work product, involves "an attorney's mental impressions, opinions, conclusions, judgments, or legal theories."  In re Antitrust Grand Jury, 805 F.2d 155, 163 (6th Cir. 1986) (citations omitted).  The Sixth Circuit has found that "absent waiver, a party may not obtain the 'opinion' work product of his adversary."  In re Columbia/HCA Healthcare Corp. Billing Practices Litig., 293 F.3d 289, 294, 304-305 (6th Cir. 2002) (quoting Antitrust Grand Jury, 805 F.2d 155 at 163-64). The second type, fact work product, consists of "all other work product."  See Restatement (Third) of the Law Governing Lawyers § 87; see also Upjohn, 449 U.S. at 400.  Attorneys may obtain discovery of another party's fact work product "upon a showing of substantial need and inability to otherwise obtain [the evidence] without material hardship."  Columbia/HCA Healthcare Corp., 293 F.3d at 294 (citing Toledo Edison Co. v. G.A.

Technologies, Inc., 847 F.2d 335, 339-40 (6th Cir. 1988)).  In addition, regardless of the type of work product, the work-product doctrine does not protect underlying facts from disclosure.  Upjohn, 449 U.S. at 395.

In this case, Bose's request that Rhodes identify the persons who helped answer interrogatories is tantamount to a request for a list of individuals whom Rhodes interviewed.  Whether the identification of the persons whom a party interviewed when preparing for litigation is an underlying fact or protected work product is a source of extensive debate.  See generally United States v. All Assets Held at Bank Julius Baer & Co., Ltd., No. CV 04-798 (PLF/GMH), 2017 WL 4075154, at *3 (D.D.C. Sept. 13, 2017) (collecting cases).  Although the question is a close one, the court finds that the identification of the persons whom a party interviewed is protected work product.  See id.; Hammett v. Am. Queen Steamboat Operating Co., LLC, No. 14-CV-2540-SHL-TMP, 2015 WL 12805697, at *4 (W.D. Tenn. July 17, 2015) ("[A] party seeking the identities of individuals interviewed by opposing counsel . . . raises work product concerns.").

As discussed above, attorneys can obtain work product in certain limited circumstances, but none of those circumstances are present in this case.  There is no evidence that Rhodes waived the work-product privilege in any way.  See Columbia/HCA

Healthcare Corp., 293 F.3d at 294. Nor has Bose demonstrated significant need and undue hardship. Upjohn, 449 U.S. at 400. Thus, this court concludes that all of the information that Bose requests in her Motion to Compel is protected by the work-product doctrine and not discoverable. For these reasons, the court denies Bose's Motion to Compel.

### III. CONCLUSION

For the reasons set forth above, the court DENIES both parties' Motions to Compel.

IT IS SO ORDERED.

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

October 6, 2017
Date