**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

| | | |
|---|---|---|
| **PRIANKA BOSE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 2:16-cv-02308-JTF-tmp** |
| | ) | |
| **ROBERTO DE LA SALUD BEA** | ) | |
| **and RHODES COLLEGE,** | ) | |
| | ) | |
| **Defendants,** | ) | |

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION**
**FOR SUMMARY JUDGMENT**

---

Before the Court is Defendants' Motion for Summary Judgment.  Defendants Roberto De La Salud Bea and Rhodes College filed their Motion for Summary Judgment on December 1, 2017.  (ECF Nos. 115 & 116.)  Plaintiff Prianka Bose filed her Response in opposition to Defendants' Motion on January 4, 2018, to which Defendants submitted their Reply Brief on January 18, 2018.  (ECF Nos. 60 & 67.)  For the following reasons, the Court finds that Defendants' Motion for Summary Judgment should be GRANTED IN PART AND DENIED IN PART.

**FACTUAL BACKGROUND**

This case arises out of allegations lodged between a student and teacher of a private university and the events initiated in response to those allegations.  Plaintiff Prianka Bose is an adult presently residing in DeKalb County, Georgia.  (ECF No. 1, 1:1.)  Defendant Rhodes College is a Tennessee Public Benefit Corporation with its principal place of business in Memphis, Tennessee.  (*Id.* at 1:3.)  Defendant Roberto De La Salud Bea is an adult resident of

Shelby County, Tennessee, who worked for Defendant Rhodes at the time of the events giving rise to this action.  (ECF No. 1, 1:3–4.)

Plaintiff was a student at Rhodes College from the 2013 Fall Semester until the end of the 2015 Fall Semester.  (ECF No. 120, 1:1–2.)  In her sophomore year, Plaintiff applied for and was accepted into the Rhodes College George Washington University Early Selection Program ("GW Program").  (*Id.* at 2:4.)  Students selected to the GW Program are offered a contract with George Washington University, that, upon their satisfaction of it terms, allows them to gain automatic admission to its medical school without taking the Medical College Admission Test.  (*Id.* at 2:5.) The requirements include maintaining a 3.6 grade point average throughout their matriculation at Rhodes, achieving grades in the required science courses of not less than a B minus, and reporting any allegations of substantiated academic misconduct that arise while they attend Rhodes.  (*Id.* at 2:6.)  According to the parties, the GW Program is governed by two contracts—a 2012 Agreement and a 2012 Memorandum of Understanding ("2012 MOU").  (*Id.* at 2:7.) Under the 2012 Agreement, Defendant Rhodes is responsible for reviewing student materials relating to the above terms and submitting them to the George Washington University School of Medicine & Health Sciences ("GWSMHS") Committee for additional review.  (ECF No. 44, 128:18–25; ECF No. 116-4, 46.)

In the 2015 Spring Semester, Plaintiff took Organic Chemistry I, taught by Defendant Bea.  (ECF No. 120, 3:8.)  A couple of weeks after starting the course, Plaintiff was involved in a car accident that resulted in a concussion protocol being established for her by Rhodes.  (*Id.* at 3:9.)  The protocol gave her extra time to take tests and quizzes outside of her regular classroom. (*Id.*)  At the end of the semester, Plaintiff earned an A minus in Organic Chemistry I and had a cumulative GPA of 3.71.  (*Id.* at 3:8.)  In the 2015 Fall Semester, Plaintiff took Organic

Chemistry II, which included a lecture and laboratory component. (ECF No. 120, 3:10.) Defendant Bea taught only the lecture component. (*Id.* at 3:10.) By this time, Plaintiff was no longer on a concussion protocol. (*Id.* at 4:11.) Nonetheless, Plaintiff arranged with Defendant Bea to take some tests and quizzes in his office at a time and/or on a date earlier than the class. (*Id.* at 4:11.)

Of primary relevance here is Quiz 5. (*Id.* at 4:14–5:14.) Plaintiff took Quiz 5 two days early, on December 2, 2015, in Defendant Bea's office. (*Id.* at 6:22.) At 11:03 a.m. of the same day, Defendant Bea sent an email to two Associate Deans of Students of Rhodes College, stating that he suspected Plaintiff of cheating. (*Id.* at 7:24–8:24.) Specifically, he alleged that he drafted a fake answer key to Quiz 5 and made it accessible to Plaintiff through his office computer while she took the Quiz. (*Id.* at 7:23.) He further stated that when he checked Plaintiff's answers, he found that she submitted the same fake answers he prepared. (*Id.*) One of the Deans replied within the hour, stating the need for the Rhodes College Honor Council ("HC") to address the issue and that he could make that happen. (*Id.* at 7:24–8:24.)

The HC is composed entirely of students elected by their peers. (*Id.* at 8:25.) Rhodes provides training to the HC members at the beginning of each academic year. (*Id.* at 8:25.) On December 4, 2015, Plaintiff received an email from President of the HC, Regan Adolph, informing her that she was under investigation for cheating on multiple assignments in Organic Chemistry II. (*Id.* at 8:26.) On the same date, Plaintiff also received an email from Mitchell Trychta, the HC member assigned to investigate the allegations against Plaintiff, asking to set up a time to interview her. (*Id.* at 8:27.) Plaintiff met with Mr. Trychta on three occasions late in 2015—December 7, December 10, and December 13. (*Id.* at 8:28.)

3

A day after their first meeting, Mr. Trychta sent Plaintiff a statement summarizing the results of the interview, for review and correction, which Plaintiff verified as correct. (ECF No. 120, at 9:29–30.) After the second and third interviews, Plaintiff approved an addendum to her statement in which she was asked about Quiz 5, shown the false answer key she is alleged to have copied from, and is given an opportunity to explain her answers on Quiz 5 in detail. (*Id.* at 9:31.) Although Plaintiff told Mr. Trychta that the allegations did not make sense to her, she did not tell him that Defendant Bea made inappropriate remarks to her or otherwise suggest that he had an ulterior motive for accusing her of cheating. (*Id.* at 9:32.)

On December 14, 2015, prior to the HC hearing, Ms. Adolph emailed Plaintiff a hearing packet containing the following documents: Defendant Bea's statement and addendum to his statement; Plaintiff's statement and addendum to her statement; Quiz 5; Quiz 5 notes; the false answer key; the correct answer key, Defendant Bea's handwritten grade roster; Defendant Bea's electronic grade roster; a screen shot of Defendant Bea's computer desk top; and Defendant Bea's course syllabus for Organic Chemistry II. (*Id.* at 10:33.) The HC hearing was held on December 17, 2015, and lasted approximately five hours. (*Id.* at 10:34.) At the hearing, Plaintiff called the following witnesses: Chelsea Dezfuli (a classmate); Matthew Chapman (represented to the HC by Plaintiff as her chemistry tutor without disclosing that he was also her boyfriend); Vinay Bose (her father); and two chemistry professors found through an online chemistry tutoring service. (*Id.* at 11:35.)

All of the witnesses Plaintiff called at the HC hearing were there to address the issue of how Plaintiff could have arrived at the answers to Quiz 5 without cheating. (*Id.* at 12:36.) None were aware that there was a fake answer key until the hearing. (*Id.* at 12:36.) During her closing argument, Plaintiff made the following statement:

> I have a witness for a specific incident in the Rat where Dr. Bea came up to me and looked at my phone, which is a very personal item, and says, oh, is that your boyfriend, and proceeded to ask me a question about my boyfriend and then he just walked away . . . . Right after this incident happened, I walked up to Dr. Bea and I told him, I feel uncomfortable with you asking questions about my boyfriend. Please, let's not talk about any personal stuff anymore. And then he got angry and walked away . . . . This is not the first time that an ego-hurt professor would harm a student. And there are many instances in—at other colleges where something like this has happened.

(ECF No. 116-3, 96.)

After Plaintiff finished her closing remarks, Ms. Adolph concluded the hearing and asked Plaintiff and Defendant Bea to follow her outside. (*See* ECF No. 120, 12:37.) At that time, Plaintiff asked Ms. Adolph if she could recall Ms. Dezfuli. (*Id.* at 12:38.) She was prevented from doing so, however, because it was too late in the proceeding. (ECF No. 40, 87:11–88:10; ECF No. 116-2, 67.)

Ultimately, the HC found Plaintiff in violation of the Honor Code with respect to cheating and stealing and imposed the penalty of expulsion. (ECF No. 120, 12:39.) Plaintiff decided to appeal the HC's decision to the Faculty Appeals Committee ("FAC"). (*Id.* at 12:38.) An appeal packet, which included the HC's written response to Plaintiff's allegations, was provided to both Plaintiff and the FAC. (*Id.* at 14:41.) In early January 2016, prior to Plaintiff's FAC hearing, Plaintiff and her parents met with Ms. Shapiro, Rhodes College's Title IX Coordinator, to talk about Plaintiff's allegations against Defendant Bea. (*Id.* at 15:47.) Ms. Shapiro instructed Plaintiff to fill out a Title IX complaint form online. (*Id.* at 15:48.)

On January 16, 2016, before filing a Title IX complaint form, Plaintiff, through her counsel, submitted an appeal statement for consideration by the FAC. (*Id.* at 12:39.) This submission described Plaintiff's sexual harassment allegations against Dr. Bea as follows:

> (a) In July 2015, Plaintiff and Dr. Bea had a conversation in which he asked her "many personal questions, including where she was staying on campus, how she

was spending her evenings, whether she had friends staying with her during the summer, and how her relationship with her boyfriend was. Bea then invited [Plaintiff] to dinner with him.  Ms. Bose declined his invitation, and the conversation ended."

(b) "Bea would show up in [Plaintiff's] lab course every week.  Without being solicited by [Plaintiff], Bea would make it a point to stop by [Plaintiff's] desk, look at her work, correct any lab mistakes without being asked and speak to her prior to leaving."

(c) "Around the third week of November 2015 . . . , [Plaintiff] was sitting with a classmate in the Catherine Burrow Refectory texting on her cell phone. Dr. Bea approached [Plaintiff] from behind, leaned over her shoulder, and abruptly asked her, 'Are you texting your boyfriend?' before leaving the Refectory."

(ECF No. 120, 12:39–14:40.)

Furthermore, her submission explicitly lodged allegations of retaliation by Defendant Bea as a result of Plaintiff confronting him about the above-referenced conduct.  (*Id.* at 99–106.)

On January 28, 2016, before Plaintiff filed a Title IX complaint form, the FAC held a hearing on the matter.  (*Id.* at 14:42.)  Present were members of the FAC, Plaintiff, Plaintiff's attorneys, Rhodes College's attorney, and Dean Blaisdell.  (*Id.*)  The FAC upheld the finding of "In Violation" of the Honor Code, and remanded the case to the HC for reconsideration of the penalty only in light of new evidence Plaintiff presented at the hearing concerning lost copies of her tests in Organic Chemistry II.  (*Id.* at 14:44.)  The FAC further concluded that, even if the allegations of inappropriate behavior by Defendant Bea were valid, the evidence was adequate enough for the HC to conclude Plaintiff violated the Honor Code.  (*Id.* at 14:45.)

Shortly after the FAC Hearing, in early February 2016, Plaintiff filled out a Title IX complaint form online per Ms. Shapiro's instructions.  (*Id.* at 15:48.)  As a result, Rhodes College retained Attorney Whitney Harmon to conduct an investigation of Plaintiff's Title IX complaint.  (*Id.* at 15:49.)  Ms. Harmon interviewed Plaintiff and all of the witnesses that Plaintiff requested, including Chelsea Dezfuli, Lauren Sylwester, and Emma Barr.  Ms. Harmon also interviewed Defendant Bea and Dr. Brien (an Assistant Professor of Chemistry at Rhodes).

(ECF No. 120, 16:50.)  On April 6, 2016, Ms. Shapiro informed Plaintiff, without any form of a hearing, that "[a]fter careful review of the facts, the allegations of sexual harassment and retaliation in violation of the College's policy cannot be sustained." (*Id.* at 16:51.)

Plaintiff was later provisionally admitted to Oglethorpe University in Atlanta, Georgia, where she graduated on May 13, 2017, with a Bachelor of Arts degree in History.  (ECF No. 40, 100:16–21; ECF No. 120, 17:55.)  She currently lacks all of the prerequisites needed to apply to medical school, has not taken the MCAT, and has not applied to medical school.  (ECF No. 120, 17:55.)  She currently works as an administrative assistant for a law firm.  (*Id.* at 17:55–56.)

## LEGAL STANDARD

In evaluating a motion for summary judgment, federal courts are guided by Federal Rule of Civil Procedure 56, which provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*).  A fact is "material" if it is capable of affecting the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  Thus, summary judgment will not be granted if the nonmoving party presents specific facts, both supported by the record and admissible at trial, that would allow a reasonable jury to find in its favor.  *See* Fed. R. Civ. P. 56(c)(1); *Liberty Lobby, Inc.*, 477 U.S. at 256.

To support or oppose a motion for summary judgment, a party may rely on materials in the record, including affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(c); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 324 (1986).  The district court does not have the duty to search the record for such evidence when not explicitly cited by the parties but may, on its own accord, consider other materials in the record.  *See* Fed. R. Civ. P. 56(c)(3).  In assessing the merits of a summary judgment motion, courts must remain mindful that "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inference from the facts . . . are jury functions, not those of a judge.'"  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 255)).  Indeed, if the evidence presented, alone cannot "reasonably support a jury verdict in favor of the nonmoving party, the motion for summary judgment will be granted."  *Cox v. Kentucky DOT*, 53 F.3d 146, 150 (6th Cir. 1995).

## ANALYSIS

### Title IX Claims

The Court finds that Defendants are entitled to summary judgment on Plaintiff's Title IX claims.  In her Complaint, Plaintiff alleges that Defendant Rhodes acted with deliberate indifference to her claim of sexual harassment against Defendant Bea, and that as a result of confronting Defendant Bea, she suffered a retaliatory expulsion.  (ECF No. 1, 8:41–44.)  The Court's analysis considers her allegations as both deliberate indifference and retaliation claims.

Title IX prohibits discrimination and retaliation against those who complain of discrimination by educational institutions receiving federal education funding.  20 U.S.C. § 1681; *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005).  The two primary objectives of Title IX are to "avoid the use of federal resources to support discriminatory practices" and "provide individual citizens effective protection against those practices."  *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979).

Deliberate Indifference

The Court finds that Plaintiff's does not sufficiently state a Title IX claim for deliberate indifference. "Under the deliberate-indifference theory, a plaintiff must 'demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct.'" *Doe v. Miami Univ.*, No. 17-3396, 2018 U.S. App. LEXIS 3075, at *17 (6th Cir. Feb. 9, 2018) (quoting *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638 (6th Cir. 2003)). Moreover, "[t]he deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Thomas v. Meharry Med. Coll.*, 1 F. Supp. 3d 816, 827 (M.D. Tenn. 2014); *see also M.D. v. Bowling Green Indep. Sch. Dist.*, No. 1:15-CV-00014-GNS-HBB, 2017 U.S. Dist. LEXIS 11504, at *25 n.4 (W.D. Ky. Jan. 27, 2017), *aff'd*, 2017 U.S. App. LEXIS 19651 (6th Cir. Oct. 6, 2017).

Here, the record shows that Plaintiff did not notify Defendant Rhodes of the alleged sexual harassment until the conclusion of the hearing before the HC. As Defendants contend, Plaintiff does not provide evidence that she suffered any further sexual harassment, or risk of the same, by Defendant Bea after notifying Defendant Rhodes of Bea's alleged conduct. Moreover, the record also fails to show that, prior to the alleged conduct, Rhodes was otherwise aware that Defendant Bea had engaged in the same or similar conduct. Accordingly, Plaintiff fails to state a prima facie case for deliberate indifference under Title IX.

Retaliation

The Court additionally finds that Plaintiff fails to sufficiently state a Title IX claim for retaliation. To establish a prima facie case of retaliation under Title IX, Plaintiff must show that (1) she engaged in statutorily protected activity; (2) her exercise of rights was known to Rhodes; (3) she was subjected to the adverse action contemporaneously with, or subsequent to, the

protected activity; and (4) there is a causal connection between the protected activity and the adverse educational action. *See Thomas*, 1 F. Supp. 3d at 827. Additionally, as noted by the Supreme Court, "Congress did not intend to allow recovery in damages under Title IX where liability rests solely on principles of vicarious liability or constructive notice." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287–288 (1998) ("Title IX's express means of enforcement—by administrative agencies—operates on an assumption of actual notice to officials of the funding recipient[,]" but "[i]f a school district's liability for a teacher's sexual harassment rests on principles of constructive notice or *respondeat superior*, it will likewise be the case that the recipient of funds was unaware of the discrimination.").

Here, the Court agrees with Defendants' assertion that Plaintiff cannot demonstrate the requisite causal connection needed to show a prima facie case of retaliation. (ECF No. 116, 4; ECF No. 123, 1–2.) According to Plaintiff, a prima facie case of retaliation is present here because (1) the Court previously determined that Plaintiff has offered sufficient evidence to establish such in it its Order on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction; (2) under the "Cat's paw" theory of liability, Rhodes College is liable for its actions that served as a conduit for Defendant Bea's retaliatory motive in causing Plaintiff's expulsion; and (3) the evidence presented is sufficient to find pretext for discrimination. (ECF No. 119, 6–8, 11–13.) As Defendants note, the findings of a district court in the context of a preliminary injunction do not bind this court in subsequent proceedings. *Ford Motor Co. v. Lloyd Design Corp.*, 22 F. App'x 464, 469 (6th Cir. 2001). Thus, Plaintiff's first argument—that the Court's findings in its Order on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction now bind this Court on the present matter—is of no avail.

In addition, Defendant Bea's alleged retaliatory motive cannot be imputed to the HC because the "cat's paw" theory of liability used by Plaintiff is, in essence, based on principles of *respondeat superior* and/or constructive notice not applicable in the Title IX context.  (ECF No. 116, 11.)   Under the cat's paw theory, the discriminatory or retaliatory animus of a non-decisionmaker is imputed to a decisionmaker where the non-decisionmaker uses the decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory or retaliatory action. *Marshall v. Rawlings Co. LLC*, 854 F.3d 368, 377 (6th Cir. 2017).  In essence, the theory is an attempt to hold a decisionmaker liable, through principles of vicarious liability or constructive notice, for a decision tainted by the animus of a non-decisionmaker.  *Crews v. Paine*, 686 F. App'x 540, 546 (10th Cir. 2017); *see Waters v. City of Chicago*, 580 F.3d 575, 587 n.2 (7th Cir. 2009) ("Imputing a non-decisionmaker's motive to a[n] employer sounds a lot like *respondeat superior* liability.).  The Supreme Court, in *Gebser v. Lago Vista Indep. Sch. Dist.*, held that Title IX does not allow recovery for harms based on principles of constructive notice or *respondeat superior.*  524 U.S. at 287–288.  Here, liability for Defendant Bea's actions cannot be imputed to Defendant Rhodes because the record does not reflect that Rhodes retained actual knowledge of Bea's alleged retaliatory animus, and as the Court held in *Gebser*, theories based on constructive notice or *respondeat superior* are not available under Title IX.

Plaintiff, however, attempts to distinguish *Gebser* from this case by noting that it dealt with sexual harassment as opposed to retaliation.  (ECF No. 119, 8.)  In *Gebser*'s stead, Plaintiff cites *Moresi v. Potter*, No. 07-2758-JPM, 2012 U.S. Dist LEXIS 46363, at *58 (W.D. Tenn. Mar. 9, 2012) to argue that she brings a "conduit theory of liability" that allows for application of the cat's paw theory of liability, as opposed to one of *respondeat superior* or vicarious liability. (ECF No. 119, 8.)  In other words, according to Plaintiff, "Defendant Rhodes would not be held

liable for the actions of Defendant Bea, but instead held liable for its own actions that channeled or served as conduit for Defendant Bea's retaliatory motive in causing [Plaintiff] to be expelled." (*Id.* at 8.)  The proffered distinction, however, is unavailing.

In *Moresi*, an employee held liable their employer for its management personnel's actions, on a retaliatory discrimination allegation under Title VII.  *See Moresi*, 2012 U.S. Dist LEXIS 46363, at *41.  Although the case supports the proposition that courts look to Title VII to frame and inform their analyses under Title IX, this analogous treatment does not extend to agency principles, given textual difference between the two Titles.  *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 74–75 (1992).  As noted by the Supreme Court, "Title VII, in which the prohibition against employment discrimination runs against 'an employer,' explicitly defines 'employer' to include 'any agent,'" whereas "Title IX contains no comparable reference to an educational institution's 'agents,' and so does not expressly call for application of agency principles."  *Gebser*, 524 U.S. at 283 (citations omitted).  Even more, the caselaw relied upon by the Court in *Moresi*, admittedly held that the "conduit theory of liability" it employed "is in accord with the agency principles and policies underlying Title VII."  *See e.g.*, *Roberts v. Principi*, 283 F. App'x 325, 333 (6th Cir. 2008); *Lyle v. Cato Corp.*, 730 F. Supp. 2d 768, 782 (M.D. Tenn. 2010).

Plaintiff also cites *DeNoma v. Hamilton Cnty. Court of Common Pleas*, 626 F. App'x 101 (6th Cir. 2015) to argue that the expansive treatment of the cat's paw theory of liability in the context of § 1983 claims should result in the principle's extension to Title IX.  (ECF No. 119, 9–10.)  Specifically, Plaintiff notes that in *DeNoma*, despite the Supreme Court's express rejection of *respondeat superior* liability in § 1983 claims against the government, the Sixth Circuit held that the cat's paw liability theory was applicable to a claim brought under the Equal Protection

Clause pursuant to § 1983 because the Sixth Circuit interprets such claims consistent with those brought under Title VII. (ECF No. 119, 9–10 (quoting *DeNoma*, 626 F. App'x at 107–08).) According to Plaintiff, this Court should extend the same treatment to her Title IX retaliation claim. Plaintiff's contention, however, is misguided. The findings of the court in *DeNoma*, do not overcome the actual notice requirement and textual differences between Title IX as compared to Title VII—the reasons for which courts do not apply constructive notice or *respondeat superior* theories in the Title IX context. *Gebser*, 524 U.S. at 283; *Franklin*, 503 U.S. at 74–75. Thus, the courts' expansive application of the cat's paw theory of liability in certain § 1983 claims does not provide sufficient grounds for allowing the theory in the Title IX context. (ECF No. 119, 9.) As a result of the above determinations, the Court finds that Plaintiff fails to sufficiently state a claim under Title IX, and accordingly, Defendants are entitled to summary judgment on the matter.

## A. Breach of Contract

Choice-of-Law

This case presents a threshold choice-of-law question. A federal court sitting in diversity applies "state substantive law and federal procedural law[,]" *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427 (1996), as well as the choice-of-law rules of the forum state. *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The present matter is before the Court on federal question and diversity grounds, and this Court sits in the forum state of Tennessee. Thus, Tennessee's choice-of-law rules apply. *See Klaxon Co.*, 313 U.S. at 496–97. For claims based in contract law, "Tennessee follows the rule of *lex loci contractus*, meaning it presumes that the claims are governed by the jurisdiction in which [the contract] was executed absent a contrary intent."

*Town of Smyrna v. Mun. Gas Auth. of Ga.*, 723 F.3d 640, 645 (6th Cir. 2013). A review of the record reveals that the relevant contracts here—Rhodes College's Title IX and Nondiscrimination Handbook ("Title IX Handbook"), 2012 Agreement, 2012 MOU, and HC Constitution—do not contain choice-of-law provisions. (ECF No. 59, 17:32.) Nonetheless, as the parties concede in their arguments, the contracts were issued and delivered in Tennessee. *Id.* Thus, for purposes of this analysis, Tennessee substantive law applies.

Contract Interpretation Under Tennessee Law

"The Tennessee Supreme Court 'has not . . . enunciated the standard which should be applied in a dispute arising out of the university-student relationship.'" *Anderson v. Vanderbilt Univ.*, 450 F. App'x 500, 502 (6th Cir. 2011) (quoting *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988)). Generally, though, the relationship between a student and a private university is contractual in nature. *Id.* "Accordingly, a student may raise breach of contract claims arising from a university's alleged failure to comply with its rules governing disciplinary proceedings." *Anderson*, 450 F. App'x at 502. "In construing the terms of the implied contract, however, the Sixth Circuit assumes that Tennessee courts 'would adopt the deferential standard of reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.'" *Id.* (quoting *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988)). Ultimately, the existence of a breach is determined by whether an educational institution "substantially complied" with its own procedures or rules. *See Anderson v. Vanderbilt Univ.*, No. 3-09-0095, 2010 U.S. Dist. LEXIS 52381, at *37 (M.D. Tenn, May 27, 2010), *aff'd*, 480 F. App'x 500 (6th Cir. 2011) (per curiam). Courts must additionally remain mindful that a college or university's disciplinary committee is entitled to a presumption of honesty and integrity. *See Anderson*, 2010 WL 2196599, at *38.

14

Furthermore, just as for any breach of contract claim in Tennessee, a plaintiff must offer evidence of (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach, and (3) damages proximately resulting from the breach. *See id.* at \*29.

<u>Article IV, Section 3(A)(2)—Failure to Recuse</u>

Plaintiff asserts that Defendant Rhodes breached Article IV, Section 3(A)(2) of the HC Constitution when HC member Zain Virk failed to recuse himself from the HC Hearing, given his position as Defendant Bea's research assistant.  (ECF No. 1, 9:53.)  Article IV, Section 3(A)(2) states as follows:

> The Council must act with complete impartiality.  Any Council member who believes that his or her participation in any aspect of the investigation or hearing process constitutes a conflict of interest must report the potential conflict of interest to the HC President, who shall decide whether that member should recuse himself or herself.

HC Constitution, Article IV, Section 3(A)(2).

Under the provision, the decision of whether a particular HC member must recuse themselves from an HC hearing is left to the sound discretion of the President.  (HC Constitution, Article IV, Section 3(A)(2); *see also* ECF No. 44, 28:17–20.)  Here, the HC President is Ms. Adolph.  (ECF No. 116-4, 26.)  According to the record, Ms. Adolph asked Mr. Virk before and during the hearing if he could be impartial despite working in Defendant Bea's lab, and he told her that he believed he could be.  (ECF No. 44, 46:16–47:12.)  In her discretion, Ms. Adolph did not order his recusal.  Nothing in the record indicates that Ms. Adolph in any way abused her discretion.  Thus, Defendants are entitled to a summary judgment ruling on Plaintiff's breach of contract claim pursuant to Article IV, Section 3(A)(2).

Article IV, Section 2(F)—Hearing Process Confidentiality

Plaintiff also asserts that Defendant Rhodes breached Article IV, Section 2(F) of the HC Constitution when Defendant Bea admitted that he spoke with other chemistry professors about his allegations of Plaintiff cheating and stealing.  (ECF No. 1, 10:53.)  Article IV, Section 2(F) states, "All participants in the hearing process should keep the matter under consideration confidential."  HC Constitution, Article IV, Section 2(F).  The record reflects that before the HC Hearing, Defendant Bea discussed the circumstances surrounding Plaintiff's alleged cheating with other chemistry professors.  (ECF No. 44, 122:9–123:12.)  Specifically, Bea told Dr. Kim Brien and another professor that he believed Plaintiff was cheating and discussed with them ways to catch Plaintiff in the alleged act.  (*Id.*)  It does not reflect, however, when these conversations took place, making it unclear whether the conversations occurred prior to or during the hearing process."  Nonetheless, during the FAC Hearing, Ms. Adolph stated that Defendant Bea "was not under the oath read aloud during the hearing to keep those matters confidential" and that "[s]uch conversations between professors during a case, but not a hearing, are discouraged but do occur."  (ECF No. 116-2, 67.)  The evidence presented supports these facts.  (ECF No. 44, 122:1–123:15.)  Additionally, Plaintiff neither argues nor does the record reflect that Defendant Bea took any other similarly binding affirmation of confidentiality, before asking his colleagues about their academic public folders.  Lastly, Plaintiff does not provide how the above conversations, even if in violation of Article IV, Section 2(F), caused her injury—a necessary element of a breach of contract claim.  Accordingly, Defendants are entitled to a summary judgment ruling on Plaintiff's breach of contract claim under Article IV, Section 2(F).

Article IV, Section 3(A)(4)—Disruptive Behavior

Additionally, Plaintiff asserts that Defendant Rhodes breached Article IV, Section 3(A)(4) of the HC Constitution by allowing Defendant Bea to act aggressively throughout the HC Hearing, ultimately, inhibiting Plaintiff and her witnesses from fully testifying.  Article IV, Section 3(A)(4) states, "Disruptive behavior on the part of anyone present shall result in immediate and permanent removal from the hearing."  HC Constitution, Article IV, Section 3(A)(4).  The President of the HC, as Defendants note, presides over its hearings in accordance with Article IV, Section 3(A)(1) of the HC Constitution.  Accordingly, the question of whether to remove someone from a hearing for "disruptive behavior" is reasonably understood to be in the discretion of the President.  A reading of the HC Transcript reveals that President Adolph was aware that Defendant "Bea did get animated at times" and that she addressed his behavior by reminding him at every such instance of the need to uphold the procedures required throughout the hearing.  (ECF No. 116-4, 29.)  Ultimately, President Adolph, in her discretion, decided that removal of Defendant Bea was not warranted.  Furthermore, the HC Hearing transcript does not clearly demonstrate that Defendant Bea acted so inappropriately during the hearing that his continued presence in the proceeding was so disruptive, as to warrant removal.  Accordingly, Defendants are entitled to a summary judgment ruling on Plaintiff's breach of contract claim under Article IV, Section 3(A)(4).

Article II, Section 4—President's Impartial Participation

Next, Plaintiff asserts that Defendant Rhodes breached Article II, Section 4 of the HC Constitution when President Adolph asked questions and made comments in the hearing.  (ECF No. 1, 53.)  Specifically, Plaintiff takes issue with President Adolph's repeated question to her of whether Plaintiff believed that Defendant Bea was telling the truth throughout the hearing

process.  (*Id.*)  Plaintiff's argument is not well-taken.  Article II, Section 4 states that, [t]he President shall decide questions of procedure and interpretations arising under the Constitution[;] the President's role in the hearing and in deliberations shall be one of impartial participation, and the President shall not vote."  HC Constitution, Article II, Section 4.  Upon review of the record, the Court finds that nothing in the HC Constitution expressly prohibited the HC President from asking questions in an HC hearing.  Moreover, President Adolph's questions and comments, if not aimed at clarifying arguments and testimony or preserving the procedural integrity of the proceedings, do not demonstrate a level of impartiality or unreasonableness warranting this Court's intervention.  Accordingly, Defendants are entitled to a summary judgment ruling on Plaintiff's breach of contract claim under Article II, Section 4.

<u>Article IV, Section 2(G)—Clear and Convincing Evidence</u>

Plaintiff also argues that Defendant Rhodes breached Article IV, Section 2(G) of the HC Constitution when it found Plaintiff in violation of the Honor Code, by clear and convincing evidence, based only on Defendant Bea's testimony and the "fake" answer key created.  Plaintiff further takes issue with Ms. Adolph's refusal to allow Plaintiff to present evidence concerning Defendant Bea's alleged inappropriate conduct towards the end of the HC Hearing.  The Court finds Plaintiff's arguments unpersuasive.

Article IV, Section 2(G) states, "The Council may find the Accused 'In Violation' of the Honor Code only upon clear and convincing evidence.  'Clear and convincing evidence' is an intermediate standard of proof, greater than 'by a preponderance of evidence,' but less than 'beyond a reasonable doubt.'"  HC Constitution, Article IV, Section 2(G).  Moreover, Article IV, Section 3(A)(10) states, "The Council's findings of 'In Violation' or 'Not in Violation' shall be based only on the merits and facts of the case at hand."  HC Constitution, Article IV, Section

3(A)(10).  Here, the HC made a determination on the evidence presented before it when it credited Defendant Bea's proof over Plaintiff's and found that Defendant Bea's testimony and the "fake" answer key matching Plaintiff's answers necessitated a finding that Plaintiff violated the Honor Code by cheating and stealing.  (*See* ECF No. 44, 52:22–53:5.)  As to Ms. Adolph preventing Plaintiff from presenting evidence on Defendant Bea's alleged conduct, the Honor Council Constitution states that "the president shall decide questions concerning the relevance or admissibility of witnesses and/or evidence."   Thus, the violation by clear and convincing evidence is not so inappropriate or unreasonable as to warrant this Court's intervention.  After viewing the facts in the light most favorable to Plaintiff, the Court finds Defendants are entitled to summary judgment on Plaintiff's breach of contract claim pursuant to Article IV, Section 2(G).

Failure to Investigate

Plaintiff also asserts claims for breach of the Title IX Handbook.  Specifically, Plaintiff makes two primary arguments: (1) that Defendant Rhodes failed to investigate her claim of retaliation; and (2) that Defendant Rhodes did not afford Plaintiff the type of investigatory process contemplated by the Title IX Handbook when it precluded her from having a Formal Resolution Hearing on her retaliation claim.  (ECF No. 119, 14; *see also* ECF No. 1, 11:55–14:56.)  The Title IX Handbook states:

> Rhodes College will address allegations of sexual misconduct or harassment in a timely and effective way, provide resources as needed for affected persons . . . and not tolerate retaliation against any person who reports sex/gender discrimination or sexual misconduct.

(ECF No. 124, 4.)

The Title IX Handbook indicates that all claims will be investigated by an "investigator" and that "[d]epending on how the Claim proceeds, the investigation report(s) and the parties' responses

may be presented at a Formal Resolution Hearing and/or may be presented an Informal Resolution Conference." (*See id.* at 4:73.) Furthermore, the Title IX Handbook reads, "Once the Title IX Coordinator learns of any incident of alleged sex/gender discrimination or sexual misconduct from a Mandatory Reporter, they will initiate an investigation into the alleged incident." (ECF No. 120-1, 121.) Thus, under the plain language of the contract, Defendant Rhodes should reasonably expect students to interpret the above provisions to mean that Rhodes has a contractual obligation to investigate all Title IX allegations it receives.

Defendants first contend that Plaintiff waived her breach of contract claim alleging a failure to investigate because she failed to properly plead her claim. (ECF No. 123, 4.) The Court cannot agree. It is not proper for this Court to assume facts Plaintiff has not pleaded. *Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). Thus, Plaintiff's "[C]omplaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993). Here, Defendant Rhodes has a contractual obligation to investigate all Title IX allegations it receives, including those concerning retaliation. In her Complaint, Plaintiff alleges that Defendant Rhodes failed to follow the proper methodology for addressing her Title IX allegations, citing various provisions of the Title IX Handbook, including one that states, "A Claim investigation will be conducted by an Investigator . . . ." (ECF No. 1, 12:55.) As it relates to this provision, Plaintiff cites facts tending to show that a Title IX investigation never occurred because Plaintiff was prevented from presenting witness testimony or allegations of retaliation to the HC and FAC and that her allegations were never investigated by the HC, FAC, or Ms. Harmon. (*Id.* at 6:27–7:39, 9:53–14:56.) Thus, Plaintiff's Complaint, at

least by inference, sufficiently states a claim for breach of contract under the Title IX Handbook for Defendant Rhode's failure to investigate her retaliation claim.

Defendants next contend that even if Plaintiff did not waive her "failure to investigate" claim, the allegation cannot survive summary judgment because Defendants substantially complied with the relevant contract(s).  (ECF No. 116, 19.)  Specifically, Defendants contend that Plaintiff cannot escape the fact that she received two full and fair opportunities in front of the HC and the FAC to allege that Defendant Bea's conduct was retaliatory, opportunities of which she took full advantage of.  (*Id.* at 18–19.)  The Court cannot agree.

The Court finds that summary judgment in favor of Defendants is not appropriate on Plaintiff's failure to investigate claim due to material disputes of fact in the record.  For purposes of this analysis, the Court again notes that the Title IX Handbook reasonably reads that Defendant Rhodes will investigate a student's Title IX allegation of retaliation.  Thus, the point at which Plaintiff made a Title IX retaliation claim, if at all, is relevant to a summary judgment determination on the issue.  Here, the record reflects that Plaintiff's Title IX complaint form, which explicitly triggers Defendant Rhodes contractual obligation to complete a Title IX Investigation, was not filed at the time of the HC Hearing. (ECF No. 120, 11:34, 15:48.)

It was not until her closing statement before the HC that Plaintiff first made Defendant Rhodes aware of alleged inappropriate occurrences between Defendant Bea and herself and attempted to present proof on the matter as it relates to allegations of retaliation.  (ECF No. 116-2, 67; ECF No. 116-4, 31.)  However, she was prevented from doing so because it was too late in the proceeding.  (ECF No. 116-2, 67.)  Despite this, Defendants contend that Plaintiff could have presented her retaliation claim to the HC, and thus, the HC Hearing satisfied Rhodes contractual obligation to conduct a Title IX Investigation.  (ECF No. 123, 4.)  That argument, however, is of

no avail because Defendant Rhodes has a contractual obligation to investigate all Title IX retaliation claims when made.  The opportunity to present a claim and the implementation and sufficiency of an investigation brought upon the submission of such a claim, are not the same inquiries.  Here, by the HC's own admission, it did not consider Plaintiff's allegation of Defendant Bea's inappropriate conduct, which serves as the basis of her retaliation claim, as evidence in making its determination.  (ECF No. 44, 52:2–18.)  Thus, summary judgment on Plaintiff's failure to investigate claim, as a result of the HC Hearing, is not appropriate.

Moreover, the Court finds that summary judgment in favor of Defendants, on Plaintiff's failure to investigate claim, is not appropriate based on the FAC Hearing.  To be certain, Plaintiff presented her retaliation claim to the FAC in writing and attempted to do so at the FAC Hearing. (ECF No. 116-3, 40–47, 96–97).  The FAC, by its own admission however, simply addressed the "In Violation" determination by the HC, without determining the validity or effect of Plaintiff's allegations regarding Defendant Bea.  (ECF No. 40, 178:18–180:1; ECF No. 120, 14:44.) Specifically, the FAC concluded that, even if the allegations of inappropriate behavior by Defendant Bea were valid, the evidence was adequate enough for the HC to conclude Plaintiff violated the Honor Code.  (ECF No. 120, 14:45.)  Thus, the FAC concluded that even if Defendant Bea retained a retaliatory motive in reporting Plaintiff to the HC, the evidence still showed that Plaintiff violated the Honor Code by cheating and stealing.  Defendants contend that such constitutes substantial compliance with their contractual obligations.  The Court disagrees.

As the FAC and Plaintiff submit, the above-referenced finding by the FAC focuses purely on whether Plaintiff violated the Honor Code, not whether Defendant Bea retaliated against Plaintiff.  (ECF No. 1, 6:33.)  At no time did the FAC discuss the substance of Plaintiff's Title IX retaliation claims with her but merely discussed why she did not present proof on the

allegations during the HC Hearing.  (*See e.g.*, ECF No. 116-4, 31.)  This conclusion is bolstered by the FAC's determination that the only new evidence presented to it concerned Plaintiff's lost copies of her Organic Chemistry II tests.  Perhaps more importantly, Plaintiff's retaliation claim, as pleaded, requires consideration of the inappropriate occurrences allegedly committed by Defendant Bea.  The Court finds this significant in that the retaliatory motive allegedly held by Defendant Bea, under Plaintiff's theory of the case, would tend to negate the likelihood that Plaintiff cheated, in direct opposition to the HC's findings.  Thus, for the reasons above, a reasonable jury could conclude that Defendant Rhodes did not investigate Plaintiff's Title IX retaliation allegation or substantially comply with it investigatory obligations through the FAC.

A summary judgment finding in favor of Defendants, based on Ms. Harmon's investigation, is also not appropriate.  After Plaintiff filed her Title IX complaint form, Ms. Harmon was hired to investigate Plaintiff's allegations therein.  (ECF No. 120, 15:49.)  There is a discrepancy, however, as to whether Plaintiff actually presented her Title IX retaliation claim to Ms. Harmon, despite Defendant Rhodes' knowledge of the allegations at the commencement of her investigation.  Indeed, Defendants dispute whether Plaintiff ever presented the retaliation claim to Ms. Harmon, despite Harmon's finding that Plaintiff's retaliation claim was unsubstantiated, (*id.* at 15:49–16:52), while Plaintiff contends that Harmon, though presented with both Plaintiff's harassment and retaliation claim, only investigated Plaintiff's harassment claim.  (*Id.* at 16:52–17:53.)   Although Harmon's investigation and determinations were allegedly transcribed or otherwise documented the record is void of any such material.  Whether Plaintiff presented her retaliation claim to Harmon, whether Harmon's investigation included consideration of Plaintiff's retaliation allegations, and the extent of the investigation as it relates to the allegations, are all material facts necessary to the determination of whether Defendant

Rhodes breached its obligation to investigate Plaintiff's Title IX retaliation claim. Since the answers to these inquiries are disputed and not otherwise evident from the record, the Court cannot find that Defendants, through Ms. Harmon, satisfied or substantially complied with its obligation to investigate all Title IX claims.

To the extent Defendants allege that Plaintiff's breach of contract claim for failure to investigate is lacking because Plaintiff did not adequately allege damages, the Court disagrees. Specifically, Defendants argue that Plaintiff's alleged damages as a result of her expulsion from Rhodes fails because she was already expelled from Rhodes College at the time the above-referenced "investigations" occurred. (ECF No. 116, 20.) However, this line of reasoning fails to consider the inverse relationship alleged by Plaintiff concerning the Honor Code violation found by Rhodes and Plaintiff's theory for her retaliation claim. If Defendant Bea retaliated against Plaintiff, that retaliation may include the fabrication of evidence tending to show Plaintiff cheated, which would tend to negate the validity of the evidence used to find Plaintiff guilty of cheating and stealing in violation of the Honor Code. Thus, if no "investigation" occurred, then the validity of Plaintiff's Honor Code violation, and resulting expulsion, is questionable. *Poynter v. GMC,* No.: 3:06-CV-226, 2007 U.S. Dist. LEXIS 83542, at *8–9 (E.D. Tenn. Nov. 9, 2007); *Kindred v. Nat'l College of Bus. & Tech., Inc.*, 2015 Tenn. App. LEXIS 124, at * 19–20 (Tenn. Ct. App. Mar. 19, 2015). That, after all, is Plaintiff's theory of liability. Accordingly, under Plaintiff's theory of the case, the existence of damages is not speculative here. *Poynter v. GMC*, 2007 U.S. Dist. LEXIS 83542, at *9. For these reasons, this Court denies Defendants' summary judgment request on Plaintiff's breach of contract claim for failure to investigate her Title IX allegation.

<u>Failure to Hold Formal Resolution Hearing</u>

Plaintiff also claims that Defendant Rhodes breached the Title IX Handbook when it did not permit her "to present her claims within the context of a Formal Resolution Hearing.  (ECF No. 1, 13:55; ECF No. 119, 14–15.)  The Title IX Handbook states, "A Claim investigation will be conducted by an Investigator . . . .  Depending on how the Claim proceeds, the investigation report(s) and the parties' responses may be presented at a Formal Resolution Hearing and/or may be presented at an Informal Resolution Conference."  (ECF No. 120-1, 129–30.)

Under the plain language of the Title IX Handbook, Defendant Rhodes should not reasonably expect its students to conclude that a Formal Resolution Hearing and/or Informal Resolution Hearing is guaranteed by the filing and investigation of a Claim.  Indeed, such a hearing depends on how the Claim proceeds.  Thus, Defendant Rhodes' failure to provide Plaintiff a Title IX Hearing does not constitute a breach of the Title IX Handbook.  Defendants are accordingly entitled to summary judgment on the issue.

**Intentional Interference with Business Relations**

Defendants argue that summary judgment should be granted in their favor on Plaintiff's claim that each Defendant here tortuously interfered with business relations.  Specifically, Plaintiff alleges that Defendant Bea interfered with the contractual and business relations between Rhodes and Plaintiff, negatively affecting her ability to pursue her education, (ECF No. 1, 18:92–18:96; ECF No. 119, 16), and that Defendant Rhodes interfered with Plaintiff's contractual relationship with GWSMHS.  (ECF No. 1, 15:65–71.)  To establish a claim for intentional interference with a business relationship, Plaintiff must show the following:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the

breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Amer., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (citations omitted); *see also Lick Branch Unit, LLC v. Reed*, No. 3:13-cv-203, 2014 U.S. Dist. LEXIS 16259, at *43–44 (E.D. Tenn. Feb. 10, 2014.)

As noted by the Sixth Circuit, this tort is limited to business relations that are not the product of an existing contract. *See Crouch v. Pepperidge Farm, Inc.*, 424 F. App'x 456, 461 (6th Cir. 2011). Moreover, a claim for tortious interference, generally, cannot proceed when the purportedly tortious conduct involves the exercise of a contractual right by the alleged tortfeasor. *Franklin Tractor Sales v. New Holland N. Am.*, 106 F. App'x 342, 347 (6th Cir. 2004).

Here, Defendants argue that the Court should grant summary judgment in their favor on Plaintiff's claim that Defendant Bea interfered with Plaintiff's business relationship with Rhodes because the relationship between Plaintiff and Rhodes was contractual in nature. (ECF No. 116, 22.) Defendants also contend that summary judgment should be granted on Plaintiff's claim that Defendant Rhodes interfered with Plaintiff's business relationship with GWSMHS because (1) the conduct of Defendants that Plaintiff takes issue with was in accordance with Defendant Rhodes' contractual rights, and (2) as a party to the GW Contract and MOU agreement, GWSMHS is not capable of tortuously interfering with its own contract or business relationships. (ECF No. 116, 23–24.) Plaintiff responds that Defendants are misguided, citing *Trau-Med of Amer., Inc.*, 71 S.W.3d at 701 and *Tennison Bros. v. Thomas*, No. W2016-00795-COA-R3-CV, 2017 Tenn. App. LEXIS 802 at *28–29 (Tenn. Ct. App. Dec. 15, 2017) to argue, in part, that Tennessee law allows the claim to proceed on the existence of a prospective contractual relationship.

Plaintiff and Defendant Rhodes

As to the alleged interference by Defendant Bea, the Court finds that Defendants are entitled to summary judgment on the issue. Plaintiff asserts the existence of contractual and business relations between Defendant Rhodes and herself. Generally, under Tennessee law, the relationship between a university and its student is contractual in nature. *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988); *see also Corso v. Creighton Univ.*, 731 F.2d 529, 531 (8th Cir. 1984). As noted by Defendants, the tort of intentional interference with business relations protects non-contractual business relationships. Here, however, Plaintiff does not reference any particular business relations with Defendant Rhodes that is not governed by an existing contract. Thus, Plaintiff's intentional interference with business relations claim against Defendant Bea fails to sufficiently state a claim, entitling Defendants to summary judgment on the claim.

Plaintiff and GWSMHS

As to Plaintiff's allegation that Defendant Rhodes intentionally interfered with Plaintiff's prospective contractual relationship with GWSMHS, the Court finds that Defendants are not entitled to summary judgment on the claim. In her Complaint, Plaintiff states that she "was accepted on an early admission basis to [GWSMHS] and had an ongoing contractual relationship with [GWSMHS]" that Defendant Rhodes interfered with by publicizing to GWSMHS that Plaintiff was involuntarily withdrawn from Rhodes. (ECF No. 1, 15:66–71.) To be certain, however, Plaintiff's relationship with GWSMHS also concerned prospective contractual or business relations because Plaintiff had not yet accepted her admission to GWSMHS by matriculating as a student. (ECF No. 120, 2:5 (noting that satisfaction of the GW contract terms allows Plaintiff to gain admission to its medical school—a wholly separate prospective business

relationship).)  To the extent Defendant Rhodes contends that it is incapable of tortuously interfering with its own contract or business relations, the above determination renders the argument moot.  Here, Plaintiff does not allege interference with a contract Defendant Rhodes is a party to but rather alleges interference with her prospective relations with GWSMHS as a matriculated medical student.  Thus, contrary to Defendants' contention, Plaintiff does not bring the tort based solely on a formally-existing contract but a prospective one.  *See Clear Water Partners, LLC v. Benson*, No. E2016-00442-COA-R3-CV, 2017 Tenn. App. LEXIS 4, at *21–22 (Tenn. Ct. App. May 12, 2016).

Defendant Rhodes additionally submits that it is entitled to summary judgment because it is incapable of committing the instant tort as a result of fulfilling its contractual obligation under the GW Contract to submit certain information to GWSMHS.  Although it is true that conduct allowed for under a contract may be privileged, and thus not subject to the tort of intentional interference with business relations, such may not be the case where, as here, the plaintiff alleges that the contract forbade such actions.  *Franklin Tractor Sales*, 106 F. App'x at 347.  Here, Plaintiff takes issue with Defendant Rhodes publicizing the Honor Code findings without first investigating Plaintiff's allegations against Defendant Bea, as a matter of its contractual obligations.  (*See* ECF No. 1, 15:68.)  Thus, Defendants' instant argument fails.

As to the other elements of an intentional interference with business relations claim, the Court finds that Plaintiff's pleadings sufficiently satisfy each.  Here, Defendant Rhodes retained knowledge of Plaintiff's prospective relationship with GWSMHS by virtue of the GW contract. (ECF No. 120, 2:5 (noting that satisfaction of the GW contract terms allows Plaintiff to gain admission to its medical school).)  As to the third element, Plaintiff sufficiently pleaded that Rhodes intended to terminate her prospective contractual/business relationship with GWSMHS

by reporting the HC's findings because it knew, by virtue of the GW Contract, that such would result in termination of any such relations.  Moreover, Plaintiff sufficiently pleaded an improper motive or means on Defendant Rhode's part.   "Improper interference", for purposes of an intentional interference with business relations claim, may occur through a breach of a fiduciary relationship, methods that violate an established standard of a trade or profession, or otherwise unethical conduct.  *See Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).  Here, in the least, Plaintiff sufficiently alleges that Defendant Rhodes' failure to investigate Defendant Bea's alleged conduct before reporting the Honor Code violation constituted a breach of Rhodes duty to investigate her retaliation allegations.  Lastly, contrary to Defendants' assertions, Plaintiff's alleged damages are not impermissibly speculative for the same reasons articulated in the Court's consideration of Plaintiff's breach of contract claim for failure to investigate.  *See Poynter v. GMC*, 2007 U.S. Dist. LEXIS 83542, at *9.  For these reasons, Defendants are not entitled to summary judgment on Plaintiff's intentional interference with business relations claim against Defendant Rhodes.

**Negligent Failure to Train or Supervise**

In her Complaint, Plaintiff contends that Defendant Rhodes "failed to adequately train and/or supervise its employees and agents with regard to and in accordance with its own internal policies and procedures and applicable state and federal law."  (ECF No. 1, 16:75.)  Defendants submit, however, that this Court should grant summary judgment in their favor on the claim because Plaintiff has abandoned it.  "A plaintiff in Tennessee may recover for negligent hiring, supervision or retention of an employee if he or she establishes, in addition to the elements of a negligence claim, that the employer had knowledge of the employee's unfitness for the job." *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 56 (Tenn. Ct. App. 2013).  A negligence claim

requires that the following elements are met: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *Freeman v. Wal-Mart Stores E., LP*, 781 F. Supp. 2d 661, 669 (E.D. Tenn. 2011).

In the instant matter, Plaintiff has failed to identify any agent or employee whom Defendant Rhodes allegedly failed to properly train or supervise, or that Rhodes had knowledge of any particular employee's unfitness for the job. *Brown*, 428 S.W.3d at 56. The record is void of evidence tending to show that Defendant Rhodes should have foreseen that Defendant Bea, the HC, the FAC, or Ms. Harmon, were unfit for their jobs. Plaintiff also fails to allege how any particular agent or employee's training was deficient. *See Freeman v. Wal-Mart Stores East, LP*, 781 F. Supp. 2d 661, 670 (E.D. Tenn. 2011). As a result, Defendants are entitled to summary judgment on Plaintiff's negligent failure to train or supervise claim.

**Tennessee Consumer Protection Act**

Lastly, Plaintiff brings a claim against Defendant Rhodes for false and misleading representations in violation of the Tennessee Consumer Protection Act ("TCPA"). The specific representation Plaintiff takes issue with reads as follows:

> Rhodes College is committed to providing a working, educational, social, and residential environment for all members of our College community, including all faculty, staff, and students, that is free from any form of sexual misconduct including harassment and assault. Sexually abusive behavior is harmful to both the learning environment and the sense of community the college is trying to foster among students, faculty, staff, and administrators. This policy aims to maintain a consistent, compassionate, campus-wide mechanism for assisting Rhodes students who have been sexually assaulted or harassed by a Rhodes student or employee regardless of where or when the incident occurred.

(ECF No. 1, 16:78–17:81.)

In order to recover under the TCPA, a plaintiff must show "(1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused  an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated." *Humphreys v. Bank of Am.*, No. 11-2514-STA-tmp, 2013 U.S. Dist. LEXIS 67451, at *39–40 (W.D. Tenn. May 10, 2013) (quoting *Pagliara v. Johnston Barton Proctor & Rose, LLP*, 708 F.3d 813, 819 (6th Cir. 2013)).  The Tennessee Supreme Court has recognized that a deceptive act or practice is a material representation, practice or omission likely to mislead a reasonable consumer.  *Id.* at *40 (quotation omitted).  An unfair practice is one that causes or is likely to cause a substantial injury to consumers which is neither reasonably avoidable by consumers themselves nor outweighed by countervailing benefits to consumers or to competition.  *Id.*

The Court finds, as Defendants contend, that the advertisement referenced by Plaintiff concerning the general character and quality of commitment by Defendant Rhodes' regarding its premises is opinion set forth generally, more like "puffing" or an aspirational statement that does not give rise to liability under the TCPA.  Maverick Group Mktg. v. Worx Envtl. Prods., 659 F. App'x 301, 303 (6th Cir. 2012); *see Wendy's of Bowling Green, Inc. v. Marsh USA, Inc.*, No. 3-10-1043, 2012 U.S. Dist. LEXIS 13075, at *15 (M.D. Tenn. Feb. 3, 2012); *see also Leonard v. Abbott Labs., Inc.*, 10-CV-4676(ADS)(WDW), 2012 U.S. Dist. LEXIS 30608, at *58–61 (E.D.N.Y. Mar. 5, 2012).  Indeed, the statements that Defendant Rhodes' is "committed" to providing environments free from any sexual misconduct and "aims" to provide a campus-wide mechanism for assisting those sexually assaulted or harassed, are akin to loose general statements made by a seller in commending their products or services.  *Wendy's of Bowling*

*Green, Inc.*, 2012 U.S. Dist. LEXIS 13075, at *15 n.11.   Thus, Defendants are entitled to summary judgment on Plaintiff's TCPA claim.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.   Summary judgment is **GRANTED** as to Plaintiff's Title IX claims, **GRANTED** as to Plaintiff's Breach of Contract claims under the HC Constitution, **DENIED** as to Plaintiff's Breach of Contract claim under the Title IX Handbook for failure to investigate her retaliation claim, **GRANTED** as to Plaintiff's Breach of Contract claim under the Title IX Handbook for failure to provide a Formal Resolution Hearing, **GRANTED** as to Plaintiff's Intentional Interference with Business Relations claim against Defendant Bea, **DENIED** as to Plaintiff's Intentional Interference with Business Relations claim against Defendant Rhodes, and **GRANTED** as to Plaintiff's TCPA claim.


**IT IS SO ORDERED** this 27th day of February 2018.


*s/John T. Fowlkes, Jr.*
JOHN T. FOWLKES, JR.
United States District Judge